IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| HANOVER LLOYDS INSURANCE COMPANY, and UNITED FIRE & CASUALTY COMPANY, | § § § § | |
| *Plaintiffs,* | § § | Civil Action No. EP-22-cv-162-FM |
| v. | § § | |
| DONEGAL MUTUAL INSURANCE COMPANY d/b/a MOUNTAIN STATES INSURANCE GROUP, | § § § § | |
| *Defendant.* | § § § | |

**PLAINTIFFS HANOVER LLOYDS INSURANCE COMPANY'S AND
UNITED FIRE & CASUALTY COMPANY'S FIRST AMENDED COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

**COME NOW**, Plaintiffs, HANOVER LLOYDS INSURANCE COMPANY ("Hanover") and UNITED FIRE & CASUALTY COMPANY ("United Fire") (collectively, referred herein as "Plaintiffs") and files this First Amended Complaint against, Defendant, MOUNTAIN STATES INSURANCE GROUP d/b/a MOUNTAIN STATES COMMERCIAL INSURANCE COMPANY ("Mountain" or "Defendant") pursuant to Rule 57 of the FEDERAL RULES OF CIVIL PROCEDURE, the FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, *et seq.*, and Texas Civil Practice and Remedies Code § 38.001, *et seq.*, and in support thereof would respectfully show the Court as follows:

**I.**
**STATEMENT OF THE CASE**

1.      This is an insurance coverage dispute, where Plaintiffs Hanover and United Fire complied with their respective obligations to their mutual insured Texas Electrical Contractors, LLC ("TEC") and provided a defense and indemnity to TEC in connection with the *underlying* lawsuit (defined below). However, TEC was also insured by Defendant Mountain, and Mountain improperly refused to honor its obligation to defend and/or indemnify TEC in connection with the *underlying* lawsuit. Therefore, by the instant proceeding, Plaintiffs Hanover and United Fire seek a judicial declaration from this Court that Defendant Mountain owed a defense and indemnity obligation to its insured, TEC, in connection with the *underlying* lawsuit and, as a result, Mountain owes a duty to pay part of the amounts incurred by Plaintiffs Hanover and United Fire in the defense and indemnity of TEC in connection with the *underlying* lawsuit.

2.      By way of an executed Assignment of Rights, TEC assigned all claims and/or causes of action it possessed against Defendant Mountain to Plaintiffs Hanover and United Fire. Defendant Mountain breached its contractual obligations to TEC pursuant to the Mountain policies (defined below) by its refusal to pay or reimburse any amount paid for TEC's defense and indemnity in connection with the *underlying* lawsuit. As a result of Mountain's breach of its contractual obligations, TEC incurred defense costs and other expenses, which were paid by Plaintiffs Hanover and United Fire on behalf of TEC.

3.      In addition, Hanover and United Fire have rights of contractual and equitable subrogation against Mountain for Defendant Mountain's failure to assume the defense and indemnity of TEC and/or to pay its fair share of defense and indemnity costs in the *underlying* lawsuit. Because Defendant Mountain breached its contractual obligations to TEC in connection with the *underlying* lawsuit and as contractual and equitable subrogees of TEC, Plaintiffs Hanover and United Fire are entitled to recovery of all attorneys' fees and costs incurred in bringing this action against Defendant Mountain.

## II.
## PARTIES

### Plaintiffs

4.      Plaintiff Hanover is an insurance company duly organized and existing under the laws of the State of Texas, maintains its principal place of business in Worcester, Massachusetts, and is authorized to do business in Texas.

5.      Plaintiff United Fire is an insurance company duly organized and existing under the laws of the State of Iowa, maintains its principal place of business in Cedar Rapids, Iowa and is authorized to do business in Texas.

### Defendant

6.      Defendant Donegal Mutual Insurance Company d/b/a Mountain States Insurance Group is an insurance company organized and existing under the laws of the State of Pennsylvania, maintains its principal place of business in Marietta, Lancaster

County, Pennsylvania. Mountain is an insurance company that does business in the State of Texas. Mountain has made an appearance in this lawsuit.

**III.**
**JURISDICTION AND VENUE**

7.      This is an action for declaratory judgment pursuant to the FEDERAL DECLARATORY JUDGMENT ACT 28 U.S.C. §§ 2201 *et seq.* and Rule 57 of the FEDERAL RULES OF CIVIL PROCEDURE, for the purpose of determining questions of actual controversy between the parties as more fully set forth below. The jurisdiction of this Court is proper under based upon complete diversity of citizenship between the Plaintiffs and Defendant Mountain, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Thus, this Court has jurisdiction over this dispute.

8.      Specifically, the amount in controversy in this action is that amount which Mountain owes as its proper share of the defense costs and indemnity costs paid by Plaintiffs Hanover and United Fire in the defense of TEC in the lawsuit styled, *6330 Montana, LLC v. Jordan Foster Construction, LLC, et al.*, Cause No.: 2017DCV3746, filed in the County Court at Law No. 3, El Paso County, Texas ("the *underlying* lawsuit"). In addition, Plaintiffs Hanover and United Fire seek an award of their attorneys' fees (as well as costs) in this action.

9.      Venue is properly maintained in the El Paso Division of the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the *underlying* lawsuit occurred within the El Paso Division's jurisdictional boundary. The *underlying* lawsuit, as to which Plaintiffs Hanover and

United Fire seek a declaration regarding Defendant Mountain's duty to defend and/or indemnify TEC, was filed in the County Court at Law No. 3, El Paso County, Texas. As stated above, TEC is Defendant Mountain's insured and was named as a third-party defendant in the *underlying* lawsuit. Thus, the obligation to both defend and/or indemnify TEC in connection with the allegations against it in the *underlying* lawsuit falls within the El Paso Division of the Western District of Texas. Therefore, venue is proper in the El Paso Division of the Western District of Texas.

10.    A present controversy of a justiciable nature exists between Plaintiffs Hanover and United Fire and Defendant Mountain as to Mountain's obligation to defend and/or indemnify the insured TEC in connection with the *underlying* lawsuit. Upon information and belief, all persons having an interest in the outcome of this litigation have been joined as parties, and Plaintiffs Hanover and United Fire or Defendant Mountain have not sought, by any other legal action, to adjudicate their respective rights, if any, involving the policies at issue.

### IV.
### FACTUAL BACKGROUND

**The Insurance Policies**

    *i.    The Mountain Policies*

11.    Defendant Mountain provided insurance to TEC and has identified two CGL policies providing insurance to TEC. Specifically, Mountain has identified CGL policy no. CPT9241885 to TEC with effective dates of September 8, 2019 to September 8,

2020, which was subsequently renewed for the September 8, 2020 to September 8, 2021 policy period (the "Mountain policies").

12.    Upon information and belief, the Mountain policies contain CGL Coverage form CG 00 01 12/07, which provides liability coverage pursuant to Coverage A. The insuring agreement in the Mountain policies provides, in relevant part, as follows:

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
1.    Insuring Agreement
    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply
    ....
    b.    This insurance applies to "bodily injury" and "property damage" only if:
        (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
        (2)    The "bodily injury" or "property damage" occurs during the policy period; and
        (3)    Prior to the policy period, no insured listed under Paragraph 1. Of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

13.    Moreover, upon information and belief, the Mountain policies define property damage" to mean "physical injury to tangible property, including all resulting loss of use of that property [and] [a]ll such loss of use shall be deemed to occur at the time of the physical injury that caused it". The term "property damage" is also defined to include "loss of use of tangible property that is not physically injured [and] [a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it". "Occurrence"

is defined to mean an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14.    Further, by way of correspondence dated March 31, 2021, July 16, 2021, and November 23, 2021, respectively, Mountain repeatedly improperly denied its obligation to provide a defense and indemnity to its insured, TEC, pursuant to the express terms of the Mountain policies.

    *ii.*    *The Hanover Policies*

15.    Hanover issued commercial general liability ("CGL") policy no. ZLD D358441 00 to Texas Electrical Contractors LLC (*i.e.*, TEC) with effective dates of September 8, 2017 to September 8, 2018, which was subsequently renewed for the September 8, 2018 to September 8, 2019 policy period (the "Hanover policies"). The Hanover policies contain CGL Coverage form CG 00 01 04 13.[1] Hanover provided a defense and indemnity to TEC in the *underlying* lawsuit (defined below), pursuant to a reservation of rights.

    *iii.*    *The United Fire Policies*

16.    United Fire issued CGL policy no. 85317669 to Texas Electrical Contractors, LLC (*i.e.*, TEC) with effective dates of September 8, 2014 to September 8, 2015, which was subsequently renewed for the September 8, 2015 to September 8, 2016 and September 8, 2016 to September 8, 2017 policy periods (the "United Fire policies"). The United Fire

---

[1] With respect to the issues presented in this lawsuit, form CG 00 01 04 13 contains the same pertinent language as provided in form CG 00 01 12 07 contained in the Mountain policies.

policies contain CGL Coverage forms CG 00 01 12 07 and CG 00 01 04 13.[2] United Fire also provided a defense and indemnity to TEC in the *underlying* lawsuit (defined below), pursuant to a reservation of rights.

**The Subcontract**

17.    The Project at issue in the *underlying* lawsuit involved the construction of a two-story auto sales and service facility for the Dick Poe Toyota Dealership Facility located at 6330 Montana Avenue, El Paso, Texas 79925 ("the Project"). The Project was later sold and 6330 Montana, LLC ("6330 Montana") became the subsequent owner. Moreover, Jordan Foster Construction, LLC ("JFC") was the general contractor on the Project.

18.    JFC and TEC entered into a subcontract agreement dated December 10, 2014 ("the subcontract") in connection with the Project. As discussed below, a copy of the subcontract is attached as "Exhibit F" to JFC's third-party petition filed in the *underlying* lawsuit. The subcontract provides that TEC's scope of work included, in relevant part, the installation of electrical and fire alarm systems, among other work, as well as the following:

> 2.4.    [TEC] shall furnish and install electrical, systems complete and functional in accordance with the plans and specifications.
>
> 2.5.    [TEC] shall be responsible for excavating and backfilling the underground lines in the scope of work in accordance with the plans and specifications.
>
> ….
>
> 2.9.    [TEC] shall conduct a full checkout and testing of the equipment and submit a report of the results for this complete scope of work.

---

[2] Form CG 00 01 12 07 and CG 00 01 04 13 contains the same pertinent language as provided in form CG 00 01 12 07 contained in the Mountain policies

2.10.    [TEC] shall assist the concrete subcontractor in laying out all Electrical imbeds and penetrations in the concrete subcontractor's scope of work.

2.11.    [TEC] shall furnish and install fire-stopping at all Electrical penetrations through fire-rated floors and wall partitions in accordance with the plans and specifications.

2.12.    [TEC] shall furnish and layout sleeves for all Electrical penetrations through other trades' work.

2.13.    [TEC] shall furnish and install all aerial, underground and above ground electrical routing to connect service equipment to point of connection at the building and to the EPEC transformer including but not limited to conduit rises, layout verification, excavation, backfill and compaction in accordance with the plans and specifications.

**The *Underlying* Lawsuit**

19.    6330 Montana initiated the lawsuit styled, *6330 Montana, LLC v. Jordan Foster Construction, et. al.*, Cause No. 2017DCV3746, in County Court at Law No. 3, El Paso County, Texas (*i.e.*, the *underlying* lawsuit) on October 26, 2017.

20.    On December 1, 2020, JFC, defendant in the *underlying* lawsuit, filed its Third-Party Petition, naming TEC, for the first time, as not only a third-party defendant, but as a party in general with respect to the *underlying* lawsuit.[3] The Third-Party Petition was filed during the inception of the **_second_** Mountain policy issued to TEC (*i.e.*, September 8, 2020 to September 8, 2021). A copy of JFC's Third-Party Petition ("the third-party petition") filed in the *underlying* lawsuit (with attached exhibits, including Plaintiff's Second Amended Petition and the subcontract) are attached hereto as Exhibit "1".[4]

---

[3] Upon information and belief, TEC was served on December 8, 2020, and filed its responsive pleading in the *underlying* lawsuit on December 23, 2020.

[4] 6330 Montana also filed Plaintiffs Third Amended Petition in the *underlying* lawsuit, which was the "live" pleading prior to its resolution. A copy of Plaintiff's Third Amended Petition filed on September 24, 2021 in the *underlying* lawsuit is attached as Exhibit "2". The allegations in Plaintiff's Second Amended Petition are substantially similar to the allegations alleged in Plaintiff's Third Amended Petition.

i.    *The Third-Party Petition*

21.    By way of the third-party petition, JFC sued the subcontractors - including TEC - that provided work on the Project. Relying on the claims asserted by 6330 Montana, the third-party petition asserts that the Project was "replete with defects and was not performed in a workmanlike manner" and specifically refers to the list of ninety-nine (99) "defective or unfinished items" attached to the Second Amended Petition, which demonstrates that the damages complained of by 6330 Montana consist of not only purportedly defective work, but also physical injury to tangible property. Ex. 1, p. 4-5 at ¶4.4.

22.    By way of the third-party petition, JFC alleged claims for breach of contract, contribution, indemnity, negligence, and breach of express and implied warranties against the subcontractors including TEC. With respect to TEC, the third-party petition alleged, in relevant part, that JFC subcontracted with TEC to perform electrical work throughout the project. Ex. 1, "Exhibit F" at p. 7 at ¶4.6(d). It is also alleged that JFC and TEC entered into the subcontract and that TEC's scope of work included the installation of electrical and fire alarm systems, as well as the installation of electrical embeds and penetrations through the concrete subcontractor's scope of work, installation of firestopping at electrical penetrations through fire-rate floors and wall partitions, furnish and layout sleeves for all electrical penetrations through other trades' work and/or installation of all aerial, underground and above ground electrical routing. *Id.* Further, as provided in the attached subcontract, there is no dispute that TEC's scope of work was inextricably tied to the work provided by JFC's other subcontractors.

ii.    *Pleading Attached to the Third-Party Petition*

23.    As set forth above, the Second Amended Petition is attached to the third-party petition. It is alleged, in relevant part, that each of the acts, errors, and omissions of JFC and its "contractors and subcontractors" - including TEC - "constitute negligent construction, negligent supervision, negligent installation, negligent repairs or replacement, negligent failure to follow the plans and specifications, negligent failure to use acceptable and manufacture-recommended installation methods and procedures, and negligent failure to test work on the [Project]". Ex. 1, "Exhibit A" at pp. 10-11 at ¶¶31-32; Ex. 2, pp. 12-13 at ¶¶32, 36. According to 6330 Montana, the defects and property damage caused by JFC and its subcontractors - including TEC - include but is not limited to: defective foundation with "extensive cracks" throughout, which has caused the tiles above it to crack, installed the electrical system inappropriately causing lights and fans to go out of service prematurely, and improperly installed lights which randomly dropped from the ceiling and broke, inappropriately installed the alarm room cables. Ex. 1, "Exhibit A" at pp. 6-7 at ¶21; Ex. 2, pp. 9-11 at ¶26. Also attached to and referenced in 6330 Montana's pleadings was a list of ninety-nine (99) "defective or unfinished items", which evidence that such damages complained of consist of physical injury to tangible property as well as purportedly defective work. Ex. 1, "Exhibit A"; Ex. 2, "Exhibit A".

24.    Specifically, the following defects and/or damages, in relevant part, are alleged:

....
10.    Holes in walls, exposed wiring, and carpet lifted near drains. [Balcony adjoining owner office.]

….
33.    Holes in floor and walls. [Equipment room accessed from within sales/ training room.]

….
39.    Numerous round inserts in ceiling are falling out [Delivery area and elsewhere.]

40.    Cracks in the floor evidence foundation issues. [Delivery area and elsewhere.]

….
42.    Severe and growing cracks in concrete on floor of management carport. [Management Parking Portico.]

43.    Lights on outside of main building remain on during daylight hours and cannot be turned off.

….
45.    Cracks and poor workmanship in parking lot through window of showroom. [New Car Showroom.]

….
51.    Many showroom ceiling lights need replacement. [New Car Showroom.]

….
53.    Cracks in floor evidence foundation issues….[Main Building.]

….
61.    Many lights were not secured to posts. As a result, they have fallen and broken. [Driveway leading to service department.]

….
65.    Light has fallen and had to be replaced. [Service Department.]

66.    Many lights are out in service garage. [Service Department.]

….
79.    Poor installation of electrical conduit. [Parts Department.]

….
83.    Cracks throughout floor. [Parts Department.]

….
88.    Broken lighting fixtures. [Front Parking Lot.]

….
90.    Holes in concrete. [Front Parking Lot.]

….
94.    Numerous lights not working. [Used Car Lot.]

95.    Incomplete lighting fixtures. Some installed incorrectly. One fell and almost hit a customer. [Used Car Showroom.]

….

*See* Ex. 1 at "Exhibit A"; Ex. 2 at "Exhibit A". Further, 6330 Montana alleged that the work

of the various contractors and subcontractors "caused damage not only to their own work

or products but each also caused physical injury to tangible property unrelated to their own work or products". Ex. 1, "Exhibit A" at p. 12 at ¶33; Ex. 2, pp. 14-15 at ¶38.

**V.**
**CAUSES OF ACTION**

25.    Plaintiffs Hanover and United Fire re-allege and incorporate by reference as though fully set forth herein the allegations in Paragraphs 1 to 23.

**Declaratory Judgment**

26.    Plaintiffs seek a declaration by the Court pursuant to the FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, *et seq*., as to Mountain's duties, rights, and obligations with respect to TEC's defense under the terms, conditions, and provisions of the Mountain policies. Specifically, Plaintiffs seek a declaration from the Court that Mountain had a duty to defend TEC as to the third-party petition in the *underlying* lawsuit. Hanover and United Fire further ask the Court to declare that Hanover and United Fire are entitled to reimbursement of the defense and indemnity costs paid by Plaintiffs on TEC's behalf in connection with the *underlying* lawsuit.

27.    Plaintiffs also request that this Honorable Court award Hanover and United Fire their reasonable and necessary attorneys' fees and costs incurred to bring and prosecute this action and, further, in the event of any appeal, an award of attorneys' fees and costs conditioned on the event of such appeal(s). Such fees and costs are equitable and just given that Mountain wrongfully failed and/or refused to provide and pay for the defense and indemnity of TEC pursuant to its obligations under the Mountain policies.

28.     Both Hanover and United Fire provided a defense to TEC in the *underlying* lawsuit pursuant to a reservation of rights. However, Mountain repeatedly improperly denied a defense for TEC. Mountain's failure to provide a complete defense to its insured, TEC, constitutes breach of its contractual duty to defend TEC, and such breach caused damages to TEC, as well as Plaintiffs Hanover and United Fire, which paid for TEC's defense. Hanover and United Fire also indemnified TEC in connection with the *underlying* lawsuit, while Mountain refused to contribute any payment in connection with the indemnity of TEC, in breach of its obligations pursuant to the Mountain policies.

29.     The insuring agreement contained in the Mountain policies provides insurance coverage for "damages because of…'property damage' to which this insurance applies" and that the insurance applies to "property damage" caused by an "occurrence" and such damage occurs during the policy period. The Mountain policies define the term "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property ...[or] [l]oss of use of tangible property that is not physically injured." Moreover, the Mountain policies define an "occurrence" as an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

30.     There is no dispute that the insuring agreement of the Mountain policies was triggered. The allegations against TEC alleged "property damage" caused by an "occurrence" (*i.e.*, an accident) and such damage occurred during the Mountain policy periods. Specifically, as set forth above, the allegations alleged "property damage" during the Mountain policy periods. Thus, pursuant to language contained in the

Mountain policies, the allegations triggered coverage under the policies and Mountain had a duty to provide a complete defense to TEC, as well as an obligation to indemnify TEC.

## Contribution

31.     In the alternative, the duty to defend under Texas law creates a debt that is equally and concurrently due by all insurers of a mutual insured. If even a single claim potentially falls within coverage under an insurance policy, the insurer has a duty to provide a complete defense.

32.     Here, pursuant to the Mountain policies issued to TEC, Mountain had a joint obligation with Plaintiffs Hanover and United Fire to provide a complete defense to TEC in the *underlying* lawsuit. Hanover and United Fire discharged their duties by defending TEC in the *underlying* lawsuit in excess of their proportionate share. Consequently, Plaintiffs Hanover and United Fire paid more than their fair share of TEC's common defense obligations. Therefore, Hanover and United Fire seek contribution from Mountain for its respective proportionate share of costs incurred for TEC's defense in the *underlying* lawsuit.

## Breach of Contract and Contractual and Equitable Subrogation

33.     Plaintiffs Hanover and United Fire incorporate by reference the allegations set forth above. Plaintiffs also seek, by this action, to recover from Mountain the expenses Hanover and United Fire incurred in the defense and indemnity of TEC in the *underlying* lawsuit and, pursuant to §38.001, *et seq.*, of the Texas Civil Practice and Remedies Code

their attorneys' fees and costs in bringing this action for Mountain's breach of contract. Hanover and United Fire are entitled to such damages as TEC's subrogees.

34.    As discussed above, TEC assigned all claims and/or causes of action it possessed against Defendant Mountain to Plaintiffs Hanover and United Fire. There is no dispute that Mountain issued policies to TEC that contained CGL Coverage form CG 00 01 12/07, which provides, in relevant part, that "[Mountain] will pay those sums that [TEC] becomes legally obligated to pay as damages because of…'property damage' to which this insurance applies…" and that the insurance applies to "property damage" caused by an "occurrence" and such damage occurs during the policy period. Therefore, the Mountain policies unambiguously provide coverage for "property damage" in connection with TEC. Thus, Mountain has breached its obligations to TEC as expressly provided in the Mountain policies. TEC has duly performed every covenant and satisfied every condition required of it as an insured under the Mountain policies. In the alternative and as a result of Mountain's breach of duties pursuant to the Mountain policies, including the duty to defend, TEC is excused from performing any such covenant it has not performed and is excused from satisfying any such condition it has not satisfied.

35.    As shown above, Mountain had a duty to defend and indemnify its insured, TEC, in the *underlying* lawsuit under the Mountain policies. As subrogees of TEC, Plaintiffs Hanover and United Fire have equitable and contractual rights to enforce such duties against Mountain.

36. As of the date of this pleading, Mountain has refused to acknowledge its contractual obligations to provide a defense and indemnity to TEC in the *underlying* lawsuit and has refused to pay or reimburse any amount paid for such defense and indemnity. Mountain has admitted it did not defend or contribute to such defense or indemnity and continues to dispute that it has any duty to do so. Each and every such refusal to defend constitutes a breach of Mountain's contractual duties under the Mountain policies.

37.    As a direct and proximate result of Mountain's breach of its contractual obligations, TEC has incurred substantial defense costs and other expenses, in amounts exceeding the jurisdictional limits of this Court, which costs and other expenses have been paid, in whole or part, by Plaintiffs Hanover and United Fire on behalf of TEC. Hanover and United Fire thus have rights of contractual and equitable subrogation against Mountain for Mountain's failure to assume the defense and indemnity of TEC and/or to pay its fair share of defense and indemnity costs in the *underlying* lawsuit. As contractual and equitable subrogees of TEC, therefore, Plaintiffs Hanover and United Fire are entitled to recover any and all damages caused by Mountain's breach of its contractual duties to TEC, including recovery from Mountain all attorneys' fees and expenses incurred by Hanover and United Fire in the instant action due to Mountain's continued refusal to pay its fair share of TEC's defense and indemnity costs in connection with the *underlying* lawsuit.

38.    By breaching its contractual duties, Mountain has waived defenses under the Mountain policies and at law and is estopped to assert that TEC somehow failed to comply with the Mountain policies.

## VI.
## RELIEF REQUESTED

39.    For these reasons, Plaintiffs Hanover and United Fire respectfully request that Defendant Mountain be cited to appear and answer herein, and that, on final hearing, the Court award Plaintiffs the following relief:

(1)    A declaration that Mountain owed a complete defense to TEC as to the claims made against it in the *underlying* lawsuit;

(2)    A declaration that Mountain had an obligation to indemnify TEC in connection with the *underlying* lawsuit;

(3)    A declaration that Mountain breached the terms of the Mountain policies by failing to defend and indemnify TEC in the *underlying* lawsuit;

(4)    Awarding judgment for damages as to Plaintiffs Hanover and United Fire equaling Mountain's unpaid share of defense and indemnity costs incurred on behalf of TEC in connection with the *underlying* lawsuit;

(5)    Awarding recovery of all attorneys' fees and costs Plaintiffs Hanover and United Fire have incurred in bringing this action; and,

(6)    Awarding such other and further relief to which Plaintiffs Hanover and United Fire may be entitled whether at law or in equity.

Respectfully submitted,

**TOUCHSTONE, BERNAYS, JOHNSTON, BEALL, SMITH & STOLLENWERCK, LLP**

*/s/ Dawn Woelfel Hansen*
Dawn Woelfel Hansen
State Bar No. 00786361
dawn.hansen@tbjbs.com
Comerica Bank Tower
1717 Main Street, Suite 3400
Dallas, Texas 75201
(214) 741-1166 – Telephone
(214) 259-8709 – Facsimile

***Counsel for Plaintiffs Hanover Lloyds Insurance Company and United Fire & Casualty Company***

# Exhibit 1

El Paso County - County Court at Law 3
Filed 12/1/2020 3:25 PM
Norma Favela Barceleau
District Clerk
El Paso County
2017DCV3746

CHU.25142

## IN THE COUNTY COURT AT LAW NUMBER THREE
## EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| 6330 MONTANA, LLC, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Cause No. 2017DCV3746** |
| | § | |
| JORDAN FOSTER CONSTRUCTION, | § | |
| LLC, and GOREE ARCHITECTS, INC. | § | |
| | § | |
| **Defendants.** | § | |

## JORDAN FOSTER CONSTRUCTION, LLC'S
## THIRD-PARTY PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW Third-Party Plaintiff Jordan Foster Construction, LLC (herein "Third-Party Plaintiff") and files this its Third-Party Petition against Third-Party Defendants: Contractors Tiles Plus, Inc.; The Garick Group Inc.; Texas Electrical Contractors, LLC; Commercial Roofing Systems, Inc.; and Cambro Construction, Inc. (collectively referred to herein as "Third-Party Defendants"). In support of its Third-Party Petition, Third-Party Plaintiff would show the following:

### I.
### Parties

1.1     Third-Party Plaintiff is an original party to the lawsuit filed by Plaintiff 6330 Montana, LLC ("Plaintiff"). *Plaintiff's Second Amended Petition* is attached to this *Third-Party Petition* and identified as **Exhibit A**.[1]

1.2     Third-Party Defendant Contractors Tiles Plus, Inc. is a Texas corporation. It can

---

[1] By this Third-Party Petition, Third-Party Plaintiff makes no admission of any of Plaintiff's contentions and Third-Party Plaintiff continues to deny Plaintiff's allegations in whole. Third-Party Plaintiff presents those allegations herein only to the extent they form the basis of Plaintiff's claims and therefore the basis of Third-Party Plaintiff's claims, but only to the extent they are proven by Plaintiff.

be served with citation and a copy of this *Third-Party Petition* through its registered agent: Javier Mungia, 5519 E. Paisano Drive, El Paso, Texas 79902. Service of process is requested at this time.

1.3     Third-Party Defendant The Garick Group Inc. is Texas corporation. It can be served with citation and copy of this *Third-Party Petition* through its registered agent: Richard A. Porras, 7181 Copper Queen Drive, El Paso, Texas 79915. Service of process is requested at this time.

1.4     Third-Party Defendant Texas Electrical Contractors, LLC is a Texas limited liability corporation. It can be served with citation and copy of this *Third-Party Petition* through its registered agent: William M. Martin, 6936 Commerce Avenue, El Paso, Texas 79915. Service of process is requested at this time.

1.5     Third-Party Defendant Commercial Roofing Systems, Inc. is a Texas corporation. It can be served with citation and a copy of this *Third-Party Petition* through its registered agent: Richard Rollins, 101 Valley Chile Road, Vinton, Texas 79821. Service of process is requested at this time.

1.6     Third-Party Defendant Cambro Construction, Inc. is a foreign corporation with its principal place of business in New Mexico. This third-party action arises out of business conducted in the state of Texas. It can be served with citation and copy of this *Third-Party Petition* through its registered agent David M. Camilli, 1530 George Dileter Apt. 15H, El Paso, Texas 79936. Service of process is requested at this time.

## II.
## Jurisdiction and Venue

2.1     This *Third-Party Petition* is filed in accordance with the laws of the State of Texas. The Court has jurisdiction over the parties and claims asserted in this lawsuit.

2.2     Venue is proper in El Paso County, Texas, pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code. The events giving rise to Plaintiff's causes of action and Third-Party Plaintiff's causes of action occurred in El Paso County in whole or in substantial part. Third-Party Defendants were all subcontracted to provide labor, materials, or both at the Dick Poe Toyota Dealership located at and around 6330 Montana Ave., El Paso, Texas 79925 (the "Project").

## III.
## Discovery Control Plan

3.1     Third-Party Plaintiff intends that discovery be conducted under Level III as discovery should be tailored to the circumstances of this lawsuit. The *Agreed Discovery Control Plan and Scheduling Order* is attached as **Exhibit B**.

## IV.
## Pertinent Facts

4.1     Many of the "facts" alleged in this Third-Party Petition are based on those asserted by Plaintiff in its *Second Amended Petition* filed on August 18, 2020. This is not because Third-Party Plaintiff agrees with such allegations nor judicially admits them to be true, but because these "facts" form the bases of Plaintiff's claims and therefore form the bases of the Third-Party Plaintiff's claims against the Third-Party Defendants.

4.2     On or about March 25, 2013, Goree Architects, Inc. ("Goree") entered into a Standard Form of Agreement between Poe Investments, Ltd. ("Poe Toyota") and Goree (the "Architectural Contract"). The Architectural Contract called for the design and oversight of

construction of a two-story auto sales and service facility for the Dick Poe Toyota Dealership Facility at 6330 Montana Avenue in El Paso, Texas (the "Facility"). Separately, on or about November 10, 2014, Jordan Foster Construction, LLC ("JFC") entered into a Standard Form of Agreement between Owner and Contractor (the "Construction Contract") with Poe Toyota for construction of the Facility.

4.3    Third-Party Plaintiff subcontracted with: (1) Cambro Construction, Inc. ("Cambro") to perform site concrete, building concrete and tilt wall panel work throughout the Project; (2) Commercial Roofing Systems, Inc. ("CRS") to perform roofing, wood blocking and sheet metal flashing work throughout the Project; (3) Contractors Tiles Plus, Inc. ("CTP") to perform ceramic tile, resilient floor tile, resilient wall base and accessories, carpet, epoxy terrazzo, and epoxy floor coating work throughout the Project; (4) Texas Electrical Contractors, L.L.C. ("TEC") to perform electrical and fire alarm system work throughout the Project; and (5) The Garick Group Inc. ("Garick") to perform mechanical, plumbing and utility work throughout the Project

4.4    Plaintiff alleges that the Project was "replete with defects and was not performed in a workmanlike manner."[2]    Plaintiff hired multiple experts who have provided reports including:

(a)    Poyner Group, LLC estimating the cost of repairs to the Property;

(b)    Kenneth S. C. Wong, AIA, NCARB, RAS, providing opinions about the foundation and the electrical and plumbing systems;

---

[2] *See*, Exhibit A, *Plaintiff's Second Amended Petition*, paragraph 11.

(c)     Michael D. Barrentine, P.E. providing opinions regarding civil engineering matters including the potential for flooding, vehicle access and the placement of protective bollards;

(d)     Lorne O. Epsom, P.E., who provided opinions regarding the air conditioning and plumbing systems;

e)      Dennis L. Rasco, P.E., NAFI-CFEI, CVFI, who provided opinions regarding the electrical systems;

(f)     a Property Construction Condition Report by Gregory T. Becker, P.E.; and

(g)     a residential home inspection by Jim Daw Home Inspections.

Plaintiff relies on the opinions in the above-described reports in making its allegations of construction deficiencies.

4.5     Plaintiff filed suit on October 26, 2017 and amended its petition on August 18, 2020, adding Goree as a Defendant, and alleging construction defects detailed in **Exhibit A** attached to *Plaintiff's Second Amended Petition*. Further, Plaintiff makes specific allegations implicating the work of Third-Party Defendants as follows:

(a)     "Cambro Construction Inc's defective and negligent construction work related to providing and installing site concrete, building concrete, and tilt wall panels at the Facility;

(b)     "Commercial Roofing Systems, Inc.'s defective and negligent construction work related to the provision and installation of roofing, wood blocking at the roof, roof accessories, sheet metal flashing, and trim at the Facility;

(c)     "Contractors Tiles Plus, Inc.'s defective and negligent construction work related to the provision and installation of ceramic tile, resilient floor tile, resilient wall base, carpet, epoxy terrazzo, and epoxy flooring at the Facility;

(d)     "Texas Electrical Contractors, L.L.C.'s defective and negligent construction work related to the provision and installation of electrical and fire alarm systems at the Facility; and

(e)  "The Garick Group Inc.'s defective and negligent construction work, related to the provision and installation of mechanical, plumbing, and site utilities at the Facility.

4.6  As the Project's general contractor, Third-Party Plaintiff entered into subcontracts

with each of the Third-Party Defendant to perform work on the Project.

(a)  As the Project's general contractor, JFC subcontracted with Cambro to perform concrete work at the Project. According to the December 9, 2014 Jordan Foster Construction, LLC Subcontract Agreement with Cambro Construction, Inc. (the "Cambro Subcontract" attached hereto is **Exhibit C**), Cambro's scope of work included concrete, building concrete and tilt wall panel installations, among others (hereinafter "Concrete").  Plaintiff complains of multiple deficiencies in the Concrete work by Cambro.  Plaintiff alleges that the deficient installation resulted in excessive cracking in the second-floor parts and storage area and the outside showroom.  In addition, Plaintiff alleges that deficient joint spacing and/or reinforcement caused excessive cracking and deterioration in the exterior concrete, and alleges that the concrete was poured too high in the service drive resulting in unevenness.  Plaintiff asserts that Third-Party Plaintiff is liable for the acts and omissions of Cambro.  Plaintiff further alleges that Cambro's negligence caused or contributed to cause damages at the Project.

(b)  As the Project's general contractor, JFC subcontracted with CRS to perform roofing work at the Project. According to the December 9, 2014 Jordan Foster Construction, LLC Subcontract Agreement with Commercial Roofing Systems, Inc. (the "CRS Subcontract" attached hereto as **Exhibit D**) CRS's scope of work included roofing, roof accessories, wood blocking, and sheet metal flashing, among others (hereinafter "Roofing Work").  Plaintiff alleges that the Roofing Work is deficient.  Plaintiff alleges that the Roofing Work is at risk of puncture and premature leakage as a result of substandard construction practice by CRS.  In addition, Plaintiff alleges that there are trapped air pockets in the rubber membrane, debris and other deficiencies within the roof installation. Plaintiff asserts that Third-Party Plaintiff is liable for the complained of acts and omissions of CRS.  Plaintiff specifically alleges that CRS's negligence caused or contributed to cause these damages at the Project.

(c)  As the Project's general contractor, JFC subcontracted with CTP to perform tile, carpet, terrazzo and other tile and flooring throughout the Project. According to the December 10, 2014 Jordan Foster Construction, LLC Subcontract Agreement with Contractors Tiles Plus, Inc. (the "CTP Subcontract" attached hereto as **Exhibit E**) CTP's scope of work included installation of ceramic tile, resilient floor tile, resilient wall base, carpet, epoxy terrazzo and epoxy flooring among others (hereinafter "Tile and Flooring").  Plaintiff complains of multiple deficiencies in the Tile and Flooring. Plaintiff alleges that floor tile settings show uneven grout joints, chipped edges, excessive cracking

and unevenness.  Plaintiff further alleges that the carpets and other floor covering are inadequately adhered and loose, the terrazzo floor surface finish shows scratches and the color is uneven, and the wall tiles in the bathrooms are uneven. Plaintiff asserts that Third-Party Plaintiff is liable for the acts and omissions of CTP.  Plaintiff further alleges that CTP's negligence caused or contributed to cause these damages at the Project.

(d)      As the Project's general contractor, JFC subcontracted with TEC to perform electrical work throughout the Project.  According to the December 10, 2014 Jordan Foster Construction, LLC Subcontract Agreement with Texas Electrical Contractors, LLC. (the "TEC Subcontract" attached hereto as **Exhibit F**) TEC's scope of work included the installation of electrical and fire alarm systems, among others (hereinafter "Electrical").  Plaintiff complains of numerous deficiencies in the Electrical installation.  Plaintiff alleges that the Electrical installations are incomplete and defective because conduits and wiring were left exposed, there were loose ground connections and/or missing grounds, bushings were not properly installed, and other installations were either missing, deficient and/or not in accordance with plans and specifications.  Plaintiff complains that the Electrical deficiencies cause operational issues with electrical devices including, but not limited to, recessed light fixtures in the main showroom, exterior lighting,  and circulating fans in the service bays.  Plaintiff asserts that Third-Party Plaintiff is liable for the acts and omissions of TEC.  Plaintiff further alleges that TEC's negligence caused or contributed to cause these damages at the Project.

(e)      As the Project's general contractor, JFC subcontracted with Garick to install mechanical, plumbing and site utilities at the Project.  The December 10, 2014 Jordan Foster Construction, LLC Subcontract Agreement (the "Garick Subcontract" attached hereto as **Exhibit G**) sets forth Garick's scope of work as including mechanical, plumbing and site utilities, among others (hereinafter "Mechanical and Plumbing").   Plaintiff complains that the Mechanical and Plumbing was deficiently installed and not in conformity with plans and specifications.   Plaintiff alleges that there are workmanship issues with the plumbing system including materials not within specification, and defective and/or missing installations. Plaintiff complains that the HVAC, including rooftop units, were supplied and/or installed not in conformity with plans and specifications.  Plaintiff also complains of deficiencies in site utilities and/or drainage causing flooding and other damages.  Plaintiff asserts that Third-Party Plaintiff is liable for the acts and omissions of Garick.  Plaintiff further alleges that Garick's negligence caused or contributed to cause these damages at the Project.

## V.
## Causes of Action

### Count One: Breach of Contract and Additional Insured Obligation

5.1     Third-Party Plaintiff re-alleges the allegations contained in Paragraphs 1.1. through 4.6, inclusive and incorporates them by reference as though fully set forth herein.

5.2     Third-Party Plaintiff Jordan Foster Construction, LLC entered into valid and enforceable subcontracts with Third-Party Defendants in which each Third-Party Defendant agreed to perform work and/or provide materials for the Project in fulfillment of its scopes of work, in a timely manner, in a good and workmanlike manner, and in compliance with all applicable contract documents and to defend, indemnify and hold harmless Third-Party Plaintiff from any and all claims, liability, damage, costs, expense, attorney fees, awards, fines or judgments, including property damage, arising out of or from the work performed.

5.3     In addition, said subcontracts obliged Third-Party Defendants to name Third-Party Plaintiff Jordan Foster Construction, LLC as an additional insured on their respective commercial general liability insurance policies and excess policies.

5.4     Third-Party Plaintiff denies any liability to Plaintiff.  However, if Third-Party Plaintiff is in any way found liable to Plaintiff for any of the damages alleged, it will be because Third-Party Defendants breached the terms of their respective contracts with Third-Party Plaintiff Jordan Foster Construction, LLC.

5.5     Such breaches proximately caused damages to Third-Party Plaintiff for which it now sues to recover.

### Count Two: Contribution

5.6     Third-Party Plaintiff hereby re-alleges the allegations contained in Paragraphs 1.1 through 5.5 inclusive and incorporates them by reference as though fully set forth herein.

5.7     Plaintiff seeks recovery against Third-Party Plaintiff for damages arising out of or connected to the work performed by Third-Party Defendants.

5.8     In the event the trier of fact determines that the allegations of Plaintiff are true, and if Third-Party Plaintiff is held liable to Plaintiff in said action, then Third-Party Plaintiff alleges that any responsibility found on the part of Third-Party Plaintiff was proximately caused by the acts and omissions of Third-Party Defendants on account of the work and/or services provided by Third-Party Defendants at the Project. Third-Party Plaintiff makes claim for all rights of contribution as against all Third-Party Defendants, including but not limited to those in accordance with Section 33.016 of the Texas Civil Practice & Remedies Code.

5.9     Additionally, Third-Party Plaintiff makes claim for all rights under Chapter 33 of the Texas Civil Practice and Remedies Code, including but not limited to the right to have any damages awarded against it reduced by the proportion of responsibility attributed to Third-Party Defendants in addition to the proportion of responsibility attributed to Plaintiff or any other responsible third parties.

## Count Three: Indemnity

5.10     Third-Party Plaintiff hereby re-alleges the allegations contained in Paragraphs 1.1 through 4.6, inclusive and incorporates them by reference as though fully set forth herein.

5.11     Plaintiff seeks recovery against Third-Party Plaintiff for damages arising out of or connected to the work performed by Third-Party Defendants. Third-Party Plaintiff has incurred fees and expenses defending this action that arises out of or is connected to the work performed by Third-Party Defendants.

5.12     Third-Party Plaintiff entered into subcontracts with Third-Party Defendants for work at the Project. Said subcontracts contained indemnity clauses obligating Third-Party

Defendants to defend, indemnify and hold harmless Third-Party Plaintiff. Pursuant to the express indemnity obligations of said Third-Party Defendants, Third-Party Plaintiff is entitled to contractual indemnification for the damages caused by the failure of Third-Party Defendants to comply with the terms of the subcontract.

5.13    In the event the trier of fact determines that the allegations of Plaintiff are true, and if Third-Party Plaintiff is held liable to Plaintiff in said action then Third-Party Plaintiff alleges that any responsibility found on the part of Third-Party Plaintiff was proximately caused by the acts and omissions of Third-Party Defendants. In such an instance, Third-Party Plaintiff is also entitled to common law indemnity from all Third-Party Defendants on account of the work and services Third-Party Defendants provided at the Project.

### Count Four: Negligence

5.14    Third-Party Plaintiff hereby re-alleges the allegations contained in Paragraphs 1.1 through 5.13, inclusive and incorporates them by reference as though fully set forth herein.

5.15    Third-Party Plaintiff denies it is liable to Plaintiff for any of its alleged damages. Although Third-Party Plaintiff believes Third-Party Defendants generally performed proper work, in the event Third-Party Plaintiff is found liable to Plaintiff, Third-Party Plaintiff would show the damages, if any, are attributable to Third-Party Defendants as they owed Third-Party Plaintiff a duty of reasonable care in the careful handling and installation of materials, rendering of services and construction at the Project.

5.16    If Third-Party Plaintiff  is in any way liable to Plaintiff, then Third-Party Defendants breached their duty of care owed to Third-Party Plaintiff and as a direct and proximate result of said breach, Third-Party Plaintiff will have been damaged in a total amount not yet ascertained but within the jurisdiction of this Court.

### Count Five: Breach of Express and Implied Warranties

5.17    Third-Party Plaintiff hereby re-alleges the allegations contained in Paragraphs 1.1 through 5.16, inclusive and incorporates them by reference as though fully set forth herein.

5.18    In the unlikely event that Plaintiff prevails on its claims against Third-Party Plaintiff Jordan Foster Construction, LLC, it will be because Third-Party Defendants each breached their respective express and implied warranties, including but not limited to those for good and workmanlike services.  Third-Party Defendants represented they would provide and furnish service necessary for proper and complete performance and acceptance of each respective subcontractor's work for the Project.  These representations became a part of the basis of the bargain.  If Third-Party Plaintiff Jordan Foster Construction, LLC is found liable for damages, it will be because Third-Party Defendants breached their express and implied warranties to Third-Party Plaintiff.  As a result of the breaches of express and implied warranties, Third-Party Plaintiff Jordan Foster Construction, LLC suffered injuries.

### VI.
### Conditions Precedent

6.1    All of the conditions precedent to Third-Party Plaintiff's right to bring these claims against Third-Party Defendants have been performed, have occurred, or have been excused.

### VII.
### Attorneys' Fees and Interest

7.1    Third-Party Plaintiff is entitled to attorneys' fees pursuant to Chapter 38 of the Texas Civil Practices and Remedies Code, as well as other costs incurred by it through trial and any appeal in pursuit of all claims and defense in this lawsuit.

7.2    Third-Party Plaintiff would further show that it is entitled to recover all pre-

judgment and post-judgment interests allowed by law.

## VIII.
## Notice of Self-Authenticated Documents

8.1    In accordance with Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, Defendant advises all parties of its intent to use at trial, or at any pre-trial proceeding, all documents produced by Plaintiff and Defendants in response to written discovery in the above-entitled and numbered cause.

## IX.
## Rule 194 Request for Disclosures

9.1    Pursuant to Tex. R. Civ. P. 194, Third-Party Plaintiff requests that each Third-Party Defendant disclose, within fifty (50) days of service of this request/pleading, all of the information and materials described in Rule 194.2(a)-(l).

## X.
## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, Third-Party Plaintiff seeks monetary relief over $1,000,000 and prays that Third-Party Defendants be cited to appear and answer herein. Further, Third-Party Plaintiff requests that judgment be awarded in favor of Third-Party Plaintiff and against Third-Party Defendants for the following relief:

1. Breach of Contract, Negligence, Breach of Express and Implied Warranties and Contribution, as allowed by law;

2. For indemnity of all damages and/or economic losses that Plaintiff recovers from Third-Party Plaintiff by way of judgment, order, settlement, compromise, or trial;

3. For reasonable attorneys' fees, expert fees and costs;

4. Pre-judgment and post-judgment interest, as allowed by law;

5. Assessment of a percentage of responsibility to be determined, as allowed by law; and

6. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**FLETCHER, FARLEY,**
**SHIPMAN & SALINAS, L.L.P.**

By:  */s/ Lane P. Farley*
**LANE P. FARLEY**
State Bar No. 00787451
lane.farley@fletcherfarley.com
**KAREN KENNEDY**
State Bar No. 24066599
karen.kennedy@fletcherfarley.com
9201 N. Central Expwy., 6th Floor
Dallas, Texas 75231
214-987-9600 (telephone)
214-987-9866 (facsimile)


**AINSA HUTSON HESTER & CREWS, LLP**


By:*/s/ Chantel Crews* (by permission)
**CATHERINE CHANTEL CREWS**
STATE BAR NO. 24007050
ccrews@acaiapark.com
5809 Acacia Circle
El Paso, Texas 79912
(915) 845-5300 (phone)
(915) 845-7800 (fax)


**ATTORNEYS FOR DEFENDANT**
**JORDAN FOSTER CONSTRUCTION,**
**LLC**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been mailed, served by electronic means, telecopied or hand delivered to all attorneys of record, in compliance with Rule 21a. of the TEXAS RULES OF CIVIL PROCEDURE, on this the 1st day of December, 2020.

*/s/ Lane P. Farley*
**LANE P. FARLEY**

Exhibit A

El Paso County - County Court at Law 3

Filed 8/18/2020 12:50 PM
Norma Favela Barceleau
District Clerk
El Paso County
2017DCV3746

## IN THE COUNTY COURT AT LAW NUMBER THREE
## ELPASO COUNTY, TEXAS

| | | |
|---|---|---|
| 6330 MONTANA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No: 2017DCV3746 |
| | § | |
| JORDAN FOSTER CONSTRUCTION, LLC, | § | |
| And GOREE ARCHITECTS, INC., | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S SECOND AMENDED PETITION

TO THE HONORABLE COURT:

COMES NOW Plaintiff 6330 Montana, LLC and files Plaintiff's Second Amended Petition over and against Defendants Jordan Foster Construction, LLC, and Goree Architects, Inc. This is a level three lawsuit. Plaintiff seeks monetary compensation exceeding one million dollars including damages or any kind, penalties, costs, expenses, pre-judgment interest, and attorney's fees. The damages sought are within the jurisdictional limits of the court.

### I.

### PARTIES

1.    Plaintiff 6330 Montana, LLC ("Plaintiff") is a Texas limited liability company with its principal place of business in El Paso, El Paso County, Texas.

2.    Defendant Jordan Foster Construction, LLC ("Jordan") is a Texas limited liability company with its principal place of business in El Paso, El Paso County, Texas. Jordan was previously served with process and has appeared in this suit.

3.    Defendant Goree Architects, Inc. ("Goree") is a Texas corporation with its principal place of business in Bellaire, Harris County, Texas. Goree may be served with process through its

**PLAINTIFF'S SECOND AMENDED PETITION – PAGE 1**
527428.000002 23565840.3

registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II.

## STATEMENT OF FACTS

4.      On or about March 25, 2013, Goree entered into that certain Standard Form of Agreement between Owner and Architect (the "Architecture Contract") with Poe Investments, Ltd. ("Poe"). The Architecture Contract called for the design and oversight of construction of a two-story auto sales and service facility for the Dick Poe Toyota Dealership Facility at 6330 Montana Avenue, El Paso, Texas 79925 (the "Facility").

5.      Pursuant to the Architecture Contract, Goree had obligations to perform architectural services "in compliance with all applicable Owner's Standards and Procedures for Construction and Exterior Design Standards...." Goree agreed that during each design phase, Goree would "evaluate the Owner's Design Standards and recommend any variances that should be made thereto that the Architect believes will provide a higher quality Project without exceeding the Project budget, or otherwise benefit the Owner." Goree additionally was obligated to "recommend any changes to the Owner's program or preliminary design for the Project that the architect reasonably expects will reconcile the program...provide a higher quality Project without exceeding the Project budget, or otherwise benefit the Owner." Ultimately, Goree was to "provide Construction Documents that conform to the accepted Design Development Documents, the Owner's Design Standards, all schedules accepted by Owner, and the Cost of Work."

6.      Goree additionally had obligations to timely implement requested changes during the construction process. Specifically, Goree had a duty to "promptly review requests by the

Owner...for changes in the Work," and if necessary incorporate estimates related to such changes "into a Change Order or other appropriate documentation for Owner's execution...."

7.      Goree failed to comply with its obligations under the Architecture Contract in a number of respects. These failures include, without limitation, the failure to comply with the following instructions and design standards communicated to Goree from the inception of its work on the Facility: (a) a failure to design and provide Construction Documents for the Facility that allow 18-wheeler tractor trailers to maneuver around the Facility; (b) a failure to design and provide Construction Documents that place bollard posts around portions of the perimeter of the Facility structure that effectively prevent the passage of vehicles; and (c) failing to design and provide Construction Documents for the Facility's service drive at a grade to allow for the installation of requested tile flooring.

8.      In addition to the obligations above, Goree had obligations to provide evaluation and oversight functions during construction of the Facility. Specifically:

> The Architect shall visit the site not less often than once every 14 days and otherwise at intervals appropriate to the state of construction...to become generally familiar with the progress and quality of the portion of the Work completed, and to determine, in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

Goree further had the obligation to "keep the Owner reasonably informed about the progress and quality of the Work," including furnishing written reports concerning "defects and deficiencies observed in the Work." Additionally, Goree had the obligation to "reject Work that does not conform to the Contract Documents."

9.      On or about November 10, 2014, Jordan entered into that certain Standard Form of Agreement between Owner and Contractor (the "Construction Contract") with Poe. The

Construction Contract called for the construction of the Facility and other incidental work related thereto. Jordan agreed to finish its work in under one year.

10.     Jordan made multiple warranties to Poe through the Construction Contract, including:

> ...that materials and equipment furnished under the Contract will be of good quality and new unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective.

Jordan further warranted that it "shall perform the work in a good and workmanlike manner in strict compliance with the Contract Documents." Jordan additionally warranted and was obligated to "promptly correct any of the work found to be not in accordance with the requirements of the Contract Documents."

11.     The work provided by Jordan is replete with defects and was not performed in a workmanlike manner. Attached hereto as Exhibit "A" is a detailed report describing many of the defects, which is incorporated by reference as if fully set forth herein. Despite being notified of the defects, Jordan has failed and/or refused to correct them.

12.     Jordan was also supposed to provide electrochromic glass (glass that can transition from clear to opaque) in certain parts of the dealership. However, Jordan's subcontractor's carrier broke such glass during shipment. Jordan has installed temporary glass, but refuses to re-order and install the glass specified in the Construction Contract.

13.     Jordan further did not complete the Facility by the time specified in the Construction Contract. As a result, Poe was charged by Jordan for 124 days during the delay—and lost use of the Facility for the same period.

14.    Throughout the construction process, Goree failed to oversee and ensure the quality of the work provided by Jordan. Goree, and its employees and representatives, repeatedly re-scheduled, cut-short, or failed to attend various Facility site inspections and meetings. Goree failed to inform Poe of and/or reject a number of readily visible and conspicuous defects and deficiencies resulting from Jordan's incomplete or noncompliant work. Goree further failed to timely execute on requested Owner changes during or prior to the construction of the Facility.

15.    Poe has sold the Facility designed by Goree and constructed by Jordan to Plaintiff. Poe has further assigned all right, title and interest to any claims, suits, damages, and causes of action it has or had against Jordan and Goree to Plaintiff. Thus Plaintiff is the proper party and has standing to assert all causes of action set forth herein.

16.    Plaintiff has fully performed its obligations under the Construction Contract and Architecture Contract, and given all necessary notices thereunder. All conditions precedent to Plaintiff's recovery have been satisfied.

### III.

### CAUSES OF ACTION

17.    All prior paragraphs are incorporated herein by reference.

**Breach of Contract - Goree**

18.    The Architecture Contract is a valid and binding contract between Goree and Plaintiff's predecessor in interest. Plaintiff and its predecessor in interest have performed all obligations under the Architecture Contract. Goree has breached its obligations under the Architecture Contract by, among other acts or omissions: (a) failing to design and provide Construction Documents for the Facility that allow 18-wheeler tractor trailers to maneuver around the Facility; (b) failing to design and provide Construction Documents that place bollard posts

around the perimeter of the Facility structure that effectively prevent the passage of vehicles; and (c) failing to design and provide Construction Documents for the Facility's service drive at a grade to allow for the installation of requested tile flooring.

19.     Goree further breached its obligations to provide oversight and evaluation services. Goree failed to identify defects and deficiencies in the work and materials provided by Jordan during the construction of the Facility. Goree further failed to reject work during the construction of the Facility that was clearly noncompliant with the Contract Documents. Finally, Goree failed to timely review and execute on requested changes to the Facility plans and construction. Goree's breaches of the Architecture Contract have caused damages to Plaintiff within the jurisdictional limits of this Court. Attached hereto as Exhibit "B" is a Certificate of Merit and Affidavit of Kenneth S.C. Wong, AIA, NCARB, RAS in support of the Plaintiffs' causes of action against Goree which is incorporated by reference as if fully set forth herein.

**Breach of Express Warranties - Jordan**

20.     The Construction Contract is a valid and binding contract between Jordan and Plaintiff's predecessor in interest. Plaintiff and its predecessor in interest have performed all obligations under the Construction Contract. Jordan has breached its express warranties as found in the Construction Contract. Jordan's breaches of the Construction Contract have caused damages to Plaintiff within the jurisdictional limits of this Court.

**Breach of Contract - Jordan**

21.     The Construction Contract is a valid and binding contract between Jordan and Plaintiff's predecessor in interest. Plaintiff and its predecessor in interest have performed all obligations under the Construction Contract. Jordan has breached a number of its obligations as

found in the Construction Contract. Jordan's breaches include, without limitation, the following

acts or omissions:

- Jordan did not complete the Facility on time;

- Jordan neither reordered and installed electrochromic glass, nor did not provide a refund for the same;

- Jordan charged more than the contract specified;

- Jordan breached the Construction Contract by providing the following defective, nonconforming and/or incomplete Work;

- The drainage system provided by Jordan is defective and results in major flooding when rain falls;

- Jordan installed terrazzo flooring that is not uniform, is discolored, and/or was not properly installed;

- The entire foundation provided by Jordan is defective; it has extensive cracks throughout it and has caused the tiles above it to crack;

- Jordan installed the bollard posts on Montana Avenue incorrectly and out of place;

- Jordan poured the concrete around the service drive too high causing unevenness;

- Tile throughout the dealership was improperly installed causing it to become discolored;

- Jordan installed the electrical system inappropriately causing lights and fans to go out of service prematurely;

- Jordan inappropriately installed the bollard posts in the service drive;

- The air conditioning unit in the principal's office was improperly installed causing it to drain water into the walls;

- The flooring in the principal's patio floods when rain falls and is peeling off;

- All water faucets and appliances near the principal's office area, including the principal's bathroom, emit water that comes out black and smells foul;

- Jordan installed broken tiles in the restroom of the second floor;

- Jordan provided a substandard data room that is unappealing and is not according to the Drawings;

- Jordan installed defective, subpar and unattractive staircases;

- The hot water heater that was installed leaked water shortly after installation;

- Many doors that Jordan installed were the wrong size;

- Jordan installed tiles using incorrect grout;

- The countertops that were installed in the bathrooms were cut the wrong size and not installed according to the Drawings;

- Jordan improperly installed lights which randomly dropped from the ceiling and broke;

- Jordan did not paint the ceiling and/or conduit as required by the Drawings;

- Jordan installed defective carbon-fiber carpet;

- Jordan did not install support for maglocks to be installed;

- Jordan did not paint the parking lot stripes;

- Jordan inappropriately installed the alarm room cables;

- Jordan installed the exterior lights in a manner that does not allow for the lights to be turned off during the day;

22.    There are many other defective or unfinished items throughout the entire auto dealership. Exhibit "A," attached hereto, lists some of the defective and unfinished items.

**Negligence – Jordan**

23.    Jordan owed a duty to Plaintiff's predecessor in interest to design, supervise, and construct the Facility in a reasonable and non-negligent manner including, but not limited to, designing, supervising, and constructing the Facility in accordance with all plans, specifications, design professionals' recommendations, building codes, industry standards, and government agency requirements applicable to the construction of the Facility.

24.     Jordan's duty of care included the duty to ensure that all construction was designed and performed in a good and workmanlike manner by qualified contractors and subcontractors and the Facility was suited for its reasonably anticipated use.  Jordan also owed a duty of care to hire competent contractors and subcontractors and to supervise the contractors and subcontractors on the site in their work.

25.     Jordan is vicariously liable for the defective work performed by the various contractors and subcontractors, as they are Jordan's agents for purposes of the construction.

26.     As a result of Jordan's negligent and improper work, there are substantial defects at the Facility as referenced in Exhibit "A" attached hereto.

27.     Plaintiff suffers from among other things, Jordan's failure to follow the plans and specifications, negligent construction, negligent supervision, failure to perform the work in a good and workmanlike manner, and failure to meet applicable building codes.

28.     Plaintiff alleges that the negligence of Jordan and its contractors and subcontractors was a proximate cause of the occurrences in question and Plaintiff's resulting damages. Specifically, Plaintiff alleges that the Jordan and its contractors and subcontractors were negligent in one or more of the following respects:

- Failing to use ordinary care in the construction of the Facility;

- Failure to use ordinary care in the selection and use of proper components for the Facility;

- Failure to use ordinary care in the selection of contractors and subcontractors for construction of the Facility;

- Failure to use ordinary care to inspect the products and construction work for the Facility;

- Failure to use ordinary care to supervise the contractors and subcontractors involved in construction of the Facility;

- Failure to use ordinary care to test the products and construction work for the Facility;

- Failure to repair or replace defective products and work;

- Failure to hire and contract competent contractors and subcontractors who were qualified and competent to perform the construction work on the Facility;

- Failure to have appropriate quality control policies and procedures in place;

- Failure to use due care under the circumstances;

- Failure to remedy the damages caused by Jordan's and its contractor's and subcontractor's negligence; and

- Failure to remedy the defects to protect Plaintiff from future damages.

29.     Despite being notified of the various defects and negligent work, Jordan has failed or refused to correct those defects.

30.     Jordan breached its duties to Plaintiff or its predecessor in interest by failing to properly supervise the contractors and subcontractors and to construct the Facility in a good and workmanlike manner.

31.     Plaintiff would show that each of the acts, errors, and omissions of Jordan and its contractors and subcontractors as alleged herein, constitute negligent construction, negligent supervision, negligent installation, negligent repairs or replacement, negligent failure to follow the plans and specifications, negligent failure to use acceptable and manufacture-recommended installation methods and procedures, and negligent failure to test work on the Facility. Jordan and its contractors and subcontracts owed a duty to Plaintiff or its predecessor in interest to perform their work and supply materials which, when competently and properly installed, would produce a Facility which was fit for its intended purpose, constructed in accordance with approved plans and specifications, constructed with reasonable quality, and free of the Construction Defects identified in Exhibit "A".

32.    Jordan is liable for the acts and omissions of its contractors and subcontractors who were employed by or in an agency or contractual relationship with Jordan at all times material hereto. The defective construction work is tied to, related to, and a direct result of certain work performed by Jordan's contractors and subcontractors including, but not limited to:

- Cambro Construction Inc.'s defective and negligent construction work related to providing and installing site concrete, building concrete, and tilt wall panels at the Facility;

- APCO Building Specialties Inc.'s defective and negligent construction work related to the provision and installation of doors, door framing and hardware at the Facility;

- Commercial Roofing Systems Inc.'s defective and negligent construction work related to the provision and installation of roofing, wood blocking at the roof, roof accessories, sheet metal flashing, and trim at the Facility;

- Contractors Tile Plus Inc.'s defective and negligent construction work related to the provision and installation of ceramic tile, resilient floor tile, resilient wall base, carpet, epoxy terrazzo, and epoxy flooring at the Facility;

- Diversified Interiors Inc.'s defective and negligent construction work related to the provision and installation of metal studs, sheetrock, wood blocking, insulation, EIFS, stucco, ceiling systems, painting, wall coverings, access doors, and spray fire systems at the Facility;

- EFI Panels, LLC's defective and negligent construction work related to the provision and installation of ACM panels and Tyvek at the Facility;

- Miner El Paso LTD's defective and negligent construction work related to the provision and installation of doors, security grills, and fire shutters at the Facility;

- Steel Specialties Inc.'s defective and negligent construction work related to the provision and installation of structural steel, joists, deck, miscellaneous steel, metal stairs, pipe and tube rails and embed plates at the Facility;

- Texas Electrical Contractors, LLC's defective and negligent construction work related to the provision and installation of electrical and fire alarm systems at the Facility;

- The Garick Group Inc.'s defective and negligent construction work related to the provision and installation of mechanical, plumbing, and site utilities at the Facility;

- The Glass House Inc.'s defective and negligent construction work related to the provision and installation of glass, glazing, aluminum storefront, curtain walls, and hardware at the Facility;

- ThyssenKrupp Elevator Corp.'s defective and negligent construction work related to the provision and installation of hydraulic elevators at the Facility; and

- Alliance Riggers & Constructors Ltd.'s defective and negligent construction work related to the provision and/or installation of structural steel, joists, metal deck, miscellaneous steel, metal stairs, and tiltwall panels at the Facility.

33.     The work of the various contractors and subcontractors listed herein caused damage not only to their own work or products but each also caused physical injury to tangible property unrelated to their own work or products.

34.     Jordan's negligence arises out of, or was caused in whole or in part, by the negligence of the contractors and subcontractors listed herein.

35.     Jordan is also vicariously liable for the negligence of the contractors and subcontractors listed herein.

36.     It is and was foreseeable that Jordan's negligence did and could in the future cause damage to the Plaintiff.

37.     Jordan's breach of these duties proximately caused damages to Plaintiff within the jurisdictional limits of this Court.

## IV.

## ATTORNEY'S FEES

38.     Defendants' breaches have necessitated the engagement of the undersigned counsel, and Plaintiff is entitled to an award of reasonable and necessary attorney's fees pursuant to Texas Civil Practice & Remedies Code §38.001 *et seq.*

V.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff 6330 Montana, LLC respectfully prays that Defendants Jordan Foster Construction, LLC and Goree Architects, Inc. appear and answer herein, and that upon the trial of this matter Plaintiff recover from Defendants:

    a.     Actual damages;

    b.     Special and consequential damages for lost profits and costs incurred resulting from the delayed completion of the Facility;

    c.     Special and consequential damages for lost profits and costs incurred resulting from any loss of use or business interruption due to any closure or partial closure of the Facility necessitated by repair or re-work due to Defendants' breaches;

    d.     Attorney's fees;

    e.     Applicable pre and post-judgment interest as allowed by law;

    f.     All costs of court; and

    g.     Such other and further relief to which Plaintiff may show itself entitled.

Respectfully submitted,

**STEVEN C. JAMES ATTORNEY PLLC**

By: /s/ _____

Steven C. James
State Bar No. 10551500
steve@stevencjames.com
521 Texas Avenue
El Paso, Texas 79901
Telephone: (915) 543-3234
Facsimile: (915) 543-3237

**MOSS LEGAL GROUP, PLLC**

By: /s/ _____

M. Mitchell Moss
State Bar. No. 00784647
Mitch@MossLegalSolutions.com
Priscilla M. Castillo
State Bar No. 24076531
Priscilla@MossLegalSolutions.com
5845 Cromo Dr., Suite 2
El Paso, Texas 79912
Telephone: (915) 703-7307
Facsimile: (915) 703-7618

**THOMPSON & KNIGHT LLP**

By: /s/ _____

Greg W. Curry
State Bar No. 05270300
Greg.curry@tklaw.com
Michael B. Tristan
State Bar No. 24046995
Michael.tristan@tklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record on August 18, 2020, in accordance with the Texas Rules of Civil Procedure.

*/s/ Michael B. Tristan*
Michael B. Tristan

# EXHIBIT A

1. Holes in the wall, opening by junction box, exposed wiring and painted sprinkler head.   [Closet next to elevator, first floor.]

2. Mismatched and missing screws in railing.   Some screws are loose.   Railing is not secured and stable.   [Stairwell, near elevator.]

3. Elevator jumps and bounces.   Operates erratically.

4. Significant noise in recessed area next to stairwell.

5. Terrazzo flooring poorly cut at doorway, closet floor rough and unfinished, sheet rock chipped, primer showing on walls, and water leaking possibly due to improper installation of electric diode in water heater.   [Water heater closet near elevator on second floor.]

6. No base plates on round poles.   [Hallway, second floor.]

7. Area above door of conference room is not finished out.   [Hallway, second floor.]

8. Unfinished edge outside of owner office window into showroom.   [Hallway, second floor.]

9. Partially painted fixtures, tape on pipes, handwriting on steel beam, temporary light still in place, white paint drops on beams, primer showing in places, and cracks in sheet rock.   [Owner office.]

10. Holes in walls, exposed wiring, and carpet lifted near drains.   [Balcony adjoining owner office.]

11. Milky water and Sulphur smell from faucet.   Water sometimes comes out black.   Water gushes erratically and lands outside of basin.   [Owner restroom.]

12. Two screws are visible and protruding in tile above toilet.   [Owner restroom.]

13. Defects [chipped wood] in bathroom door. [Owner restroom.]

14. Scrapes and other defects on fixtures and tiled walls.   Poor calking work at junction of wall and floor.   [Hallway within owner office area.]

15. Milky water with gushing and erratic flow from faucet.   Sulphur smell.   Water sometimes comes out black.   [Wet bar within owner office.]

16. White splotches that cannot be buffed out in terrazzo floor.   [Hallway, second floor.]

17. Poor caulk work around doorway to file room.   [Comptroller's office.]

18. Hole above baseboard in file room.   [Comptroller's office.]

19. Poorly done air conditioner installation in file room.   [Comptroller's office.]

20. Counters, wood work, tile and calk work in need of repair.   [All public restrooms]

21. Poor calk work at union of toilet and floor.    [All public restrooms.]

22. Holes in sheet metal next to roof hatch.    [Roof access closet.]

23. Baseboard molding does not extend for full length of wall and has fallen off the wall.    [Roof access closet.]

24. Roof hatch does not latch to allow locking.    [Roof access closet.]

25. Many electrical outlets on second floor do not work.

26. Builder promised that all glass would be cleaned but never came back to do so.

27. Baseboard molding has been nicked by a buffer operated by builder.    [Employee breakroom.]

28. Baseboard molding has fallen off wall below kitchen cabinets.    [Employee breakroom.]

29. Floor is discolored near walls.    [Employee breakroom and everywhere there is terrazzo flooring.]

30. Poor caulk work at junction of floor and walls.    [Employee breakroom.]

31. Caulk work and metal work needs to be redone around doorway.    [Employee breakroom.]

32. Terrazzo floor is discolored and blotchy.    Buffing does not resolve the problem and floor needs to be redone.    [Employee breakroom, second floor hallway and sales/training room.]

33. Holes in floor and walls.    [Equipment room accessed from within sales/training room.]

34. Missing ceiling panels.    [Equipment room accessed from within sales/training room.]

35. Poor installation of floor to ceiling marker board at front of sales/training room.    Seams, uneven surface, nicks and scratches, and marker board surface protrudes at junction of walls and ceiling in corner of room.    [Sales/training room.]

36. Scratches and missing paint on railing.    [Stairway from showroom to second floor.]

37. Railing is not anchored flush to wall at bottom of stairway.    [Stairway from showroom to second floor.]

38. Garage doors do not function properly.    Some require one quick press of button to raise or lower door completely; others require button be held down until door is completely up or down.    [Delivery area next to showroom.    No photos.]

39. Numerous round inserts in ceiling are falling out [Delivery area and elsewhere.]

40. Cracks in the floor evidence foundation issues. [Delivery area and elsewhere.]

41. Water damage in several spots on ceiling.    [Delivery area.]

42. Severe and growing cracks in concrete on floor of management carport.    [Management Parking Portico.]

43. Lights on outside of main building remain on during daylight hours and cannot be turned off.

44. Poor caulking work on exterior walls.    [Main building.]

45. Cracks and poor workmanship in parking lot through window of showroom.    [New Car Showroom.]

46. Caulking in tile floor of showroom is incorrect.    Should be a sand grout but epoxy grout has been used, which gives a dirty appearance.    [New Car Showroom.]

47. Severe water damage on ceiling tile in showroom.    During times of inclement weather, a bucket must be placed under this ceiling tile.

48. Double door has issues.    Panel has fallen down from above door and hit a customer.    Door does not close flush with door frame.    [New Car Showroom.]

49. Large cracks in floor tiles.    [New Car Showroom.]

50. Poor caulk work at junction of floor and wall in service desk area.    [Main Building.]

51. Many showroom ceiling lights need replacement.    [New Car Showroom.]

52. Door does not fully open due to unlevel slab.    [Service Desk Area, Main Building.]

53. Cracks in floor evidence foundation issues.    Missing and discolored caulking.    [Main Building.]

54. Visible electrical wires on countertop in public restroom. [First floor, near Showroom.]

55. Wood paneling frequently falls.    [First floor, near Showroom.]

56. Damage to wood paneled wall.    [First floor, near Showroom.]

57. Damage to wood cubical.    [Service Desk Area, Main Building.]

58. Wood veneer is separating.    [Service Desk Area, Main Building.]

59. Poor caulking work including missing caulking between pavestones.    [Drive through area leading to service department.]

60. Pavestones are not level.    [Drive through area leading to service department.]

61. Many lights were not secured to posts.    As a result, they have fallen and broken.    [Driveway leading to service department.]

62. Poor caulk work at junction of floor and wall.    [Service Department driveway.]

63. Door to service waiting area has metal plate patchwork rather than being properly repaired or aligned.    Does not open fully due to unlevel pavestones.    [Service Waiting Area.]

64. Double doors are installed improperly.    They are very close at bottom and have a gap at top. [Service Department.]

65. Light has fallen and had to be replaced.    [Service Department.]

66. Many lights are out in service garage.    [Service Department.]

67. Open junction box.    [Express Maintenance Desk.]

68. Sheet rock shows long seam or crack.   [Express Maintenance Desk.]

69. Gas leak was caused by equipment swinging back and forth.   Repaired with a brace at top and new flex tube.   [Detail bay.]

70. Tracks in concrete.   [Service Parking Lot.]

71. Tracks in concrete and poor caulking work.   [Service Parking Lot.]

72. Open junction box.   [Wash Bay.]

73. Poor concrete installation.   [Service Parking Lot.]

74. Loose floor tiles with no grout.   [Just inside garage door in Service Garage.]

75. Two ceiling fans do not work.   [Service Garage.]

76. Many lights are out prematurely.   [Service Garage.]

77. Broken pavestones.   [Service Garage.]

78. Tile missing in front of door. [Service Garage.]

79. Poor installation of electrical conduit.   [Parts Department.]

80. Paint on sprinkler head in parts department. [Parts Department.]

81. Equipment room is not finished out and air conditioning unit does not work properly.   Does not keep room cool.   [Parts Department.]

82. Door knob does not work.   [Parts Department.]

83. Cracks throughout floor.   [Parts Department.]

84. Walls and floor are not finished out.   [Photography room.]

85. Poor concrete work.   [Parking Lot.]

86. Floor lights on elevated display areas do not work. [Front Parking Lot.]

87. Exposed pipe is safety hazard in customer walking areas.   [Front Parking Lot.]

88. Broken lighting fixtures. [Front Parking Lot.]

89. Bollard posts are too far apart to prevent a vehicle traveling through them. [Front Parking Lot.]

90. Holes in concrete.   [Front Parking Lot.]

91. No liner (weed barrier) installed with landscaping and weeds are a large problem.   Not enough plants along front of property.   [Landscaping Along Montana Ave.]

92. No lights installed on two of the raised display areas.

93. Paint peeling off on ceiling of carport area.   [Front parking lot.]

94. Numerous lights not working.   [Used Car Lot.]

95. Incomplete lighting fixtures.   Some installed incorrectly.   One fell and almost hit a customer. [Used Car Showroom.]

96. Door closer detached.    [Used Car Showroom.]

97. Public restrooms in used car showroom have poorly installed tile, countertops and wooden panels underneath sink.    Power switch is poorly installed.    [Used Car Showroom.]

98. Cracking in sidewalk.    [Used Car Lot.]

99. Parking lot should be fully striped and is not.    [Front Parking Lot.]

Exhibit F

Jordan Foster Construction, LLC
7700 CF Jordan Drive
El Paso, TX 79912-8802



P: 915-877-3333
F: 915-877-3999
website: www.jordanfosterconstruction.com

**CONTRACT:**  1405919
**VENDOR CODE: TEXELC01**
**PHASE CODE: 26.05.01**

## SUBCONTRACT AGREEMENT

Contract Date: December 10, 2014
Subcontractor:   Texas Electrical Contractors, LLC
Address:            12350 Montwood Dr. Ste. 400-C
                        El Paso, TX 79928
Phone:  (915) 855-8800
Fax:      (915) 503-2304
Federal ID No.:                  80-0636804
Subcontractor License No.:   _____
Sales Tax ID No.:               _____

Project:        Dick Poe Toyota :TX:N:I
Project No.:   14059
Description:   26 Electrical, Fire Alarm System

Job Location:   6330 Montana Ave.
                      El Paso, TX 79925
Architect:       Goree Architects, Inc.

Project Owner:   Dick Poe Toyota

*This agreement ("Subcontract") is made between Contractor and Subcontractor for the performance of the Work described herein. Subcontractor acknowledges receipt of an executed copy of this Subcontract and copies of all the Contract Documents referenced below. Subcontractor has read, understands and agrees to be bound to the terms of this Subcontract, the Contract Documents, and any special or supplemental general conditions attached hereto.*

1.  **CONTRACT DOCUMENTS.** The Contract Documents are set forth below and are incorporated herein as if fully written in this Subcontract: Subcontract; the General Contract between Owner and Contractor and any attachments thereto including, without limitation, any General, Supplemental or Special Conditions and other Addenda to date; *Exhibit "A"* Scope of Work; *Exhibit "B"* Drawings, Specifications and other Design Documents; *Exhibit "C"* Certified List of Material Suppliers and Second Tier Subs; *Exhibit "D"* Jordan Foster Construction, LLC, Request and Certification for Payment; *Exhibit "E"* Forms of Lien Waivers; *Exhibit "F"* Initial Baseline Schedule; *Exhibit "G"* Downstream Insurance Requirements; *Exhibit "H"* Subcontract Performance Bond & Labor/Material Bond; *Exhibit "I"* Equal Opportunity Clause; *Exhibit "J"* Standard Federal Equal Employment Opportunity Construction Contract Specifications (Executive Order 11246); and other attachments hereto, including all addenda to or revisions of any of the foregoing issued after the date of this Subcontract.

2.  **SUBCONTRACTOR'S WORK.** Subcontractor shall perform all work set forth in the Contract Documents required for the successful completion of the Scope of Work identified in Exhibit "A" attached hereto (the "Work") sufficient to result in a complete and operating system or fully functional component of the Project. Subcontractor shall furnish, install and pay for, without limitation, all necessary labor, material, tools, equipment, insurance, freight and other items required to successfully complete its Scope of Work in strict accordance with the Contract Documents and any applicable building codes, ordinances, statutes, regulations, or other legal duty, as well as in accordance with all terms, covenants, and conditions of the contract between Contractor and Owner. Subcontractor shall also furnish all other work incidental thereto to ensure that Subcontractor's Work is complete and functional for its intended purpose, including but not limited to supervision, quality control, testing, safety, personnel safety equipment, layout, field measurements, submittals, hoisting, scaffolding, task lighting, dumpsters, protection of installed work, protection of the work of others, and water for tradesmen. To the extent the provisions of the contract between Contractor and Owner relate, directly or indirectly, to Subcontractor's Work and otherwise do not conflict with any provision in this Subcontract, Subcontractor agrees that such provisions are fully incorporated herein as if completely rewritten herein except that the word "Contractor" shall be substituted for the word "Owner", and the word "Subcontractor" shall be substituted for the word "Contractor" in the prime contract. All obligations and representations placed on Contractor under its contract with Owner shall apply to and be binding upon Subcontractor to the extent they relate in any way to Subcontractor's Work or its general obligations under this Subcontract. However, to the extent of any conflicting obligations, the provisions contained herein shall control. To the extent of any conflict between the requirements of any of the foregoing, Subcontractor shall perform the

Sub Initials

more extensive or expansive of the requirements. Subcontractor hereby represents and acknowledges that it has reviewed and agrees to the Subcontract and the Contract Documents and has investigated and satisfied itself as to the conditions affecting Subcontractor's Work including, but not restricted to, those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides or similar physical conditions of the Project and the type of equipment and facilities needed to perform Subcontractor's Work. Any failure by Subcontractor to acquaint itself with the available information will not relieve it from responsibility for estimating properly the difficulty or cost of successfully performing Subcontractor's Work and will not relieve it from responsibility for performing Subcontractor's Work as required. Contractor assumes no responsibility for any conclusions or interpretations made by Subcontractor on the basis of any information made available by the Owner or Contractor.

3.   **SUBCONTRACT AMOUNT.** Contractor agrees to pay Subcontractor for the successful and complete performance of Subcontractor's Work the sum of: **Six Hundred Eighty Nine Thousand Eight Hundred Seventy One Dollars And .00/100($689,871.00)** and to make payments on account thereof as follows:

3.1   Within thirty (30) days after execution of this Subcontract and prior to submission of the first application for payment, Subcontractor shall submit to Contractor an accurate breakdown showing the estimated cost of each part of the Work, which, if approved by Contractor, shall be used for evaluating future applications for payment.

3.2   On or before the 20th day of each month, Subcontractor shall submit to Contractor's office, as directed by Contractor, its application for payment in a form acceptable to Contractor covering the value of the Work which has been completed by Subcontractor to Owner's and Contractor's satisfaction to that date, from which amount shall be deducted (a) a 10% retention, (b) all previous payments, (c) all previous retention amounts, and (d) all other charges for material or service furnished by Contractor on Subcontractor's behalf. The balance of the amount of the application as approved by Contractor, and for which payment has been previously received by Contractor from Owner, shall be paid to Subcontractor on or about the 20th day of the succeeding month. Subcontractor acknowledges that late submission of any application for payment causes damage to Contractor. Should Subcontractor fail to submit a proper application for payment within ninety (90) days after the date such payment application is due, Subcontractor expressly waives its entitlement to any funds otherwise due from such application. Subcontractor shall, along with any payment application, submit a Conditional or Unconditional Waiver and Release on Progress Payment from itself and anyone providing labor or material by, through or under Subcontractor effective for the full amount of the pay application.

3.3   Final payment of all remaining monies, including retention, shall be paid to Subcontractor within forty (40) days after completion, but only after completion, of all of the following conditions precedent:
   a.   Final completion of the Project;
   b.   Receipt by Contractor of its final payment from Owner;
   c.   Final acceptance of Subcontractor's Work by Contractor, Owner, Architect and Engineer, if any;
   d.   Furnishing Contractor the following: (i) Unconditional Waiver And Release On Final Payment from Subcontractor in the form attached as Exhibit "E", (ii) Unconditional Waiver And Release On Final Payment in the form attached as Exhibit "E", to Contractor from all subcontractors or suppliers providing labor or material through or under Subcontractor, and (iii) other evidence satisfactory to Contractor that all labor and material accounts incurred by Subcontractor have been paid in full;
   e.   Furnishing Contractor all As-Built Plans, warranties, guaranties, instruction manuals, operations and maintenance manuals, spare parts, extra material, and other items as required under the Contract Documents.

3.4   No payment to Subcontractor, monthly or final, shall operate as an approval of Subcontractor's Work, or materials, or any part thereof, or a waiver of Subcontractor's obligation to remedy improper Work or satisfy warranty obligations or other responsibilities under this Subcontract. Subcontractor expressly agrees that it will be paid if and when Contractor is paid by Owner for Subcontractor's Work and that Contractor's obligation to pay Subcontractor is expressly contingent upon Contractor receiving payment from Owner for said amount. If payment to Contractor is withheld because of any objection to Subcontractor's Work, Subcontractor shall immediately remedy such objection to the satisfaction of the Owner and Architect prior to receipt of any monies from Contractor. If payment from Owner is withheld, or for any reason not made, in whole or in part, Subcontractor acknowledges that its right to receive payment from Contractor is expressly contingent on Contractor receiving said payment from Owner, and further acknowledges that Contractor would not retain Subcontractor for this Project in the absence of such agreement by Subcontractor. Monies otherwise due Subcontractor may also be withheld from any payment for: (a) liens or threats of liens by sub-subcontractors, suppliers or laborers; (b) claims made or threats of potential claims from sub-subcontractors, suppliers or laborers; (c) reasonable evidence that Subcontractor cannot complete its obligations under



this Subcontract for the balance unpaid to Subcontractor; (d) defective Work not remedied; and (e) when Subcontractor: (i) causes damage or losses to the Project, Contractor or another subcontractor, (ii) fails to perform its work timely, or (iii) otherwise fails to perform its obligations under this Subcontract. If said causes are not removed or remedied within forty-eight (48) hours of written notice from Contractor to Subcontractor, Contractor may, at its sole discretion, rectify the cause at Subcontractor's expense. In such case, Contractor may withhold from monies due or to become due to Subcontractor an amount sufficient to rectify such deficiency and compensate Contractor for all costs it suffers as a result therefrom or otherwise recover such amount from Subcontractor sufficient to rectify such deficiency and compensate Contractor for all costs it suffers as a result therefrom if the balance due Subcontractor under this Subcontract is insufficient to fully address these costs. In the event of: (a) any breach of this Subcontract by Subcontractor; (b) the occurrence of items (a) – (e) above; or (c) upon Contractor's good faith belief that Subcontractor may have insufficient funds to properly complete its Work, joint checks may be issued to Subcontractor and its suppliers or sub-subcontractors. Subcontractor expressly waives any rights it may have under any law requiring that funds retained out of any payments due will be paid or segregated into any escrow or separate account for the benefit of Subcontractor or its sub-subcontractors or suppliers. Subcontractor grants Contractor a first security interest in and right of set-off to any amounts due or to become due Subcontractor to secure Subcontractor's performance of its obligations to Contractor, whether under this Subcontract or otherwise.

3.5   Subcontractor covenants and agrees that any money received by it for the performance of its Work are trust funds which shall first be used solely for the benefit of its sub-subcontractors and suppliers providing labor or material for the Project. All payments from Contractor to Subcontractor shall immediately become trust funds for the benefit of such persons, and shall not be used or diverted by Subcontractor for any other purpose until such persons have been paid in full.

4.   **LIENS AND CLAIMS**. Subcontractor will promptly pay all costs and expenses incurred in the performance of this Subcontract as they become due and shall furnish evidence of their payment which is satisfactory to Contractor as requested by Contractor. Subcontractor shall keep the Project, buildings, (including the property upon which it is situated as well as any other property against which a lien is filed), Work and payment bonds, free from all liens and claims filed by Subcontractor or any other person providing, or claiming to provide, labor or material by, through or under Subcontractor. If Subcontractor fails to remove a lien by bonding or otherwise discharging it within forty-eight (48) hours of written notice from Contractor, Contractor may, in addition to its other rights and remedies it has, retain monies due or which may become due Subcontractor in an amount sufficient to pay the lien claimant, remove the claim, and pay Contractor for all costs associated with removing the claim, including but not limited to Contractor's attorneys' fees. Should monies due Subcontractor be insufficient to reimburse Contractor for these costs, Subcontractor shall remain obligated to reimburse Contractor any cost difference.

5.   **TIME FOR PERFORMANCE**. *Time is of the essence of the Subcontract*. Subcontractor, in signing this Subcontract, agrees that it has taken into consideration all hindrances and delays, including weather, incident to its Work, and agrees that the time allocated for its performance is sufficient. Subcontractor shall commence its Work when directed and as scheduled or rescheduled by Contractor, and diligently prosecute and coordinate its Work with other work being performed on the Project by others such that the completion of the entire Project in the time specified in the Contract Documents shall not be delayed by Subcontractor. Subcontractor's Work must be completed in sufficient time to allow all other work on the Project to be completed in accordance with the Schedule for the entire Project. Subcontractor recognizes and acknowledges that Contractor may modify the Schedule as the Work progresses, and Subcontractor shall continually keep itself updated as to job conditions to ensure that its Work shall be performed as directed by Contractor and in the durations scheduled by Contractor. If Subcontractor falls behind schedule, as determined by Contractor in its sole discretion, Subcontractor shall, at its sole expense and without additional compensation, work extra hours, weekends, or add additional labor to catch up and maintain the schedule established by Contractor. Should Subcontractor fail to do so, Contractor may add labor or retain third parties, and/or accelerate the work of others as necessary, and backcharge Subcontractor for all costs incurred in doing so. **SUBCONTRACTOR SHALL INDEMNIFY AND HOLD CONTRACTOR HARMLESS FOR ANY DAMAGES, SETTLEMENTS, COSTS, LEGAL FEES, OR EXPENSES INCURRED BY CONTRACTOR (INCLUDING LIQUIDATED DAMAGES ASSESSED BY OWNER) DUE TO SUBCONTRACTOR'S FAILURE TO PERFORM ITS WORK IN A TIMELY MANNER**. In the event Subcontractor is delayed by the sole or partial acts or inactions of Contractor or Owner, or for any reason whatsoever, including the active interference of either Contractor or Owner, Subcontractor shall be entitled to an extension of time for the performance of its Work as its sole and exclusive remedy for such delay or interference. To the extent enforceable under applicable state law, Subcontractor expressly waives any damages arising out of any delay unless Contractor pursues and recovers Subcontractor's delay damages from Owner. Contractor has no obligation to pursue Owner for delay damages, if any, sustained or claimed by Contractor or Subcontractor.

6. **WARRANTY**. All labor, material, and equipment furnished under this Subcontract is warranted and guaranteed by Subcontractor: (a) to satisfy all requirements of the Contract Documents; (b) to be sufficient for the purposes intended; (c) to be merchantable; (d) to be new unless otherwise specified; and (e) to be installed in a good and workmanlike manner free from defects. The foregoing warranties shall extend for the time period required by the Contract Documents, but in no event less than one (1) year from the date of substantial completion of the Project. These warranties are in addition to, and not in lieu of, all implied warranties that may exist under the law or any extended manufacturer warranties provided or required by the Contract Documents.

7. **DEFECTIVE WORK**. Subcontractor warrants and guarantees that it shall perform all Work in a good and workmanlike manner, in conformity with the obligations of this Subcontract, and in conformity with all applicable laws, building codes, specifications, and manufacturer's standards and recommendations. For a period of one year after substantial completion of the Project or such other longer period as provided in the Contract Documents, Subcontractor shall promptly restore or repair any defective Work or material that does not meet the obligations of this Subcontract. If Subcontractor fails to do so, Contractor may have such work performed and Subcontractor shall pay the reasonable costs thereof, including all of Contractor's direct and indirect costs associated therewith. Subcontractor shall promptly make good by replacement or correction, at its sole expense, any defective Work, any defect in materials or workmanship, or any Work or material which does not meet the requirements of this Subcontract, including the restoration of any Work of Contractor or other subcontractors that has been affected thereby. Subcontractor agrees to perform the Work under this Subcontract in such a manner that it will not injure, damage or delay any other work performed or to be performed by Contractor or other subcontractors and further agrees to pay Contractor for any damage that may be caused to such other Work. Subcontractor further agrees that if it shall cause any stains, blemishes, imperfection, marks or damage of any sort whatsoever, whether to its Work or to the Work of Contractor or other subcontractors, it will immediately remedy the damage so caused to the satisfaction of Contractor. Subcontractor acknowledges that its Work under Paragraphs 6 and 7 may be performed after the Project is being occupied or otherwise utilized by the Owner, the Owner's tenants, or others. Before and during the performance of its Work under Paragraphs 6 and 7, Subcontractor shall coordinate with Contractor, Owner, Owner's tenants, or others occupying or utilizing the Project, and shall be responsible for performing such work in a manner and time that will not interfere with the current usage of the Project, even if such accommodation requires that the Subcontractor's work is performed on weekend, after business hours, or even after the time periods set for in Paragraphs 6 or 7 have otherwise expired.

8. **INDEMNITY: TO THE FULLEST EXTENT PERMITTED BY LAW, SUBCONTRACTOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS CONTRACTOR AND OWNER, TOGETHER WITH THEIR AGENTS, SERVANTS, EMPLOYEES, REPRESENTATIVES, OFFICERS, DIRECTORS, SURETIES AND ATTORNEYS, FROM AND AGAINST ANY AND ALL CLAIMS, DAMAGES, SETTLEMENTS, LOSSES, EXPENSES, ATTORNEYS' FEES, AND CAUSES OF ACTION ARISING OUT OF OR RESULTING FROM THE FAILURE OF SUBCONTRACTOR TO PERFORM ITS CONTRACTUAL OBLIGATIONS OR SATISFY ANY STATUTORY OR COMMON LAW DUTIES. THIS INDEMNIFICATION OBLIGATION SHALL INCLUDE, BUT NOT BE LIMITED TO:**

(i) **ALL CLAIMS BY OWNER OR OTHERS AGAINST CONTRACTOR BASED ON ANY DEFECTS OR IMPROPER PERFORMANCE OF SUBCONTRACTOR'S WORK AND ALL CLAIMS, DAMAGE, SETTLEMENTS, LOSSES, EXPENSES, ATTORNEYS' FEES AND CAUSES OF ACTION ATTRIBUTABLE TO BODILY INJURY, SICKNESS, DISEASE OR DEATH, OR INJURY TO OR DESTRUCTION OF TANGIBLE PROPERTY, INCLUDING LOSS OF USE RESULTING THEREFROM, TO THE EXTENT CAUSED BY ANY BREACH OF WARRANTY, FAILURE TO PERFORM THE REQUIREMENTS OF THE CONTRACT DOCUMENTS, WILLFUL OR INTENTIONAL ACT OR NEGLIGENT ACT OR OMISSION OF SUBCONTRACTOR OR ANYONE DIRECTLY OR INDIRECTLY EMPLOYED BY SUBCONTRACTOR OR ANYONE FOR WHOSE ACTS SUBCONTRACTOR IS LIABLE, AND**

(ii) **ALL CLAIMS, DAMAGE, SETTLEMENTS, LOSSES, EXPENSES, ATTORNEYS' FEES AND CAUSES OF ACTION ATTRIBUTABLE TO BODILY INJURY, SICKNESS, DISEASE OR DEATH TO ANY EMPLOYEE OF SUBCONTRACTOR, ITS AGENT OR SUB-SUBCONTRACTOR OF ANY TIER, REGARDLESS OF WHETHER SUCH CLAIMS, DAMAGE, SETTLEMENTS, LOSSES, EXPENSES, ATTORNEYS' FEES AND CAUSES OF ACTION ARE CAUSED, OR ARE ALLEGED TO BE CAUSED, IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR OR OWNER, IT BEING THE EXPRESSED INTENT OF CONTRACTOR AND SUBCONTRACTOR THAT IN SUCH EVENT**

SUBCONTRACTOR IS TO INDEMNIFY, HOLD HARMLESS AND DEFEND OWNER AND CONTRACTOR FROM THE CONSEQUENCES OF THEIR OWN NEGLIGENCE, WHETHER IT IS OR IS ALLEGED TO BE THE SOLE OR CONCURRING CAUSE OF THE BODILY INJURY, SICKNESS, DISEASE OR DEATH OF SUBCONTRACTOR'S EMPLOYEE, AGENT OR THE EMPLOYEE OF ANY OF ITS SUB-SUBCONTRACTORS.

SUBCONTRACTOR'S INDEMNITY OBLIGATIONS SHALL REMAIN IN FULL FORCE AND EFFECT REGARDLESS OF WHETHER THE CLAIM RELATES TO A CLAIM UNDER SUBCONTRACTOR'S WORKERS COMPENSATION POLICY.    SUBCONTRACTOR'S OBLIGATION TO INDEMNIFY SHALL NOT BE CONSTRUED TO NEGATE, ABRIDGE OR OTHERWISE REDUCE ANY OTHER RIGHT OR OBLIGATION OF CONTRIBUTION OR INDEMNITY WHICH WOULD OTHERWISE EXIST AS TO ANY PARTY OR PERSON IN ANY OTHER PROVISION OF THIS SUBCONTRACT OR UNDER THE LAW. IN THE EVENT OF ANY INDEMNIFIED CLAIM AGAINST CONTRACTOR BY ANY THIRD PERSON, CONTRACTOR RESERVES THE RIGHT TO CHOOSE LEGAL COUNSEL AND DIRECT THE DEFENSE OF SUCH CLAIM AT SUBCONTRACTOR'S SOLE COST AND EXPENSE. THE ABOVE REFERENCED INDEMNITY OBLIGATIONS SHALL SURVIVE THE COMPLETION OF ALL WORK REQUIRED BY THE SUBCONTRACT AND/OR THE TERMINATION OF THE SUBCONTRACT.

9.    **DEFAULT/TERMINATION.** If, in the opinion of Contractor, Subcontractor shall at any time: (a) abandon the Work or refuse, fail or neglect to prosecute its Work with promptness or diligence or otherwise cause any stoppage, delay or interference with the Work of the Contractor or any other subcontractors on the Project; (b) refuse, fail or neglect in any respect to prosecute its Work according to Contractor's then current Schedule; (c) refuse, fail or neglect to provide sufficient properly skilled workers, adequate supervision or materials of proper quality; (d) refuse, fail or neglect to comply with any provision of this Subcontract or the Contract Documents; (e) file for relief under the Bankruptcy Act or be placed into receivership; or (f) fail to immediately rectify any unsafe condition or work procedure; then, in any of the foregoing events, Contractor, in its sole discretion, and after providing Subcontractor forty-eight (48) hours written notice, may: (i) terminate this Subcontract for default; or (ii) provide such materials, workmen, tools, equipment, and/or supervision as shall be deemed necessary by Contractor to prosecute the Work with due diligence, and to deduct the cost thereof from any money due or thereafter to become due to Subcontractor. In either instance, Contractor may enter upon the Subcontractor's premises, take possession of all materials, tools and other equipment of any kind whatsoever necessary for completing Subcontractor's Work and employ all persons and material necessary to complete the Work. If Contractor elects to take such actions as described in (i) or (ii) above, Subcontractor shall not be entitled to receive any further payment under this Subcontract until all of the Work of the Subcontract has been finished and all costs associated with finishing such Work have been paid. If the unpaid balance of monies otherwise due under this Subcontract exceeds the monies spent by Contractor to cure Subcontractor's default and/or complete Subcontractor's Work, including monies spent by Contractor for attorney's fees and additional overhead made necessary by Subcontractor's action, Subcontractor shall receive the difference, so long as: (a) Subcontractor has otherwise satisfied all other conditions to payment under this Subcontract, and (b) the time period for Subcontractor's warranty obligations has expired. If the monies as described above spent by Contractor exceed the unpaid balance of monies otherwise due, Subcontractor shall immediately pay Contractor the difference. In the event Contractor terminates Subcontractor under this Paragraph, Subcontractor agrees that all of its purchase orders or sub-subcontracts shall, upon written election by Contractor, be automatically assigned to Contractor. Contractor also reserves the right to terminate this Subcontract for convenience in which event Subcontractor shall be reimbursed, as its sole and exclusive remedy, and subject to any other limitations on payment as provided herein, for: (a) its actual costs incurred to date; and (b) all actual and reasonable demobilization costs. Subcontractor has the responsibility to document and demonstrate the accuracy and reasonableness of the costs for which it seeks payment from Contractor in such event. In the event Contractor terminates this Subcontract for default and said termination is determined, by Court or final arbitration Award, to have been wrongful, then such termination shall be converted to a termination for convenience and Subcontractor shall be entitled to the remedies provided for and agreed to herein as though the termination was one for convenience as Subcontractor's sole remedy.   Subcontractor expressly waives any consequential damages of any type or nature whatsoever in the event of termination or breach by the Contractor, whether by termination for default or for convenience. Notwithstanding anything contrary to the foregoing, Subcontractor's warranty obligations shall survive and shall not be affected or modified by any default or termination of this Subcontract, whether for cause or for convenience.

10.    **INSURANCE.** Subcontractor shall, in a manner satisfactory to Contractor, maintain at its own expense policies of insurance of the types and in the amounts not less than those stipulated below.  At the time this Subcontract is executed and returned to Contractor, prior to commencement of any Work and as a condition precedent to any payment being made, Subcontractor shall provide proof that it has satisfied all requirements of this paragraph.

10.1    Workers Compensation and Employer's Liability
    10.1.1    Coverage "A" - Statutory requirements in states where operating, to include all areas involved in operations covered by this Subcontract.
    10.1.2    Coverage "B" Employer's Liability, bodily injury by accident, $500,000 each accident; bodily injury by disease, $500,000 each employee; and bodily injury by disease $500,000 policy limit.
    10.1.3    Policy to include standard "Broad Form Other States" endorsement.

10.2    Commercial General Liability
    10.2.1    Commercial General Liability, including Premises/Operations, Elevators and Escalators, Independent Contractors, Products/Completed Operations, Personal and Advertising Injury, Broad Form Property Damage (including Completed Operations), and coverage for explosion, collapse and underground hazards. If *Exhibit A* Scope of Work is for residential construction, the Commercial General Liability policy must not contain any exclusion for the residential construction exposure in this Agreement. Residential construction is defined as (including but limited to) military housing, dormitories, nursing homes, multi-family, garden apartments, town homes, and condominiums.
    10.2.2    Contractual Liability: Blanket basis insuring the liability assumed under this Subcontract.
    10.2.3    Limits of Liability: $1,000,000 each occurrence for Bodily Injury and Property Damage; $2,000,000 general aggregate; $2,000,000 for products/completed operations aggregate.
    10.2.4    This policy shall remain in effect for a period of 10 years after the date of final completion of the Work.

10.3    Business Automobile Policy
    10.3.1    Business Automobile Policy form, including coverage for all Owned, Non-Owned and Hired Vehicles.
    10.3.2    Limits of Liability: $1,000,000 combined single limit for Bodily Injury and Property Damage.

☐ **Check box for Professional Liability Insurance (If box is checked, Section 10.4 Insurance is required)**

10.4    Professional Liability Insurance        $1,000,000 each claim
                                       Subject to a $1,000,000 policy aggregate.

This policy, shall remain in effect for a period of 10 years after the date of final completion and shall provide coverage for the negligent acts, errors and omissions of the Professional, any agent, servant or employee of the Professional while acting in their professional capacity for liability or damage that:

    10.4.1    is caused by or results from:
        a)  defects in plans, designs, or specification prepared, approved, or used by the architect; or
        b)  negligence of the Professional in the rendition or conduct of professional duties called for or arising out of the contract documents and the plans, designs or specifications that are a part of the contract documents; and

    10.4.2    arises from:
        a)  personal injury or death;
        b)  property injury; or any other expense that arises from personal injury, death or property injury.

☒ **Check box for Umbrella Liability Insurance (If box is checked, Section 10.5 Insurance is required)**

10.5    Umbrella Liability: Such insurance shall provide coverage with limits not less than $1,000,000 each occurrence for Bodily Injury and Property Damage; $1,000,000 general aggregate, in excess of the coverage's listed in Paragraphs 10.1, 10.2, 10.3 and 10.4 above.

10.6    Subcontractor shall cause the policies referenced in Paragraphs 10.1, 10.2, 10.3, 10.4 and 10.5 to be duly and properly endorsed by subcontractor's insurance underwriters as follows:
    10.6.1.    To the fullest extent of coverage allowed under Chapter 151 of the Texas Insurance Code, Contractor and Owner shall be included as additional insureds under the Commercial General Liability policy, using ISO Additional Insured Endorsements CG 20 10 10 01 and CG 20 37 10 01, or endorsements providing equivalent coverage, including products-completed operations. This insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs maintained by Contractor. To the fullest extent of coverage allowed under Chapter 151 of the Texas Insurance Code, Subcontractor



shall also include Contractor and Owner as additional insureds on the Umbrella Liability policy provided pursuant to Paragraph 10.5, including products completed operations coverage and on a primary basis. Subcontractor shall name Owner and Contractor as additional insureds in its Commercial General Liability and Umbrella Liability policies for ten (10) years after final completion as set out above. This provision does not apply to Worker's Compensation and Employer's Liability policies listed in Paragraph 10.1.

10.6.2.  To provide that the insurances will be primary, and that Owner's and Contractor's insurances shall be secondary and non-contributing at all times.

10.6.3.  To provide contractual liability coverage for liability assumed in its entirety under the terms of this Subcontract.

10.6.4.  To provide a full waiver of subrogation rights against Owner and Contractor for Workers Compensation and all other insurance coverages provided by Subcontractor.

10.6.5.  To provide forty-five (45) days prior written notice of cancellation or material change in coverage to Owner and Contractor for any insurance coverages provided by Subcontractor.

10.7  Subcontractor shall include provisions identical to Paragraphs 8 and 10 herein in each of its contracts and purchase orders with sub-subcontractors and suppliers, with each sub-subcontractor and supplier agreeing to indemnify and insure Subcontractor, Contractor and Owner to the same extent as required of Subcontractor in this Subcontract. In that regard, Subcontractor shall specifically include and incorporate the language referenced in Exhibit "G" in each of its own subcontracts, and shall provide Contractor copies of such subcontracts showing that Subcontractor has complied with this obligation. Without limiting Subcontractor's other obligations to this Agreement, in the event an individual hired or retained by a sub-subcontractor or other person performing work within Subcontractor's scope of Work is injured, and the person or entity retaining the services of such injured individual has not carried worker's compensation insurance for such injured individual, then in such event Subcontractor agrees that the injured individual will be deemed an employee of Subcontractor for statutory, contractual and common law purposes.

10.8  At the time this Subcontract is executed and returned to Contractor, and prior to the commencement of any Work, Subcontractor shall furnish Contractor with a certificate(s) of insurance, executed by a duly authorized representative of each insurer, showing compliance with the insurance requirements set forth herein. A copy of the endorsement or other policy provision adding Contractor and Owner as additional insureds to the Commercial General Liability policy shall be attached to the certificate of insurance. Contractor shall have the right, but not the obligation, to prohibit Subcontractor or any Sub-Subcontractor from entering the project site until such certificates or other evidence that insurance has been placed in compliance with these requirements is received and approved by Contractor. Failure to maintain the required insurance may result in termination of this Agreement at Contractor's option. If Subcontractor fails to maintain the insurance as set forth herein, Contractor shall have the right, but not the obligation, to purchase said insurance at Subcontractor's expense. Subcontractor shall provide certified copies of all insurance policies required herein within ten (10) days of Contractor's written request for copies. Subcontractor shall also be responsible for payment of its proportional share of any deductible for any loss covered by any insurance or builders risk policies provided by others for the Project.

10.9  Subcontractor, on behalf of itself and its insurers, agrees to waive any and all rights of subrogation which it or its insurers have or may have against Owner or Contractor, and their agents, representatives, employees, officers, directors, sureties, and insurers, for any loss or expense which is required to be covered under any policy of insurance pursuant to this Subcontract.

10.10  The above insurance coverages shall be maintained throughout the term of this Subcontract and for a ten (10) year period after final completion of the Project. Subcontractor's insurance carrier's shall be acceptable to Contractor and licensed or admitted to conduct business in the state where the Project is located and carry an A.M. Best Key rating of at least A-VIII or better.

11.  **ASSIGNMENT**. Subcontractor shall not let, assign, transfer or delegate this Subcontract or any portion or interest therein without the prior written consent of Contractor, which consent may be withheld at Contractor's sole discretion. Neither shall Subcontractor assign its rights to receive payments or factor any of its receivables for Work performed under this Subcontract.

12.  **BONDS AND FINANCIAL ASSURANCES/CONTRACTOR'S DEFAULT INSURANCE PROGRAM.**

Sub Initials 

☐ **If checked,** Subcontractor shall provide payment and performance bonds in an amount equal to the Subcontract Amount from a treasury listed surety with a best rating of A-VIII or better and authorized to do business in the State where the Project is located. Bonds shall be provided in the form attached as Exhibit "H". Subcontractor shall pay for any bond premium if a bond is required and in such case the cost of Subcontractor's bond is included in the Subcontract Amount. Premium for any required bonds shall not exceed the standard premium for said bond for the state in which the project is located. In the event bonds are not required initially Contractor shall still have the option to require bonds at any point after the Work has commenced. Contractor may also require Subcontractor to provide other reasonable financial assurances at any point, before, during or after the performance of the Work hereunder. In the event Subcontractor is unable to provide reasonable financial assurance sufficient to establish that it has the financial capability to perform its obligations hereunder, Contractor may elect and/or require, at Contractor's sole election, any of the following (i) the posting of payment and performance bonds at Subcontractor's sole cost and expense (notwithstanding anything to the contrary herein) in an amount, at Contractor's sole discretion, sufficient to complete the Work, (ii) the posting of a Letter of Credit or other financial guarantees in an amount, at Contractor's sole discretion, sufficient to complete the Work, or (iii) terminate this Subcontract with no further payment to Subcontractor, complete Subcontractor's Work, and thereafter recover any monies paid in excess of the Subcontract balance from Subcontractor. No election by Contractor shall affect or limit Subcontractor's obligations to Contractor as otherwise provided in this Subcontract.

☐ **If checked,** this project is enrolled in Contractor's Default Insurance (CDI) Program. Contractor shall deduct Subcontractor's portion of its CDI premium from the subcontract amount through a deductive change order.

13. **DAILY REPORTS.** Subcontractor shall prepare and furnish copies of daily reports to Contractor reflecting manpower and Work performed by, through or under Subcontractor each day.

14. **RESPONSIBILITY.** Subcontractor shall be and remain solely responsible for any loss or damage to any of its Work or materials provided to the Project, whether located on the site or stored offsite, as well as any equipment it has located at the site of the Project, until the Project is finally completed and accepted by the Owner. **SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS CONTRACTOR FROM ANY CLAIMS, COSTS, SUITS, DAMAGES OR SETTLEMENTS ASSOCIATED WITH ANY SUCH LOSS OR DAMAGE.**

15. **CLEAN UP.** Subcontractor is responsible for all of its own clean up and trash removal from the site daily in a manner acceptable to Contractor.

16. **SAFETY.** Subcontractor shall take all safety precautions, as required by applicable law and as otherwise required to ensure a safe workplace. Subcontractor shall take all reasonable precaution for the safety of all its employees and other persons affected by the performance of Subcontractor's Work, and for the safety of all property and improvements at the construction site. Subcontractor shall attend a Pre-Construction meeting at which time it will be given Contractor's Subcontractor Safety Packet detailing Contractor's Safety Requirements. Subcontractor shall attend all safety meetings, and shall conduct its own weekly safety meetings for its employees. Subcontractor shall comply with all applicable laws, ordinances, rules, regulations, statutes, and orders of any governmental agency or authority for the safety of persons or property or otherwise affecting the Work or the Project. Subcontractor shall comply with Contractor's Safety Requirements prior to commencing Work on the Project and throughout completion of its scope of work on the Project.

17. **TAXES.** Subcontractor shall pay all F.I.C.A., unemployment, social security and other employment taxes imposed upon it as an employer in connection with Subcontractor's Work. If requested by Contractor, Subcontractor will provide evidence satisfactory to Contractor that this obligation has been satisfied. Subcontractor shall also pay all local, state and federal taxes including but not limited to sales taxes, fees or assessments associated with Subcontractor's Work, and shall secure and pay for all licenses, permits, fees and approvals necessary for its Work.

18. **LABOR & EMPLOYMENT LAWS.** During the performance of the Subcontract, Subcontractor shall comply with all applicable federal, state, and local labor and employment laws (all as amended), including, but not limited to, the following: Fair Labor Standards Act, Equal Pay Act, and other laws relating to the payment and accrual of compensation and benefits; Occupational Safety and Health Act; Drug Free Workplace Act; National Labor Relations Act; Uniformed Services Employment and Reemployment Rights Act; Immigration Reform and Control Act of 1986 and other laws relating to lawful employment of persons authorized to work in the United States; Civil Rights Acts of 1866, 1964 and 1991; Americans with Disabilities Act; the Age Discrimination in Employment Act; other Equal Employment Opportunity ("EEO") laws prohibiting unlawful discrimination, harassment and retaliation based on any legally protected classification or status; and when applicable, Affirmative Action and EEO obligations as provided in Section 503 of the Rehabilitation

Act of 1973, Vietnam Era Veterans Readjustment Act and Executive Order 11246 and as provided in the following provisions, each of which are incorporated herein as if fully written in this Subcontract: the Equal Opportunity Clause at 41 C.F.R. § 60-1.4 and Section 202 of Executive Order 11246, the Standard Federal Equal Employment Opportunity Construction Contract Specifications at 41 C.F.R. § 60-4.3, Equal Opportunity for Workers with Disabilities at 41 C.F.R. § 60–741.5(a), and Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, Recently Separated Veterans, and Other Protected Veterans at 41 C.F.R. 60-250.5 and § 60-300.5.

19. **LEGAL FEES.** If Contractor, in its sole discretion, deems it necessary to employ legal counsel to enforce any of Subcontractor's obligations or protect Contractor or Owner from Subcontractor's failure to perform its obligations hereunder, Contractor shall be entitled to recover its reasonable attorneys' fees, costs and expenses.

20. **CHANGES.** This Agreement may be amended or modified only by written instrument signed by both Contractor and Subcontractor. In the absence of contrary provisions in the Owner/Contractor agreement: (a) any change involving an increase in the Subcontract Amount because of an increase in Subcontractor's scope of Work shall be priced at the actual cost of the work plus a markup for overhead, general conditions and profit not to exceed ten (10%) percent of the actual cost of the work; (b) any change involving a decrease in the Subcontract Amount due to a reduction in Subcontractor's scope of Work shall be priced at the actual cost of the work plus an additional decrease for overhead, general conditions and profit not to exceed ten (10%) percent of the actual cost of the work; and (c) any increase or decrease in the Subcontract Amount due to backcharges for work done to remedy damages caused by Contractor, Subcontractor or other subcontractors shall be priced at the actual cost of work with no markup for overhead, general conditions or profit. Pricing for changes to the Work shall be submitted to the Contractor within five (5) days of notification of or request for change. Contractor's Project Superintendent shall not have the authority to order, approve, or accept any alterations of any kind to Subcontractor's Work as shown or described by the Contract Documents, including any work beyond the scope of this Subcontract. An extension of time will not be granted for Subcontractor's performance unless (a) Subcontractor has given Contractor's Project Manager written notice of the delay within twenty-four (24) hours of the commencement of the event causing such delay, (b) Subcontractor is otherwise entitled to such extension pursuant to the Contract Documents, and (c) the Owner grants Contractor an extension of time in the Schedule equal to or greater than the amount of time Subcontractor seeks. Subcontractor expressly waives any claim for monies associated with any time extension or extra work performed prior to receipt of written order signed by Contractor's Project Manager.

21. **CHOICE OF LAW AND VENUE.** Unless otherwise precluded by operation of law, (i) this Subcontract shall be governed by and interpreted in accordance with the substantive laws of the State of Texas, and (ii) any mediation or arbitration (or litigation in the event the arbitration clause is held unenforceable) shall be conducted in either the location of the Project or in El Paso, Texas, as Contractor, in its sole discretion elects. Notwithstanding the foregoing, if Contractor's agreement with Owner provides for a choice of law different than this Subcontract, the law selected in Contractor's agreement with Owner shall govern this Subcontract. This provision shall survive the termination of the Subcontract, whether by default or for convenience.

22. **MEDIATION AND ARBITRATION.** Subcontractor and Contractor understand and warrant to one another that this transaction involves interstate commerce, and that any dispute of any type or nature whatsoever between Subcontractor and Contractor (past, present or future) including, but not limited to, (a) any and all controversies, disputes or claims arising under or related to this Subcontract, the property to be improved by Subcontractor, the Project, or any dealings between the parties (excluding "consumer products" as defined in the Magnuson-Moss Warranty - Federal Trade Commission Act and regulations promulgated thereunder), (b) any controversy, dispute or claim arising by virtue of any representations, misconduct or omissions, and (c) any personal injury or property damage claim, shall first be submitted to mediation and, if not settled at mediation, to binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., or, if deemed inapplicable, to the similar state arbitration statute for the state where the Project is located. In deciding the disputes between the parties, the arbitrator shall enforce the terms and conditions of this Subcontract utilizing the state law applicable to this Subcontract. If the arbitrator fails to do so, he shall be considered to have exceeded his authority. Determination of the arbitrability of any dispute shall be made by the arbitrator, and shall be binding on both parties. Mediation shall be conducted before a mediator jointly selected by both Contractor and Subcontractor. In the event the parties cannot agree on a mediator, then the mediator shall be selected by the American Arbitration Association ("AAA") utilizing the AAA's Construction Industry Mediation Rules in effect as of the date of this Subcontract, which are incorporated into this Subcontract. Arbitration shall be conducted before the AAA utilizing the AAA's Construction Industry Arbitration Rules in effect as of the date of this Subcontract, which are incorporated into this Subcontract. The award of the arbitrator(s) shall be rendered in writing, include an award of attorneys' fees and costs to the prevailing party, shall be final and binding and may be entered as judgment in any court of competent jurisdiction. Contractor and Subcontractor agree that this Mediation and Arbitration obligation shall survive the termination of this Subcontract,

whether by default or for convenience. Notwithstanding anything to the contrary, (a) Contractor reserves the right to pursue and obtain injunctive or equitable relief from a court of law, (b) if a lawsuit or arbitration is brought against Contractor in a court of law and such claims involve, directly or indirectly, Subcontractor's Work, Contractor reserves the right to join Subcontractor in such arbitration or lawsuit and Subcontractor agrees to join in that proceeding without objection, and (c) if any claims by Subcontractor involve, directly or indirectly, the work or obligations of other persons, Contractor reserves the right to join such other persons to its arbitration or litigation with Subcontractor.

23. **SUBMITTALS.** Subcontractor shall submit to Contractor as specified in the attached Scope of Work complete shop drawings, data, catalogue cuts and/or samples, and Material Safety Data Sheets for Subcontractor's Work as required by the Contract Documents or any state or federal laws or regulations. Subcontractor warrants that the submittals shall conform to the requirements of the Contract Documents. Approval by Contractor or Owner of any submittals shall not limit or abrogate Subcontractor's warranty that the submittals conform to the Contract Documents.

24. **SUBCONTRACTOR QUALIFICATION PROGRAM.** In order to perform work on this Project, Subcontractor shall be required to comply with Contractor's Qualification and Requalification Program. Subcontractor expressly agrees that payment, whether monthly or final, is contingent upon Contractor's receipt of fully executed Qualification and, if need be, Requalification documents. Subcontractor further agrees that Contractor shall withhold payment, whether monthly or final, to Subcontractor until such fully executed documents are received by Contractor.

25. **CLOSEOUT DOCUMENTS.** At such time as the Contractor deems appropriate, Subcontractor shall submit all closeout documents, including but not limited to all As-Built Plans, warranties, guaranties, instruction manuals, operations and maintenance manuals, spare parts, extra material, and other items as required under the Contract Documents.

26. **PRIOR NEGOTIATIONS AND AGREEMENTS.** Any prior negotiations, understandings, representations, promises, or agreements of any type or nature, excluding any bond provided by Subcontractor, if any, between Contractor and Subcontractor are hereby merged into this Subcontract and, to the extent they are inconsistent with or add to vary the terms hereof, they are void. Subcontractor warrants and represents that its sole rights and obligations are set forth in this Subcontract, and that it is not relying upon any written or verbal representation, assurance or promise of any type in entering this Subcontract.

27. **ENTRY.** All of Subcontractor's employees, subcontractors, suppliers and material carriers shall use the gate or place of access so designated by Contractor for their use at this Project.

28. **SEVERABILITY.** In the event any one or more provisions of this Subcontract, or any instrument executed and delivered hereunder or pursuant hereto, shall be held invalid, illegal or unenforceable in any respect as to any person or party by any court or in any arbitration proceeding, then the validity, legality and enforceability of the remaining provisions of this Subcontract or any other instrument executed and delivered hereunder pursuant hereto, and as to all other persons and parties affected or impaired thereby will remain unaffected and this Subcontract shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

29. **WRITTEN NOTICE.** All written notices provided for in this Subcontract shall be deemed given if delivered in writing to a representative of the party or, if and when sent by facsimile, regular mail, or by overnight carrier to the party at the address herein, or to the surety of the party named herein. Only one such notice shall be required, and any notice given in the manner herein described shall be deemed continuous.

30. **OWNER/ARCHITECT APPROVALS.** To the extent provided in the contract between Contractor and Owner, this Subcontract is subject to the approval of the Owner and/or Architect.

31. **SOILS.** In the event any of Subcontractor's Work involves, directly or indirectly, the condition of any soil or subsurface conditions at the site, Subcontractor warrants and represents that it has independently investigated the soils conditions and is not relying upon any soil report or other information concerning the characteristics or conditions of the soil or subsurface provided by or through Contractor, and Subcontractor waives any claim it has or might have against Contractor in the event the soil or subsurface varies from such soil report or other information. All soils and subsurface conditions shall be considered unclassified.

32. **EXECUTION.** This Subcontract is subject to cancellation at Contractor's sole discretion unless signed by Subcontractor and returned unaltered to Contractor within 10 working days. If so canceled, Subcontractor shall be entitled to no compensation.



33. **SURVIVAL.** Subcontractor's obligations hereunder shall survive the termination of this Subcontract as a result of default by Subcontractor or as a result of a termination by Contractor.

34. **SUCCESSORS AND ASSIGNS.** Subcontractor binds itself, its partners, successors, any assigns approved by Contractor, and legal representatives to the Contractor and to the partners, successors, assigns and legal representatives of the Contractor in respect to the covenants, agreements and obligations contained herein.

| **CONTRACTOR** | **SUBCONTRACTOR** |
|---|---|
| **Jordan Foster Construction, LLC** | **Texas Electrical Contractors, LLC** |
| By: | By: |
| Paul Bauer | Title: President |
| Title: Executive Vice President | |
| | Witness: |
| Date: 1/9/15 | Date: 1/5/2015 |

Exhibit "A"
**Scope of Work Product**

*Subcontractor is obligated to supply all labor, material and services required to perform and complete its Scope of Work as set forth below and as otherwise provided in the Contract Documents. Subcontractor's obligations shall include, without limitation, any related or incidental labor, material or services required to satisfy its obligations or any obligations reasonably inferable thereto, as well as any addenda or modifications issued subsequent to the date of this Subcontract.*

*Outline of Work:*

*The Bidder, herein after referred to as "Contractor" shall provide all labor, materials (installed & consumed), supervision, tools, equipment, permits, scaffolding, forms, shoring, layout, hoisting, erection, delivery, coordination and storage and all expense necessary for the engineering, supply, fabrication, field erection and installation, application, handling, hauling, disposal, unloading and receiving, installation, construction, assembly, testing, evaluation, safety, and quality assurance to complete the 26 Electrical, Fire Alarm System, hereinafter called work.*

*All work shall be accomplished in accordance with all applicable Local, State and Federal codes, ordinances, statutes and regulations. The Work shall furthermore constitute a complete and operable systems or systems in accordance with the intent as set forth or implied by the contract documents.*

*As per Texas Electricals attached proposal dated August 26, 2014 and plans, specifications and Addendums listed in Exhibit "B".*

1. **Specifications**: Contractor shall furnish and install all materials to provide functioning systems in compliance with the performance requirements specified in the specifications and drawings.

| | |
|---|---|
| 260500-01 | **Basic Electrical Materials and Methods** |
| 260519-01 | **Conductors and Cables** |
| 260526-01 | **Grounding and Bonding** |
| 260533-01 | **Raceways and Boxes** |
| 260923-01 | ~~**Lighting Control Devices**~~ WM |
| 262200-01 | **Dry Type Transformers** |
| 262413-01 | **Switchboards** |
| 262416-01 | **Panelboards** |
| 262726-01 | **Wiring Devices** |
| 262816-01 | **Enclosed Switches and Circuit Breakers** |
| 264113-01 | ~~**Lightning Protection**~~ WM |
| 264313-01 | **Surge Protective Devices** |
| 265100-01 | ~~**Interior Lighting**~~ WM |
| 265600-01 | ~~**Exterior Lighting**~~ WM |
| 269520-01 | **Electrical Cleaning and Testing** |
| 283112-01 | **Fire Alarm System** |

2.
   Scope of Work:
   2.1. In addition to the work in the specifications sections listed above, without the intent of limiting the work to be performed by this Trade Contractor, the following items are intended to be clarifications to the scope of work for **26 Electrical, Fire Alarm System,** are indicated by the Contract documents, generally described but not limited to the following:

Texas Electrical Contractors, LLC
12350 Montwood Dr. Ste 400-C
El Paso, TX 79928
TECL 27585
NM 368436
TACLA 016332E
M-19059



**TEXAS ELECTRICAL
TEXAS PLUMBING
TEXAS MECHANICAL
CONTRACTORS, LLC**

| | |
|---|---|
| Number of pages including cover sheet: | 1 |
| Date:        August 26, 2014 | RE:   Dick Poe Toyota |
| To:          Victor Dominguez Jr. | Tel:   915-877-3333 |
| Company   Jordan Foster Construction | Fax:   915-877-3999 |
| Message: | |

Victor,

Our price for MP&E for new Dick Poe Toyota Car Dealership as per issued drawings will be as follows:

| | |
|---|---|
| Electrical | $689,871.00 |
| ~~Plumbing~~ | ~~$649,342.00~~ |
| ~~Mechanical~~ | ~~$998,897.00~~ |

*ok la Hart*

Includes:
1. Sales tax on material
2. Fire alarm
3. Permit fees

Excludes:
1. Patch and paint
2. Roof patch
3. Structural framing
4. Tel/data wiring
5. Meter fees and/or utility fees of any kind
6. Gas yard line
7. Concrete patch
8. Formed concrete
9. Asphalt patch
10. Carbon Monoxide Extracting System
11. Lighting allowance of $650,000.00
12. Temporary services
13. Trash haul off
14. Site storm lines
15. Fire line and/or private hydrants of any kind
16. Special systems of any kind
17. Restroom accessories and/or partitions

Thank you,

Marc Martin

| | | | |
|---|---|---|---|
| From:        Marc Martin | | | |
| Direct Tel:   915-855-8800 | | Direct Fax: | 915-503-2304 |

Sub Initials

**Mobilization, temporary measures, coordination with other trades, traffic control, dust control, protection of existing features, regulatory and code compliance with all Federal, State and Local requirements pertaining.**

2.1     Mobilization: Subcontractor shall mobilize its equipment and temporary facilities immediately following award of the contract. Locations of the same shall be approved by Jordan Foster's field superintendent. Subcontractor shall not be entitled to recover costs related to any additional mobilizations or de-mobilizations related to this scope of work.

2.2     Traffic Control: Subcontractor shall be responsible for all traffic control required to accomplish the scope of work of this bid package. Subcontractor shall provide necessary flagmen, signage, barricades, flashing lights and any other necessary traffic control to monitor access to and from site on to adjoining public streets and areas required by his work.

2.3     Subcontractor shall perform his own layout from General Contractor furnished control points and benchmarks.

2.4     Subcontractor shall furnish and install  electrical, systems complete and functional in accordance with the plans and specifications.

2.5     Subcontractor shall be responsible for excavating and backfilling the underground lines in this scope of work in accordance with the plans and specifications.

2.6     Subcontractor shall furnish all required engineering including calculations, stamped drawings, and data furnished by a qualified licensed Professional Engineer for items in this scope of work.

2.7      Subcontractor shall be responsible for coordination and tie-ins to existing services. Coordination of all utility outages for this scope of work is the responsibility of this Subcontractor.

2.8     Subcontractor shall furnish all permits for this scope of work. All permits, licenses, insurance, and testing required by the authority having jurisdiction shall be furnished by this Subcontractor.

2.9     Subcontractor shall conduct a full checkout and testing of the equipment and submit a report of the results for this complete scope of work.

2.10    Subcontractor shall assist the concrete subcontractor in laying out all Electrical imbeds and penetrations in the concrete subcontractor's scope of work.

2.11    Subcontractor shall furnish and install fire-stopping at all Electrical penetrations through fire-rated floors and wall partitions in accordance with the plans and specifications.

2.12    Subcontractor shall furnish and layout ~~boots~~, sleeves, and ~~flashings~~ for all Electrical penetrations through other trades' work.

2.13    Subcontractor shall furnish and install all aerial, underground and above ground electrical routing to connect service entrance equipment to point of connection at the building and to the EPEC transformer including but not limited to conduit risers, layout verification, excavation, backfill and compaction in accordance with the plans and specifications.

2.14    Subcontractor shall furnish and install all hangers and anchors for the Electrical scope in accordance with the plans and specifications.

2.15    Subcontractor shall furnish and install a fire alarm system that is in full compliance with all necessary local, state and federal code and regulatory authority, including but not limited to NFPA as noted in the plans and specifications.

2.16    Subcontractor shall coordinate with the fire sprinkler subcontractor to allow tie-ins of the fire sprinkler valves to the fire alarm system for a completely functional fire suppression/protection system.

2.17    Subcontractor shall bear responsibility to implement a "Lock Out/Tag Out" program to ensure safe operating procedures once electrical power is energized in the building.

2.18     Subcontractor shall coordinate installation of permanent power to the site with El Paso Electric Company.

2.19    Subcontractor shall take extreme care so as not to damage work by other trades that is already in-place. Costs to restore the damaged items to their original condition shall be borne by this subcontractor.

2.20    Liquidated Damages: The Subcontractor and their surety/sureties shall be jointly and severally liable for and shall pay Construction Manager the sum of $1,000.00 per day as the fixed, agreed liquidated damages, for each full or partial calendar day of unexcused delay from the date of completion of this scope of work, as indicated in the referenced project schedule.

## General Clauses

1      Subcontractor shall provide all scaffolding, ladders and hoisting required to complete the work identified in this agreement. Said equipment shall meet OSHA standards.

2.     There is no space available on site for trailers, storage areas or vehicle parking. Each Subcontractor must make their own arrangements for these items to be located off-site.

3.  Due to the limited access to the building, all deliveries must be coordinated with Contractor's Project Superintendent. Notice must be given 48-hours in advance, and scheduling will be on a first come, first serve basis. Subcontractor shall provide Contractor with a complete delivery schedule within 14 calendar days from date of this Agreement. This delivery schedule shall include each manufacturers' or supplier's name, address, contact, phone number, item or equipment being furnished, and projected delivery date. Within 45 calendar days of the date of this Agreement, this schedule shall be supplemented with written confirmations of the delivery date from each manufacturer or supplier. Contractor may directly contact any of the Subcontractor's suppliers, manufacturers, or Subcontractors with whom delivery is either not confirmed or appears likely to create problems or delays.

4.  Subcontractor will provide a full-time, English speaking superintendent. Prior to beginning work, Subcontractor shall provide Contractor with the name of the superintendent for approval. Once approved, this superintendent shall be designated as the Subcontractor's superintendent for the entire length of the project. The superintendent that is designated for this project must be present at the jobsite whenever the Subcontractor has workers on-site.

5.  All fees and permits associated with this scope of work are included.

6.  All sales tax is included.

7.  Subcontractor will purchase at least one radio that will be designated for communication with Contractor Management. Subcontractor will get specifications for this radio from the Contractor superintendent prior to purchase.

8.  Subcontractor agrees to require post-accident drug testing of any and all employees on-site at the time of an accident if requested by Contractor.

9.  The warranty period for all materials and equipment provided in this scope of work shall begin at the time that a Certificate of Occupancy has been issued or when the owner occupies the building, whichever is later.

10. Subcontractor is responsible for general cleanup of his work by-product on a daily basis. Subcontractor shall provide one man, for one morning each week (typically Friday, or as designated by the Contractor superintendent) for additional jobsite clean-up.

11. Subcontractor will provide Contractor complete and accurate Daily Reports on Contractor's Daily Report Form. These reports will be turned in no later than 10:00 AM on the following workday.

12. Subcontractor shall be responsible for providing drinking water to its own workforce.

13. Subcontractor will notify Contractor's Superintendent in writing of any unacceptable substrate or work in place prior to proceeding with Work in that area.

14. Subcontractor shall work on Saturdays as make-up days at no additional expense to the Contractor in the event that normal workdays are lost due to weather.

15. Subcontractor will prepare his submittals or other information immediately upon execution of this agreement.

16. Subcontractor will not perform Work that would alter the Subcontract Amount unless directed to do so by written instructions from the Contractor.

17. Subcontractor's Project Manager must attend weekly job progress meetings as required by Contractor. Failure to comply with this requirement may result in contract termination.

18. At the completion of the Work, Subcontractor is to clean and protect all materials/ equipment installed under this Subcontract.

19. Subcontractor to provide necessary traffic control to monitor access to and from site on to adjoining public streets required by his Work.

20. Subcontractor understands that there will be minor and necessary repairs to their Work required after their installations are completed. Subcontractor has included all touch-up work as required and directed by the Contractor.

21. In case of an inconsistency in the plans or specifications, Subcontractor has included the better quality and/or greater quantity of Work.

22. Subcontractor is responsible for furnishing and installing all sleeves, block outs, embeds and inserts, etc., for any and all required penetrations through poured-in-place concrete and CMU walls, slabs, and beams. All such penetrations must be coordinated with the penetrations of other trades and with the structural design so that the structural integrity of the building is not impaired.

23.   Subcontractor is responsible for firesafing and sealing around all slab and wall penetrations so that the fire safety and water-tightness is code-worthy and not compromised. This Work shall be done in a timely manner so as not to delay other Work.

24.   It is agreed and completely understood that the Subcontractor will supply all access doors to be installed by the Contractor. The Subcontractor will also clearly mark access requirements within the ceiling systems as required. Access doors shall be supplied of adequate size and numbers to access the mechanical and plumbing work as required by the Owner, Architect, and applicable codes.

25.   Prior to the release of final retention, Subcontractor shall provide all as-built drawings, warranty notifications, O & M Manuals and completed punch-lists.

26.   Contractor will provide adequate (per OSHA requirements) access and egress lighting. Subcontractor is responsible to provide adequate task lighting to perform his scope of Work.

27.   Subcontractor to remove and place all trash in dumpsters provided by the Contractor.

28.   Subcontractor shall only temporarily store material in location(s) designated by the Contractor. Subcontractor staging and lay-down areas will be designated on Contractor's Site Logistics Plan. Material stored without proper authorization will be moved by Subcontractor at no additional cost, or Contractor will relocate material at Subcontractor's cost and without liability of damage.

29.   Subcontractor is responsible for the parking and transportation of his employees to and from the site.

30.   It is Contractor's goal to achieve a "Zero Punchlist". In order to achieve this goal, Subcontractor is to provide all required Quality Control/ Quality Assurance personnel to achieve this goal. Subcontractor is responsible for Punchlisting his own Work, and providing Contractor copies of the Punchlist. Contractor will provide this service at Subcontractor's cost if not performed satisfactory.

## Exhibit "B"
### Drawings, Specifications and other Design Documents

*The following sets forth the drawings, specifications and other design documents associated with the performance of Subcontractor's Work. This list may not be a comprehensive listing of drawings, specifications or design documents relating to Subcontractor's Scope of Work, and Subcontractor shall carefully review this list and immediately notify Contractor if other design or specification-related documents contained in the Contract Documents may involve or otherwise relate to Subcontractor's Work. Failure to list such other documents in this Exhibit "B" shall not relieve Subcontractor from performing the Scope of Work and its other obligations pursuant to this Subcontract.*

DICK POE TOYOTA
6330 MONTANA AVE.
EL PASO, TX  79925

**DRAWINGS**
CIVIL

| | |
|---|---|
| C1.0 GRADING PLAN | 7-31-14 |
| C1.1 GRADING SECTIONS | 7-31-14 |
| C1.2 GRADING SECTIONS | 7-31-14 |
| C2.0 DRAINAGE PLAN | 7-31-14 |
| C2.1 INLETS AND FLUMES | 7-31-14 |
| C2.2 HISTORICAL FLOWS | 7-31-14 |
| C3.0 PAVEMENT LAYOUT | 8-22-14 |
| C3.1 RAMPS AND DRIVEWAYS | 8-22-14 |
| C3.2 TYPICAL DETAILS | 7-31-14 |
| C3.3 SITE DRIVEWAY LOCATIONS | 7-31-14 |
| C3.11 TX DOT RAMP DETAILS | 7-31-14 |
| C3.12 TX DOT DRIVEWAY DETAILS | 7-31-14 |
| C4.0 PRECAST CONCRETE SCREENING WALL LAYOUT | 7-31-14 |
| C4.1 PRECAST CONCRETE SCREENING WALL DETAILS | 7-31-14 |
| C5.0 STORM WATER POLLUTION PREVENTION PLAN | 7-31-14 |
| C5.1 STORM WATER POLLUTION PREVENTION PLAN | 7-31-14 |
| C5.2 STORM WATER POLLUTION PREVENTION PLAN | 7-31-14 |
| C6.0 UTILITY PLAN | 7-31-14 |
| C6.1 SEWER PLAN AND PROFILE | 7-31-14 |
| C6.2 SEWER DETAILS | 7-31-14 |
| C6.3 WATER DETAILS | 7-31-14 |
| LANDSCAPE | |
| L1.0 LANDSCAPE PLAN | 7-04-14 |
| L2.0 IRRIGATION PLAN | 7-04-14 |
| L3.0 LANDSCAPE AND IRRIGATION DETAILS | 7-04-14 |
| ARCHITECTURAL | |
| -- COVER | |
| G0.0 DRAWING INDEX/GENERAL NOTES | 8-01-14 |
| G0.1 ACCESSIBILITY STANDARDS | 8-01-14 |
| G0.2 ACCESSIBILITY STANDARDS | 8-01-14 |
| | |
| SP0.1 SITE PLAN PHASING DEMOLITION | 8-01-14 |
| SP0.2 SITE PLAN PHASING CONSTRUCTION | 8-01-14 |
| SP1.0 DIMENSIONED SITE PLAN | 8-01-14 |
| SP1.1 NOTED SITE PLAN | 8-20-14 |
| SP1.2 LIGHTING SITE PLAN | 8-01-14 |
| SP2.1 SITE DETAILS | 8-01-14 |
| A0.1 BUILDING CODE ANALYSIS | 8-01-14 |
| A0.2 BUILDING CODE ANALYSIS | 8-20-14 |
| A0.3 PHASING PLAN | 8-01-14 |
| A0.4 PHASING PLAN | 8-01-14 |
| A1.0 COMPOSITE FLOOR PLAN | 8-01-14 |
| A1.1 PARTIAL 1ST FLOOR DIMENSIONED PLAN- SHOWROOM | 8-18-14 |
| A1.2 PARTIAL 1ST FLOOR DIMENSIONED PLAN-EXPRESS LUBE/USED CAR | 8-18-14 |
| A1.3 PARTIAL 1ST FLOOR DIMENSIONED PLAN-SERVICE SHOP | 8-18-14 |
| A1.4 PARTIAL 1ST FLOOR NOTED PLAN- SHOWROOM | 8-20-14 |
| A1.5 PARTIAL 1ST FLOOR NOTED PLAN-EXPRESS LUBE/USED CAR | 8-18-14 |

A1.6 PARTIAL 1ST FLOOR NOTED PLAN-SERVICE SHOP 8-18-14
A1.7 PARTIAL 1ST FLOOR FINISH PLAN- SHOWROOM 8-18-14
A1.8 PARTIAL 1ST FLOOR FINISH PLAN-EXPRESS LUBE/ USED CAR 8-20-14
A1.9 PARTIAL 1ST FLOOR  FINISH PLAN-SERVICE SHOP 8-18-14
A1.10 2ND FLOOR DIMENSIONED PLAN SHOWROOM 8-18-14
A1.11 2ND FLOOR NOTED PLAN -SHOWROOM 8-18-14
A1.12 2ND FLOOR FINISH PLAN – SHOWROOM 8-21-14
A1.13 BASEMENT LEVEL 8-01-14
A2.0 ELEVATIONS 8-01-14
A2.1 ELEVATIONS 8-18-14
A2.2 ELEVATIONS 8-18-14
A2.3 ELEVATIONS 8-18-14
A3.1 SCHEDULES 8-18-14
A3.2 DOOR SCHEDULE 8-21-14
A3.3 EXTERIOR GLAZING SCHEDULE 8-18-14
A3.4 EXTERIOR GLAZING SCHEDULE 8-18-14
A3.5 EXTERIOR GLAZING SCHEDULE 8-20-14
A3.6 INTERIOR GLAZING SCHEDULE 8-21-14
A3.7 INTERIOR GLAZING SCHEDULE 8-20-14
A3.8 INTERIOR GLAZING SCHEDULE 8-20-14
A3.9 PARTITIONS SCHEDULE 8-18-14
A3.10 PARTITIONS SCHEDULE 8-18-14
A3.11 PARTITIONS SCHEDULE 8-01-14
A3.12 ENLARGED RESTROOMS 8-18-14
A3.13 ENLARGED RESTROOMS 8-18-14
A3.14 ENLARGED RESTROOMS 8-18-14
A3.15 ENLARGED RESTROOMS 8-18-14
A3.16 MILLWORK DETAILS 8-21-14
A3.17 MILLWORK DETAILS 8-20-14
A3.18 MILLWORK DETAILS 8-21-14
A4.1 BUILDING SECTIONS 8-20-14
A4.2 BUILDING SECTIONS 8-20-14
A4.3 BUILDING SECTIONS 8-20-14
A4.4 BUILDING SECTIONS 8-01-14
A5.0 WALL SECTION NOTES 8-20-14
A5.1 WALL SECTIONS 8-20-14
A5.2 WALL SECTIONS 8-20-14
A5.3 WALL SECTIONS 8-21-14
A5.4 WALL SECTIONS 8-21-14
A5.5 WALL SECTIONS 8-21-14
A5.6 WALL SECTIONS 8-21-14
A5.7 AXONOMETRIC FRAMING VIEW 8-01-14
A5.8 ENLARGED DETAILS 8-21-14
A5.9 ENLARGED DETAILS 8-01-14
A5.10 ACM DETAILS 8-01-14
A5.11 ACM DETAILS 8-01-14
A5.12 ACM DETAILS 8-01-14
A5.13 ACM DETAILS 8-01-14
A6.1 STAIR 1 & STAIR 3 8-01-14
A6.2 STAIR 2/ELEVATOR SECTION 8-01-14
A6.3 STAIR 4 8-01-14
A7.1 PARTIAL 1ST FLOOR RCP-SHOWROOM 8-20-14
A7.2 PARTIAL 1ST FLOOR RCP-USED CAR 8-20-14
A7.3 PARTIAL 1ST FLOOR RCP-SERVICE SHOP 8-20-14
A7.4 2ND FLOOR REFLECTED CEILING PLAN 8-20-14
A8.1 ROOF PLAN 8-20-14
A9.1 PERSPECTIVE VIEWS 8-01-14
A9.2 PERSPECTIVE VIEWS 8-01-14
A9.3 PERSPECTIVE VIEWS 8-01-14
STRUCTURAL
S1.0 OVERALL FOUNDATION PLAN 8-15-14
S1.1 PARTIAL FOUNDATION PLAN – SHOWROOM 8-15-14
S1.2 PARTIAL FOUNDATION PLAN - USED CAR 7-28-14
S1.3 PARTIAL FOUNDATION PLAN - SERVICE SHOP 8-15-14

| | |
|---|---|
| S1.4 BASEMENT AND FIRST FLOOR PLANS | 7-28-14 |
| S2.0 OVERALL ROOF FRAMING PLAN | 8-15-14 |
| S2.1 SECOND FLOOR FRAMING PLAN | 8-15-14 |
| S2.2 PARTIAL ROOF FRAMING PLAN – SHOWROOM | 8-15-14 |
| S2.3 PARTIAL ROOF FRAMING PLAN - USED CAR | 8-15-14 |
| S2.4 PARTIAL ROOF FRAMING PLAN - SERVICE SHOP | 8-15-14 |
| S3.1 FOUNDATION DETAILS | 7-28-14 |
| S3.2 FOUNDATION DETAILS | 7-28-14 |
| S3.3 FOUNDATION DETAILS | 7-28-14 |
| S3.4 FOUNDATION DETAILS | 8-15-14 |
| S4.1 FRAMING DETAILS | 8-15-14 |
| S4.2 FRAMING DETAILS | 8-15-14 |
| S4.3 FRAMING DETAILS | 7-28-14 |
| S4.4 FRAMING DETAILS | 7-28-14 |
| S4.5 FRAMING DETAILS | 7-28-14 |
| S4.6 BRACE ELEVATIONS AND DETAIL CONNECTIONS | 8-15-14 |
| S5.1 TILT UP PANEL ELEVATIONS | 7-28-14 |
| S5.2 TILT-UP PANEL ELEVATIONS | 7-28-14 |
| S5.3 TILT-UP PANEL ELEVATIONS | 7-28-14 |
| S6.1 SPECIFICATIONS | 7-28-14 |
| S6.2 CNS | 7-28-14 |
| MECHANICAL | |
| M0.0 HVAC COVER SHEET | 7-23-14 |
| M0.1 HVAC COMPLIANCE FORM | 7-23-14 |
| M2.1 FIRST FLOOR PLAN - HVAC – SHOWROOM | 8-18-14 |
| M2.2 FIRST FLOOR PLAN - HVAC - USED CAR | 8-18-14 |
| M2.3 FIRST FLOOR PLAN - HVAC - SERVICE SHOP | 8-18-14 |
| M2.4 SECOND FLOOR PLAN – HVAC | 8-18-14 |
| M2.5 ROOF PLAN – HVAC | 8-18-14 |
| M3.1 HVAC PARTIAL PLANS | 8-18-14 |
| M4.1 HVAC DETAILS | 7-23-14 |
| M4.2 HVAC DETAILS | 7-23-14 |
| M4.3 HVAC DETAILS | 7-23-14 |
| M5.1 HVAC SCHEDULES | 8-18-14 |
| M5.2 HVAC SCHEDULES | 7-23-14 |
| ELECTRICAL | |
| E0.0 ELECTRICAL COVER SHEET | 7-23-14 |
| E0.1 ENERGY COMPLIANCE FORMS ELECTRICAL | 7-23-14 |
| E1.1 SITE PLAN ELECTRICAL | 7-23-14 |
| E1.2 SITE PHOTOMETRIC PLAN | 7-23-14 |
| E2.1 FIRST FLOOR PLAN - LIGHTING – SHOWROOM | 8-18-14 |
| E2.2 FIRST FLOOR PLAN - POWER – SHOWROOM | 8-18-14 |
| E2.3 FIRST FLOOR PLAN - LIGHTING - USED CAR | 8-18-14 |
| E2.4 FIRST FLOOR PLAN - POWER - USED CAR | 8-18-14 |
| E2.5 FIRST FLOOR PLAN - LIGHTING - SERVICE SHOP | 8-18-14 |
| E2.6 FIRST FLOOR PLAN - POWER - SERVICE SHOP | 8-18-14 |
| E2.7 SECOND FLOOR PLAN – LIGHTING | 8-18-14 |
| E2.8 SECOND FLOOR PLAN – POWER | 8-18-14 |
| E2.9 ROOF PLAN – ELECTRICAL | 8-18-14 |
| E3.1 ELECTRICAL PARTIAL PLANS | 7-23-14 |
| E3.2 ELECTRICAL PARTIAL PLANS | 8-18-14 |
| E4.1 ELECTRICAL RISERS & DETAILS | 8-18-14 |
| E5.1 ELECTRICAL DETAILS | 7-23-14 |
| E5.2 ELECTRICAL DETAILS | 7-23-14 |
| E5.3 ELECTRICAL DETAILS | 7-23-14 |
| E6.1 ELECTRICAL SCHEDULES | 7-23-14 |
| E6.2 ELECTRICAL SCHEDULES | 7-23-14 |
| E6.3 ELECTRICAL SCHEDULES | 7-23-14 |
| E6.4 ELECTRICAL SCHEDULES | 7-23-14 |
| PLUMBING | |
| P0.0 PLUMBING COVER SHEET | 8-18-14 |
| P1.1 SITE PLAN - PLUMBING / FIRE PROTECTION | 8-18-14 |
| P2.1 FIRST FLOOR PLAN - SHOWROOM – PLUMBING | 8-18-14 |
| P2.1U UNDERFLOOR PLAN - SHOWROOM – PLUMBING | 8-18-14 |

P2.2 FIRST FLOOR PLAN - USED CAR – PLUMBING                                  8-18-14
P2.2U UNDERFLOOR PLAN - USED CAR – PLUMBING                                  8-18-14
P2.3 FIRST FLOOR PLAN - SERVICE SHOP – PLUMBING                              8-18-14
P2.3U UNDERFLOOR PLAN - SERVICE SHOP – PLUMBING                              8-18-14
P2.4 SECOND FLOOR PLAN – PLUMBING                                           8-18-14
P2.5 BASEMENT FLOOR PLANS – PLUMBING                                        8-18-14
P2.6 ROOF PLAN – PLUMBING                                                   8-18-14
P3.1 PLUMBING PARTIAL PLANS                                                 8-18-14
P3.2 PLUMBING PARTIAL PLANS                                                 8-18-14
P3.3 PLUMBING PARTIAL PLANS                                                 8-18-14
P3.4 PLUMBING PARTIAL PLANS                                                 7-23-14
P4.1 PLUMBING RISERS                                                        8-18-14
P4.2 PLUMBING RISERS                                                        8-18-14
P5.1 PLUMBING DETAILS                                                       7-23-14
P5.2 PLUMBING AND FIRE PROTECTION DETAILS                                   8-18-14
P6.1 PLUMBING SCHEDULES                                                     8-18-14

**SPECIFICATIONS DATED 8-1-14**
DIVISION 0 Proposal
00050 Invitation to Bidders
00075 Report of Geotechnical Investigation Study
00100 Instructions to Bidders, AIA A701
00700 General Conditions of the Contract, AIA A201
00800 Supplementary Conditions
DIVISION 1
01001 Summary of Work
01014 Owner Furnished Items
01045 Cutting and Patching
01210 Allowances
01250 Contract Modification Procedures
01270 Unit Prices
01290 Payment Procedures
01300 Product Color Submittals
01310 Project Management and Coordination
01320 Construction Progress Documentation
01322 Photo Documentation
01330 Submittal Procedures
01400 Quality Requirements
01410 Testing Laboratory Services
01500 Temporary Facilities and Controls
01770 Closeout Procedures
01781 Project Record Documents
01782 Operation and Maintenance Data
DIVISION 2
02200 Earthwork & Grading
02220 Trenching, Backfilling & Compaction
02230 Site-work and Clearing
02235 Finish Grading
02260 Excavation Support & Protection
02270 Erosion and Sedimentation Control
02276 Filter Fabric
02361 Termite Control
02441 Underground Irrigation System
02485 Landscaping
02510 Water Distribution
02520 Portland Cement Walks & Curbs
02530 Sanitary Sewage
02630 Storm Drainage
02751 Cement Concrete Paving
02764 Pavement Joint Sealants
02820 Pipe Rail Fences & Gates
02821 Chain Link Fences & Gates
DIVISION 3 0
3300 Cast-In-Place Concrete



DIVISION 4
04810 Unit Masonry Assemblies

DIVISION 5
05120 Structural Steel
05210 Steel Joists
05310 Steel Deck
05400 Cold Formed Metal Framing
05500 Miscellaneous Metal Fabrications
05511 Metal Stairs
05521 Pipe & Tube Railings
DIVISION 6
06100 Rough Carpentry
06160 Sheathing
06202 Interior Finish Carpentry and Millwork
DIVISION 7
07190 Water Repellents
07210 Building Insulation
07241 Exterior Insulation and Finish Systems – Class PB
07250 Aluminum Composite Material (A.C.M.)
07263 Under-slab vapor barrier
07541 PVC Mechanically Attached
07620 Sheet Metal Flashing and Trim
07710 Manufactured Roof Specialties
07720 Roof Accessories
07811 Sprayed Fire Resistive Materials
07841 Through Penetration Fire Stop Systems
07842 Fire Resistive Joints
07920 Joint Sealants
DIVISION 8
08110 Steel Doors and Frames
08125 Interior Aluminum Frames
08126 Fixed Glass Panel Partitions
08211 Plastic Laminated Face & Solid Core Wood Doors
08311 Access Doors & Frames
08220 Composite (FRP) Doors and Frames
08320 Sliding Entrance Doors
08321 Sliding Automatic Entrance Doors
08332 High Speed Rolling Doors
08334 Rolling Overhead Fire Shutter
08340 Security Grilles
08360 Sectional Insulated Overhead Doors
08361 Sectional Overhead Doors
08411 Aluminum Framed Entrance & Curtain Walls
08420 Tempered Glass Doors
08520 Aluminum Storefront
08710 Door Hardware
08800 Glazing
DIVISION 9
09111 Non Load Bearing Steel Framing
09220 Portland Cement Plaster
09250 Gypsum Board
09310 Ceramic Tile
09311 Solid Surfacing
09512 Acoustical Tile Ceiling
09542 Linear wood ceiling
09651 Resilient Floor Tile
09653 Resilient Wall Base and Accessories
09547 Metal Plank Ceiling System
09680 Carpet
09652 Epoxy Terrazzo
09965 Epoxy floor Coating
09720 Wall Coverings
09911 Exterior Painting

09912 Interior Painting
DIVISION 10
10155 Toilet Compartments
10200 Louvers and Vents
10505 Metal Lockers
10520 Fire Protection Specialties
10800 Washroom Accessories
DIVISION 11
11000 Equipment
DIVISION 12
12494 Roller Shade
12482 Entrance floor grid
12364 Stone Countertops
DIVISION 13 NOT USED
DIVISION 14
14210 Machine Room-Less Elevators
DIVISION 23
23341 High Volume Low Speed fan
23342 HVAC Fan
23350 Internal-Combustion Engine Exhaust Piping
**SPECS DATED JULY 23, 2014**
**Division 21 – Fire Suppression**
210500 Fire Suppression General Requirements
210510 Fire Suppression System
**Division 22 – Plumbing**
220130 Cleaning and Testing
220500 Basic Plumbing Materials and Methods
220523 Valves (Plumbing)
220529 Plumbing System Hangers and Supports
220553 Plumbing Identification
220700 Pipe Insulation
221116 Domestic Water Piping
221117 Fuel Gas Piping
221119 Plumbing Specialties
221122 Meters and Gages
221123 Water Distribution Pumps
221316 Sanitary Waste and Vent Piping
221413 Storm Drainage Piping
221513 General Service Compressed Air Piping
223300 Electric, Domestic Water Heaters
224000 Plumbing Fixtures
224500 Emergency Plumbing Fixtures
**Division 23 – Mechanical**
230130.51 Cleaning and Testing
230500 Basic Mechanical Materials and Methods
230513 Motors
230515 Variable Frequency Drives
230529 Hangers and Supports
230548 Mechanical Vibration Controls
230553 Mechanical Identification
230593 Testing, Adjusting and Balancing
230700 Duct Insulation
230719 HVAC Piping Insulation
230900 Instrumentation and Control for HVAC
230901 Carbon Monoxide Monitoring and Control System
230993 Sequence of Operations for HVAC Controls
232300 Refrigerant Piping
232913 Motor Controllers
233113 Metal Ducts
233300 Duct Accessories
233423 Power Ventilators
233523 Gas-Fired Radiant Heaters
233713 Diffusers, Registers and Grilles
237413 Rooftop Units (DX)

238126 Split-System Air-Conditioning Unit
238213 Electric Radiant Heaters
238223 Propeller Unit Heaters
**Division 26 – Electrical**
260500 Basic Electrical Materials and Methods
260519 Conductors and Cables
260526 Grounding and Bonding
260533 Raceways and Boxes
260923 Lighting Control Devices
262200 Dry Type Transformers
262413 Switchboards
262416 Panelboards
262726 Wiring Devices
262816 Enclosed Switches and Circuit Breakers
264113 Lightning Protection
264313 Surge Protective Devices
265100 Interior Lighting
265600 Exterior Lighting
269520 Electrical Cleaning and Testing
**Division 28 – Electronic Safety and Security**
283112 Fire Alarm System

| | |
|---|---|
| Addendum No. 1 | 8-18-14 |
| Addendum No. 2 | 8-20-14 |
| Addendum No. 3 | 8-21-14 |
| Addendum No. 4 | 8-25-14 |

## Exhibit "C"
## Certified List of Material Suppliers and Second Tier Subs

*Upon Contractor's request, which request may be made at any time, Subcontractor shall provide Contract with a certified list of its suppliers and sub-contractors of all tiers. Subcontractor shall remain obligated to supplement this list until the time period associated with its warranty obligations has expired. Suppliers and sub-subcontractors known at this time include:*

This subcontractor shall provide executed monthly waivers of lien for each of the suppliers and subcontractors listed below as a condition of payment.

| SUPPLIER / SUB-SUBCONTRACTOR | ITEM SUPPLIED | $AMOUNT |
|---|---|---|

1. _____  _____  _____
   Address / Phone _____

2. _____  _____  _____
   Address / Phone _____

3. _____  _____  _____
   Address / Phone _____

4. _____  _____  _____
   Address / Phone _____

5. _____  _____  _____
   Address / Phone _____

6. _____  _____  _____
   Address / Phone _____

7. _____  _____  _____
   Address / Phone _____

*Contractor requires 48-hour notice of any changes to this list.*

**Texas Electrical Contractors, LLC**
Company

W Marc Martin, President                    Walen n lih    1/5/2015
Printed Name and Title          Signature              Date

**Exhibit "D"**
**Application for Payment Form**

*See form provided for your use following.*

Jordan Foster Construction, LLC
7700 CF Jordan Drive
El Paso, TX 79912-8802



P: 915-877-3333
F: 915-877-3999
website: www.jordanfosterconstruction.com

Note to Subcontractors: Application for payment must be received by the 20th of the month at the main office of Jordan Foster Construction, LLC for the month payments are requested. Application for payment not received by the 20th will not be included in the request by Jordan Foster Construction, LLC for payment to the owner and thus will not be processed until the following month.

## SUBCONTRACTOR'S REQUEST FOR PAYMENT

| | | |
|---|---|---|
| Project Name: | Dick Poe Toyota ;TX:N:l | Project Number: **14059** |
| Address: | 6330 Montana Ave. | Vendor Number: **TEXELC01** |
| | El Paso, TX 79925 | Contract Number: **1405919** |
| Subcontractor: | Texas Electrical Contractors, LLC | Phase Code: 26.05.01 |
| Address: | 12350 Montwood Dr. Ste. 400-C | Application Number: _____ |
| | El Paso, TX  79928 | |

Application Period: _____ to _____

| | | | Office Use Only |
|---|---|---|---|
| 1. | Original Subcontract Amount | $        689,871 | |
| 2. | Approved Change Order _____ through _____ | $ | |
| 3. | Current Subcontract Sum | $ | |
| 4. | Total Work in Place (per attached schedule Column D + E) | $ | |
| 5. | Total Stored Materials (per attached schedule Column F) | $ | |
| 6. | Total Value to Date (Line 4 + Line 5) | $ | Gross |
| 7. | Total Previous Application (Line 6 of previous application) | $ | $ |
| 8. | Total Amount This Application (Line 6 – Line 7) | $ | Retention |
| 9. | 10% Retention (10% of Line 8) | $ | $ |
| 10. | Payment Amount Requested (Line 8 – Line 9) | $ | Net |
| 11. | Total Retention to Date (10% of Line 6) | $ | $ |

- - - - - - - - - - - - - Jordan Foster Construction, LLC Approvals - - - - - - - - - - - - - - - --

Project Supt.:_____   Project Manager:_____   Subcontractor:_____

### Exhibit "E"
### Forms of Lien Waivers

*Attached are standard forms of Conditional Waiver And Release On Progress Payment; Unconditional Waiver And Release On Progress Payment and Unconditional Waiver And Release On Final Payment.*

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT

Project: Dick Poe Toyota :TX:N:I                                    Project No. 14059

On receipt by the signer of this document of a check from Jordan Foster Construction, LLC (maker of check) in the sum of $
_____ payable to Texas Electrical Contractors, LLC (payee or payees of check) and when the check has been properly
endorsed and has been paid by the bank on which it is drawn, this document becomes effective to release any mechanic's lien
right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right,
any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for
persons in the signer's position that the signer has on the property of Dick Poe Toyota located at 6330 Montana Ave., El Paso,
TX 79925 (location) to the following extent: Dick Poe Toyota :TX:N:I (job description).

      This release covers a progress payment **for all labor, services, equipment** or **materials furnished** to the property or
**to** Jordan Foster Construction, LLC (person with whom signer contracted) through _____ (invoice date) as indicated
in the attached statement(s) or progress payment request(s), except for unpaid retention, pending modifications and changes, or
other items furnished.

      Before any recipient of this document relies on this document, the recipient should verify evidence of payment to the
signer.  The signer warrants that the signer has already paid or will use the funds received from this progress payment to
promptly pay in full all of the signer's laborers, subcontractors, materialmen and suppliers for all work, materials, equipment or
services provided for or to the above referenced project in regard to the attached statement(s) or progress payment request(s).

Company Name:      Texas Electrical Contractors, LLC

By: _____

Title: _____

Signature: _____

Date: _____


STATE OF TEXAS                          §
                                        §
COUNTY OF _____                §

This instrument was acknowledged before me on the _____ day of _____, 20___, by _____.
_____ of _____, for the consideration herein expressed, on behalf of same.


_____
Notary Public in and for the
STATE OF TEXAS

**NOTICE: THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. IT IS PROHIBITED FOR A PERSON TO REQUIRE YOU TO SIGN THIS DOCUMENT IF YOU HAVE NOT BEEN PAID THE PAYMENT AMOUNT SET FORTH BELOW. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.**

## UNCONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT

Project: <u>Dick Poe Toyota :TX:N:I</u>                                    Project No. <u>14059</u>

**The signer of this document has been paid and has received a progress payment in the sum of $ _____ (Amt Payable for RFP) all labor, services, equipment or materials furnished to the property or to** Jordan Foster Construction, LLC **(person with whom signer contracted) on the property of** Dick Poe Toyota **located at 6330 Montana Ave., El Paso, TX 79925 (location) to the following extent:** <u>Dick Poe Toyota :TX:N:I</u> **(job description).**

The signer therefore waives and releases any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position that the signer has on the above referenced project to the following extent:

This release covers a progress payment for all labor, services, equipment or materials furnished to the property or to Jordan Foster Construction, LLC (person with whom signer contracted) through _____(invoice date) as indicated in the attached statement(s) or progress payment request(s), except for unpaid retention, pending modifications and changes, or other items furnished.

The signer warrants that the signer either has already paid or will use the funds received from this progress payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen and suppliers for all work, materials, equipment or services provided for or to the above referenced project in regard to the attached statement(s) or progress payment request(s).

Company Name: <u>Texas Electrical Contractors, LLC</u>

By: _____

Title: _____

Signature: _____

Date: _____

STATE OF TEXAS                §
                              §
COUNTY OF _____    §

This instrument was acknowledged before me on the _____ day of _____, 20\_\_\_, by _____.

_____ of _____, for the consideration herein expressed, on behalf of same.

_____        _____
Notary Public in and for the                 My Commission Expires:
STATE OF TEXAS

## CONDITIONAL WAIVER AND RELEASE ON FINAL PAYMENT

Project: Dick Poe Toyota :TX:N:l                                                                Project No. 14059

On receipt by the signer of this document of a check from Jordan Foster Construction, LLC (maker of check) in the sum of $_____ payable to Texas Electrical Contractors, LLC (payee or payees of check) and when the check has been properly endorsed and has been paid by the bank on which it is drawn, this document becomes effective to release any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position that the signer has on the property of Dick Poe Toyota (owner) located at 6330 Montana Ave., El Paso, TX 79925 (location) to the following extent:  Dick Poe Toyota :TX:N:l (job description).

This release covers the final payment to the signer for all labor, services, equipment, or materials furnished to the property or to _____ (person with whom signer contracted).

Before any recipient of this document relies on this document, the recipient should verify evidence of payment to the signer.

The signer warrants that the signer has already paid or will use the funds received from this final payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen, and suppliers for all work, materials, equipment, or services provided for or to the above referenced project up to the date of this waiver and release.

Company Name:  Texas Electrical Contractors, LLC

By: _____

Title: _____

Signature: _____

Date: _____


STATE OF TEXAS                              §
                                            §
COUNTY OF _____                    §

This instrument was acknowledged before me on the _____ day of _____, 20___, by _____,

_____ of _____, for the consideration herein expressed, on behalf of same.


_____
Notary Public in and for the
STATE OF TEXAS                              My Commission Expires: _____

NOTICE: THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. IT IS PROHIBITED FOR A PERSON TO REQUIRE YOU TO SIGN THIS DOCUMENT IF YOU HAVE NOT BEEN PAID THE PAYMENT AMOUNT SET FORTH BELOW. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM.

## UNCONDITIONAL WAIVER AND RELEASE ON FINAL PAYMENT

Project: <u>Dick Poe Toyota :TX:N:I</u>                                        Project No. <u>14059</u>

The signer of this document has been paid in full for all labor, services, equipment or materials furnished to the property or to Jordan Foster Construction, LLC (person with whom signer contracted) on the property of Dick Poe Toyota located at 6330 Montana Ave., El Paso, TX 79925  (location) to the following extent: Dick Poe Toyota :TX:N:I (job description).  The signer therefore waives and releases any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position.

The signer warrants that the signer has already paid or will use the funds received from this final payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen and suppliers for all work, materials, equipment or services provided for or to the above referenced project up to the date of this waiver and release.

Company Name: <u>Texas Electrical Contractors, LLC</u>

By: _____

Title: _____

Signature: _____

Date: _____

STATE OF TEXAS                          §
                                        §
COUNTY OF _____                §

This instrument was acknowledged before me on the _____ day of _____ , 20___ , by _____ ,
_____ of _____ ., for the consideration herein expressed, on behalf of same.

_____
Notary Public in and for the
STATE OF TEXAS                                    My Commission Expires: _____



## Exhibit "F"
### Initial Baseline Schedule

*Attached is the Initial Baseline Schedule. Such schedule may be modified at Contractor's sole election. Subcontractor recognizes and acknowledges that the Initial Baseline Schedule may be modified as the Work progresses, and Subcontractor shall continually keep itself updated as to job conditions to ensure that its Work shall be performed as directed by Contractor and in the durations scheduled by Contractor.*

| Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|
| **General Conditions** | | | |
| **General Requirments** | | | |
| **General Contractor** | | | |
| Begin Contract Time | 0 | 20NOV14 A | |
| **Owner** | | | |
| Bid Date | 0 | 22AUG14 A | |
| Notice to Proceed or | 0 | 20NOV14 A | 20NOV14 A |
| Owner Review and Award | 14 | 25AUG14 A | 11SEP14 A |
| Iniate Subcontracts | 10 | 12NOV14 | 25NOV14 |
| Benificial occupancy | 1 | 01MAY15 | 01MAY15 |
| ARCH Punch List | 1 | 13MAY15 | 13MAY15 |
| 192 Days | 1 | 27MAY15 | 27MAY15 |
| Phase 1 Complete | 0 | | 27MAY15 |
| Arch Punch List Phase 2 | 1 | 13OCT15 | 13OCT15 |
| Benificial Occupancy Phase 2 | 1 | 20OCT15 | 20OCT15 |
| 160 Days - 352 days total | 1 | 03NOV15 | 03NOV15 |
| Phase 2 Complete | 0 | | 03NOV15 |
| **Submittals** | | | |
| Submittals | 65 | 10OCT14 A | 12FEB15 |
| **Long Lead item** | | | |
| Structural Steel Phase 1 | 20 | 05FEB15 | 04MAR15 |
| Elevator | 80 | 13FEB15 | 04JUN15 |
| Doors & Hardware | 40 | 06MAR15 | 30APR15 |
| Interior Finish items | 40 | 14APR15 | 08JUN15 |
| **Phase 1** | | | |
| **Sitework** | | | |
| **General Contractor** | | | |
| Apply NOI SWPPP | 1 | 04NOV14 A | 11NOV14 A |
| **Site Contractor** | | | |
| Initiate SWPPP Plan | 5 | 03NOV14 A | 07NOV14 A |
| Iniate Water Source | 5 | 13NOV14 | 19NOV14 |
| Excavate Footings Fence | 15 | 18NOV14 | 08DEC14 |
| Building Pad | 10 | 21NOV14 | 04DEC14 |
| Rough Grade Site 1st Move | 5 | 05DEC14 | 11DEC14 |
| Install Curbs | 10 | 19FEB15 | 04MAR15 |
| Fencing Exterior | 35 | 12DEC14 | 02FEB15 |
| Lay Out | 7 | 04FEB15 | 12FEB15 |
| Install Landscaping | 45 | 13FEB15 | 15APR15 |
| Approaches Install | 5 | 13FEB15 | 19FEB15 |
| Grading Prep | 15 | 13FEB15 | 05MAR15 |
| Install light poles Bases ( | 8 | 18FEB15 | 27FEB15 |
| Concrete paving | 40 | 26FEB15 | 22APR15 |
| Stripeing | 3 | 28APR15 | 30APR15 |
| **Building " A " Phase 1 Showroom** | | | |
| **Caulk & Waterproof** | | | |
| Waterproof Elevator Pitt Wall | 1 | 18DEC14 | 18DEC14 |
| **Concrete Contractor** | | | |
| Foundation Systems | 15 | 05DEC14 | 26DEC14 |
| Form & Pour Elevator Pit | 6 | 10DEC14 | 17DEC14 |
| Backfill Elevator Pitt Walls | 1 | 19DEC14 | 19DEC14 |
| Slab On Grade - A-1 | 3 | 19DEC14 | 23DEC14 |
| Form & Pour Tilt Wall Panels | 15 | 24DEC14 | 15JAN15 |
| Slab on Grade A-2 | 3 | 12JAN15 | 14JAN15 |
| Form & Pour 2nd Level A | 12 | 11FEB15 | 26FEB15 |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◖ Start milestone point
- ◗ Finish milestone point

**Jordan Foster Construction**
Page 33

GOREE ARCHITECTS INC.

| Date | Revision | Checked | Approved |
|---|---|---|---|
| 26AUG14 | Bid Schedule - 1 | | RS |
| 02DEC14 | NTP Schedule | | RS |
| | Sub-Initials | | |

| Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|
| **Door & Hardware Subcontractor** | | | |
| Install Doors & Hardware | 10 | 03APR15 | 16FEB15 |
| **Drywall & Painting Subcontractor** | | | |
| Install Exterior Metal Studs | 16 | 03FEB15 | 24FEB15 |
| Install Interior Metal Studs | 20 | 06FEB15 | 05MAR15 |
| Install & Finish Soffits - A | 15 | 17FEB15 | 09MAR15 |
| Install Exterior Sheathing | 16 | 17FEB15 | 10MAR15 |
| Install Sheetrock | 18 | 23FEB15 | 18MAR15 |
| Interior Wall Finishes | 18 | 12MAR15 | 06APR15 |
| Install Grid @ Ceiling | 18 | 24MAR15 | 16APR15 |
| Install Ceiling Tile | 12 | 08APR15 | 24APR15 |
| **Electrical subcontractor** | | | |
| Under Slab Electrical Install | 10 | 03DEC14 | 16DEC14 |
| Rough In Electrical Walls | 18 | 11FEB15 | 06MAR15 |
| OH Rough Electrical | 15 | 12FEB15 | 04MAR15 |
| Install lighting | 15 | 31MAR15 | 20APR15 |
| **Elevators Subcontractor** | | | |
| Install Elevator | 20 | 05JUN15 | 02JUL15 |
| **Fire sprinkler Subcontractor** | | | |
| O H Rough Fire Sprinkler | 18 | 13FEB15 | 10MAR15 |
| Install Fire Sprinkler heads | 8 | 08APR15 | 17APR15 |
| **Flooring Subcontactor** | | | |
| Install Flooring | 27 | 09MAR15 | 14APR15 |
| **Glass Subcontractor** | | | |
| Install Glass Framing | 16 | 24FEB15 | 17MAR15 |
| Install Glass - Exterior | 10 | 18MAR15 | 31MAR15 |
| **Masonary** | | | |
| Install Masonary @ Elevator | 17 | 15JAN15 | 06FEB15 |
| **Mechanicle subcontractor** | | | |
| O H Rough Mech | 15 | 17FEB15 | 09MAR15 |
| Install Diffusers | 15 | 31MAR15 | 20APR15 |
| Systems Start Up | 8 | 22APR15 | 01MAY15 |
| **Millwork Subcontractor** | | | |
| Install Millwork | 12 | 16MAR15 | 31MAR15 |
| **Misc Items Subcontractor** | | | |
| Install Toilet ACCS | 8 | 10APR15 | 21APR15 |
| **Panels Subcontractor** | | | |
| Install Exterior Wall Panels | 18 | 01APR15 | 24APR15 |
| **Plumbing Subcontractor** | | | |
| Under Slab Plumbing Install | 15 | 03DEC14 | 23DEC14 |
| Rough In Plbg. Walls | 12 | 10FEB15 | 25FEB15 |
| **Roofing Subcontractor** | | | |
| Install Roofing Building A | 6 | 11FEB15 | 18FEB15 |
| **Steel Erector** | | | |
| Erect Structural Steel - A-2 | 6 | 16JAN15 | 23JAN15 |
| Erect Tilt Wall Panels Area | 4 | 19JAN15 | 22JAN15 |
| Erect Structural Steel A-1 | 6 | 26JAN15 | 02FEB15 |
| Install Deck Level 2 | 5 | 30JAN15 | 05FEB15 |
| Install Metal Deck Roof - A | 4 | 05FEB15 | 10FEB15 |
| | | | |
| City Inspections | 5 | 24APR15 | 30APR15 |
| Final Clean Up | 8 | 24APR15 | 05MAY15 |
| Systems Test & Balance | 5 | 04MAY15 | 08MAY15 |
| Punch by GC | 6 | 06MAY15 | 12MAY15 |
| **Building " B " Phase 1 Shop** | | | |
| **Owner** | | | |
| Install lifts | 15 | 09APR15 | 29APR15 |
| **Concrete Contractor** | | | |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◄ Start milestone point
- ◄ Finish milestone point

**Jordan Foster Construction**
Page 34

GOREE ARCHITECTS INC.

| Date | Revision | Checked | Approved |
|---|---|---|---|
| 26AUG14 | Bid Schedule - 1 | | RS |
| 02DEC14 | NTP Schedule | | RS |
| | Sub Initials | | |

| Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|
| **Foundation Systems** | 15 | 16DEC14 | 07JAN15 |
| Slab on grade B-1 | 3 | 29DEC14 | 31DEC14 |
| Slab on grade B-2 | 3 | 02JAN15 | 06JAN15 |
| Slab on grade B-3 | 3 | 07JAN15 | 09JAN15 |
| **Drywall & Painting Subcontractor** | | | |
| Install Metal Studs | 3 | 19FEB15 | 23FEB15 |
| Install temp Wall | 12 | 19FEB15 | 06MAR15 |
| Exterior Painting of Walls | 3 | 27FEB15 | 03MAR15 |
| Install Sheetrock | 4 | 27FEB15 | 04MAR15 |
| Finish Wall Partitions | 7 | 05MAR15 | 13MAR15 |
| Interior Shop Painting | 14 | 12MAR15 | 31MAR15 |
| Install Ceiling Grid | 2 | 16MAR15 | 17MAR15 |
| Install Ceiling Tile | 2 | 18MAR15 | 19MAR15 |
| **Electrical subcontractor** | | | |
| Underslab Electrical | 5 | 18DEC14 | 24DEC14 |
| O H Electrical | 15 | 19FEB15 | 11MAR15 |
| R O Wall Elec | 3 | 24FEB15 | 26FEB15 |
| Install Fans | 4 | 01APR15 | 06APR15 |
| Install lighting | 4 | 01APR15 | 07APR15 |
| **Fire sprinkler Subcontractor** | | | |
| Install O H Fire Sprinkler | 8 | 19FEB15 | 02MAR15 |
| **Flooring Subcontactor** | | | |
| Install Flooring | 3 | 01APR15 | 03APR15 |
| Install Shop Flooring | 8 | 03APR15 | 14APR15 |
| **Masonry** | | | |
| Install Masonry | 10 | 19FEB15 | 04MAR15 |
| **Mechanicle subcontractor** | | | |
| Install Exhaust & Duct Work | 15 | 19FEB15 | 11MAR15 |
| **Misc Items Subcontractor** | | | |
| Install Toilet ACCS. | 2 | 18MAR15 | 19MAR15 |
| **Overhead Door Subcontractor** | | | |
| Install O H Doors | 6 | 19FEB15 | 02MAR15 |
| **Plumbing Subcontractor** | | | |
| Underslab Plbg | 10 | 18DEC14 | 02JAN15 |
| R O Walls PLBG | 3 | 24FEB15 | 27FEB15 |
| **Roofing Subcontractor** | | | |
| Install Roofing Building B | 6 | 19FEB15 | 26FEB15 |
| **Steel Erector** | | | |
| Erect Tilt Wall Panels | 7 | 20JAN15 | 28JAN15 |
| Erect Structural Steel | 12 | 27JAN15 | 11FEB15 |
| Install Roof Deck Building B | 5 | 12FEB15 | 18FEB15 |
| **Phase 2** | | | |
| **Sitework** | | | |
| **Site Contractor** | | | |
| Building Pad | 6 | 27MAY15 | 03JUN15 |
| Install Fencing | 25 | 04JUN15 | 08JUL15 |
| Install Curbs | 4 | 02SEP15 | 07SEP15 |
| Demolition | 7 | 14MAY15 | 22MAY15 |
| Lay Out | 2 | 25MAY15 | 26MAY15 |
| Grading Prep | 12 | 27AUG15 | 11SEP15 |
| Install light poles Bases ( | 12 | 01SEP15 | 16SEP15 |
| Concrete Paving | 35 | 09SEP15 | 27OCT15 |
| Approaches Install | 5 | 11SEP15 | 17SEP15 |
| Install Landscaping | 15 | 30SEP15 | 20OCT15 |
| Stripeing | 3 | 02NOV15 | 04NOV15 |
| **Building " C " Phase 2 Used Cars** | | | |
| **Site Contractor** | | | |

**Legend:**
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◄ Start milestone point
- ► Finish milestone point

| Date | Revision | Checked | Approved |
|---|---|---|---|
| 26AUG14 | Bid Schedule - 1 | | RS |
| 02DEC14 | NTP Schedule | | RS |

**Jordan Foster Construction**
Page 35

GOREE ARCHITECTS INC.

Sub-Initials

| Description | Orig Dur | Early Start | Early Finish |
|---|---|---|---|
| **Excavate Basement** | 7 | 04JUN15 | 12JUN15 |
| Backfill Basement | 3 | 27JUL15 | 29JUL15 |
| **Concrete Contractor** | | | |
| Form and Pour Slabs & | 8 | 04JUN15 | 15JUN15 |
| Foundations | 15 | 08JUN15 | 26JUN15 |
| Form & Pour Panels | 20 | 11JUN15 | 08JUL15 |
| Basement Walls Form & Pour | 30 | 15JUN15 | 24JUL15 |
| Slab on grade | 7 | 06AUG15 | 14AUG15 |
| **Door & Hardware Subcontractor** | | | |
| Install Doors & Hardware | 7 | 21SEP15 | 23SEP15 |
| **Drywall & Painting Subcontractor** | | | |
| Frame & Finish Soffits | 22 | 14AUG15 | 14SEP15 |
| Install Interior Metal Studs | 8 | 24AUG15 | 02SEP15 |
| Frame & Sheath Exterior | 12 | 26AUG15 | 10SEP15 |
| Install Sheetrock | 8 | 08SEP15 | 17SEP15 |
| Install Ceiling Tile | 12 | 08SEP15 | 23SEP15 |
| Install Grid @ Ceiling | 6 | 09SEP15 | 16SEP15 |
| Interior Wall Finishes | 8 | 11SEP15 | 22SEP15 |
| **Electrical subcontractor** | | | |
| Rough In Electrical Walls | 5 | 27AUG15 | 02SEP15 |
| OH Rough Electrical | 5 | 31AUG15 | 04SEP15 |
| Install lighting | 4 | 16SEP15 | 21SEP15 |
| **Fire sprinkler Subcontractor** | | | |
| O H Rough Fire Sprinkler | 8 | 01SEP15 | 10SEP15 |
| Install Fire Sprinkler heads | 2 | 08SEP15 | 09SEP15 |
| **Flooring Subcontactor** | | | |
| Install Flooring | 8 | 16SEP15 | 25SEP15 |
| **Glass Subcontractor** | | | |
| Install Glass Framing | 5 | 18SEP15 | 24SEP15 |
| Install Glass - Exterior | 8 | 25SEP15 | 06OCT15 |
| **Mechanicle subcontractor** | | | |
| O H Rough Mech | 8 | 03SEP15 | 14SEP15 |
| Install Diffusers | 4 | 16SEP15 | 21SEP15 |
| Systems Start Up | 8 | 22SEP15 | 01OCT15 |
| **Millwork Subcontractor** | | | |
| Install Millwork | 3 | 23SEP15 | 25SEP15 |
| **Misc Items Subcontractor** | | | |
| Install Toilet ACCS | 8 | 10SEP15 | 21SEP15 |
| **Panels Subcontractor** | | | |
| Install Exterior Wall Panels | 18 | 29SEP15 | 22OCT15 |
| **Plumbing Subcontractor** | | | |
| Rough In Plbg. Walls | 5 | 26AUG15 | 01SEP15 |
| **Roofing Subcontractor** | | | |
| Install Roofing | 11 | 14AUG15 | 28AUG15 |
| **Steel Erector** | | | |
| Erect Tiltwall Panels | 10 | 16JUL15 | 29JUL15 |
| Erect Structural Steel | 7 | 30JUL15 | 07AUG15 |
| Install Deck Building B | 4 | 10AUG15 | 13AUG15 |
| Erect Structural Steel | 8 | 10AUG15 | 19AUG15 |
| Install Deck Building C | 6 | 10AUG15 | 25AUG15 |
| | | | |
| Final Clean Up | 8 | 24SEP15 | 05OCT15 |
| City Inspections | 5 | 01OCT15 | 07OCT15 |
| Systems Test & Balance | 5 | 02OCT15 | 08OCT15 |
| Punch by GC | 5 | 06OCT15 | 12OCT15 |

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- ◄ Start milestone point
- ► Finish milestone point

**Jordan Foster Construction**
Page 36

GOREE ARCHITECTS INC.

| Date | Revision | Checked | Approved |
|---|---|---|---|
| 26AUG14 | Bid Schedule - 1 | | RS |
| 02DEC14 | NTP Schedule | | RS |
| | Sub-Initials | | |

Exhibit "G"
**Sub-Subcontractors and Suppliers Insurance Requirements**

*INSURANCE: Subcontractor shall, in a manner satisfactory to Jordan Foster Construction, LLC and «Subcontractor», maintain at its own expense until completion of the Work and final payment therefore, policies of insurance of the types and in the amounts not less than those stipulated below. At the request of Jordan Foster Construction, LLC or Texas Electrical Contractors, LLC, Subcontractor shall provide proof that it has satisfied all requirements for satisfying its obligations under this insuring obligation. Each of these insurance coverages shall name as additional insureds Jordan Foster Construction, LLC and Dick Poe Toyota.*

**Workers Compensation and Employer's Liability**
1.    Coverage "A" - Statutory requirements in states where operating, to include all areas involved in operations covered by this Subcontract.
2.    Coverage "B" Employer's Liability, bodily injury by accident, $500,000 each accident; bodily injury by disease, $500,000 each employee; and bodily injury by disease $500,000 policy limit.
3.    Policy to include standard "Broad Form Other States" endorsement.

**Commercial General Liability**
1.    Commercial General Liability form, including Premises/Operations, Elevators and Escalators, Independent Contractors, Products/Completed Operations, Personal Injury, Broad Form Property Damage (including Completed Operations), and coverage for explosion, collapse and underground hazards.
2     Contractual Liability: Blanket basis insuring the liability assumed under this Subcontract.
3.    Limits of Liability: $1,000,000 each occurrence (for Bodily Injury and Property Damage), $2,000,000 general aggregate, $2,000,000 for products/completed operations aggregate.

**Business Automobile Policy**
1.    Business Automobile Policy form, including coverage for all Owned, Non-Owned and Hired Vehicles.
2.    Limits of Liability: $1,000,000 combined single limit for Bodily Injury and Property Damage.

**Umbrella Liability:** Such liability shall provide coverage with limits not less than $1,000,000 each occurrence for Bodily Injury and Property Damage; $1,000,000 general aggregate, in excess of the coverages listed above.

Within five (5) days after signing this Subcontract and prior to the commencement of any Work, Subcontractor shall submit certificates of insurance complying with this Subcontract and showing that Subcontractor and each of its sub-subcontractors and suppliers have obtained the insurance coverages required herein. If such certificate is not so provided, Contractor may procure, at Subcontractor's sole expense, the required insurance coverages.

Subcontractor, on behalf of itself and its insurers, agrees to waive any and all rights of subrogation which it or its insurers have or may have against Owner, General Contractor, Jordan Foster Construction, LLC, Texas Electrical Contractors, LLC, and their agents, representatives, employees, officers, directors, sureties, and insurers, for any loss or expense which is covered under any policy of insurance provided by Subcontractor pursuant to this Subcontract.

The above insurance coverages shall be maintained by evidence of Certificates of Insurance for a ten (10) year period after substantial completion of the Project. Subcontractor's insurance carrier's shall be acceptable to Contractor and licensed or admitted to conduct business in the state where the Project is located and carry a Best Key rating of at least A-VIII or better.

Exhibit H

## SUBCONTRACT PERFORMANCE BOND

SF 502

Bond No._____

KNOW ALL MEN BY THESE PRESENTS:

That _____

_____

or, Principal, hereinafter Called Principal, and _____

a corporation organized and existing under the laws of the State of _____

as Surety, hereinafter called Surety, are held and firmly bound unto _____

as Obligee, hereinafter called obligee, in the amount of _____

Dollars ($ _____ ).

for the payment Whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns. Jointly and severally, firmly by these presents,

WHEREAS, Principal has by written agreement dated _____

entered into a subcontract With Obligee for _____

in accordance with drawings and specifications prepared by _____

which subcontract is by reference made a part hereof, and is hereinafter referred to or, the subcontract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is Such that, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The surety hereby waives notice of any alteration or extension of time made by the Obligee,

Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract the Obligee having performed Obligee's obligations thereunder:

(1)     Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
(2)     Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
(3)     The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of the subcontract price", as used in this paragraph, shall mean the total amount payable by the Obligee to Principal under the subcontract and any amendments thereto, less the amounts heretofore property paid by Obligee under the subcontract.

Any suit under this bond must be instituted before the expiration of two (2) years from date on which final payment under the subcontract falls due.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee.

Signed and sealed this _____ day of _____ , 20 _____

_____         _____

By _____         By _____
     Principal                              Surety

         (SEAL)                              (SEAL)

Updated 08/29/2013 RL

Sub Initials

Exhibit H

## SUBCONTRACT LABOR AND MATERIAL BOND

SF-503                                                                    Bond No: _____

KNOW ALL MEN BY THESE PRESENTS:

That _____

_____
as Principal, hereinafter called Principal, and _____

_____
a corporation organized and existing under the laws of the State of _____
as Surety, hereinafter called Surety, are held and firmly bound unto _____

_____
as obligee, hereinafter called Obligee, for the use and benefit of claimants as herein below defined, in the amount of
_____ Dollars
($ _____ ), for the payment whereof Principal and Surety bind themselves, their heirs, executors,
administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated _____
entered into a subcontract with Obligee for _____

_____
in accordance with drawings and specifications prepared by _____

which subcontract is by reference made a part hereof, and is hereinafter referred to as the subcontract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract, then this obligation shall be void; otherwise it shall remain in full force and effect subject, however; to the following conditions:

(1)     A claimant is defined as one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the subcontract.

(2)     The above-named Principal and Surety hereby jointly and severally agree with the Obligee that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Obligee shall not be liable for the payment of any costs or expenses of any such suit.

(3)     No suit or action shall be commenced hereunder by any claimant,

(a)     After the expiration of one (1) year following the date on which Principal ceased work on said subcontract it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the constitution hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(b)     Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States district Court for the division in which the project, or any part thereof, is situated and not elsewhere.

(4)     The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder.

Signed and sealed this _____ day of _____ 20. _____

_____     _____

By _____          By _____
   Principal                               Surety
              (SEAL)                                  (SEAL)

## Exhibit "I"
### Equal Opportunity Clause

Each Subcontract Agreement with Jordan Foster Construction, LLC is subject to the following equal opportunity clause. Subcontractor is required to include this clause in each of its contracts related to Subcontractor's Work.

During the performance of this Subcontract, Subcontractor agrees as follows:

(1) Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) Subcontractor will, in all solicitations or advertisements for employees placed by or on behalf of Subcontractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) Subcontractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of Subcontractor's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) Subcontractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) Subcontractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of Subcontractor's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and Subcontractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) Subcontractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Subcontractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Subcontractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, Subcontractor may request the United States to enter into such litigation to protect the interests of the United States.

**Texas Electrical Contractors, LLC**
Company

w Mare Martin President
Printed Name and Title

Wden _____ 1/5/205
Signature                    Date

**Exhibit "J"**
**Standard Federal Equal Employment Opportunity**
**Construction Contract Specifications (Executive Order 11246)**

Pursuant to 41 C.F.R. § 60-1.4 and Section 202 of Executive Order 11246, each Subcontract Agreement with Jordan Foster Construction, LLC is subject to the following standard federal equal opportunity construction contract specifications. Subcontractor is required to include this clause in each of its contracts related to Subcontractor's Work.

1.  As used in these specifications:
    a.  "Covered area" means the geographical area described in the solicitation from which this contract resulted;
    b.  "Director" means Director, Office of Federal Contract Compliance Programs, United States Department of Labor, or any person to whom the Director delegates authority;
    c.  "Employer identification number" means the Federal Social Security number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.
    d.  "Minority" includes:
        (i) Black (all persons having origins in any of the Black African racial groups not of Hispanic origin);
        (ii) Hispanic (all persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish Culture or origin, regardless of race);
        (iii) Asian and Pacific Islander (all persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands); and
        (iv) American Indian or Alaskan Native (all persons having origins in any of the original peoples of North America and maintaining identifiable tribal affiliations through membership and participation or community identification).

2.  Whenever Subcontractor, or any of its subcontractors at any tier, subcontracts a portion of the work involving any construction trade, it shall physically include in each subcontract in excess of $10,000 the provisions of these specifications and the Notice which contains the applicable goals for minority and female participation and which is set forth in the solicitations from which this contract resulted.

3.  If Subcontractor is participating (pursuant to 41 CFR 60–4.5) in a Hometown Plan approved by the U.S. Department of Labor in the covered area either individually or through an association, its affirmative action obligations on all work in the Plan area (including goals and timetables) shall be in accordance with that Plan for those trades which have unions participating in the Plan. Subcontractors must be able to demonstrate their participation in and compliance with the provisions of any such Hometown Plan. Each Subcontractor or their subcontractors participating in an approved Plan is individually required to comply with its obligations under the EEO clause, and to make a good faith effort to achieve each goal under the Plan in each trade in which it has employees. The overall good faith performance by other subcontractors or their subcontractors toward a goal in an approved Plan does not excuse any covered Subcontractor's (or their subcontractor's) failure to take good faith efforts to achieve the Plan goals and timetables.

4.  Subcontractor shall implement the specific affirmative action standards provided in paragraphs 7 a through p of these specifications. The goals set forth in the solicitation from which this contract resulted are expressed as percentages of the total hours of employment and training of minority and female utilization Subcontractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. Covered construction subcontractors performing construction work in geographical areas where they do not have a Federal or federally assisted construction contract shall apply the minority and female goals established for the geographical area where the work is being performed. Goals are published periodically in the Federal Register in notice form, and such notices may be obtained from any Office of Federal Contract Compliance Programs office or from Federal procurement contracting officers. Subcontractor is expected to make substantially uniform progress in meeting its goals in each craft during the period specified.

5.  Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom Subcontractor has a collective bargaining agreement, to refer either minorities or women shall excuse Subcontractor's obligations under these specifications, Executive Order 11246, or the regulations promulgated pursuant thereto.

6.  In order for the nonworking training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by Subcontractor during the training period, and Subcontractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

7. Subcontractor shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of Subcontractor's compliance with these specifications shall be based upon its effort to achieve maximum results from its actions. Subcontractor shall document these efforts fully, and shall implement affirmative action steps at least as extensive as the following:

   a. Ensure and maintain a working environment free of harassment, intimidation, and coercion at all sites, and in all facilities at which Subcontractor's employees are assigned to work. Subcontractor, where possible, will assign two or more women to each construction project. Subcontractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out Subcontractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.

   b. Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when Subcontractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.

   c. Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to Subcontractor by the union or, if referred, not employed by Subcontractor, this shall be documented in the file with the reason therefor, along with whatever additional actions Subcontractor may have taken.

   d. Provide immediate written notification to the Director when the union or unions with which Subcontractor has a collective bargaining agreement has not referred to Subcontractor a minority person or woman sent by Subcontractor, or when Subcontractor has other information that the union referral process has impeded Subcontractor's efforts to meet its obligations.

   e. Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to Subcontractor's employment needs, especially those programs funded or approved by the Department of Labor. Subcontractor shall provide notice of these programs to the sources compiled under 7b above.

   f. Disseminate Subcontractor's EEO policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting Subcontractor in meeting its EEO obligations; by including it in any policy manual and collective bargaining agreement; by publicizing it in the company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at each location where construction work is performed.

   g. Review, at least annually, the company's EEO policy and affirmative action obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with onsite supervisory personnel such as Superintendents, General Foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

   h. Disseminate Subcontractor's EEO policy externally by including it in any advertising in the news media, specifically including minority and female news media, and providing written notification to and discussing Subcontractor's EEO policy with other subcontractors and their subcontractors with whom Subcontractor does or anticipates doing business.

   i. Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to schools with minority and female students and to minority and female recruitment and training organizations serving Subcontractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, Subcontractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

   j. Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of Subcontractor's work force.

   k. Validate all tests and other selection requirements where there is an obligation to do so under 41 C.F.R. Part 60-3.

*Updated 08/29/2013 R1*

Sub Initials _____

l. Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

m. Ensure that seniority practices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO policy and Subcontractor's obligations under these specifications are being carried out.

n. Ensure that all facilities and company activities are non-segregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

o. Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction subcontractors and suppliers, including circulation of solicitations to minority and female subcontractor associations and other business associations.

p. Conduct a review, at least annually, of all supervisors' adherence to and performance under Subcontractor's EEO policies and affirmative action obligations.

8. Subcontractors are encouraged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations (7a through p). The efforts of a subcontractor association, joint subcontractor-union, subcontractor-community, or other similar group of which Subcontractor is a member and participant, may be asserted as fulfilling any one or more of its obligations under 7a through p of these Specifications provided that Subcontractor actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensures that the concrete benefits of the program are reflected in Subcontractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetables, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of Subcontractor. The obligation to comply, however, is the Subcontractor's and failure of such a group to fulfill an obligation shall not be a defense for Subcontractor's noncompliance.

9. A single goal for minorities and a separate single goal for women have been established. Subcontractor, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, Subcontractor may be in violation of the Executive Order if a particular group is employed in a substantially disparate manner (for example, even though Subcontractor has achieved its goals for women generally, Subcontractor may be in violation of the Executive Order if a specific minority group of women is underutilized).

10. Subcontractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11. Subcontractor shall not enter into any subcontract with any person or firm debarred from Government contracts pursuant to Executive Order 11246.

12. Subcontractor shall carry out such sanctions and penalties for violation of these specifications and of the Equal Opportunity Clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered pursuant to Executive Order 11246, as amended, and its implementing regulations, by the Office of Federal Contract Compliance Programs. Any subcontractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13. Subcontractor, in fulfilling its obligations under these specifications, shall implement specific affirmative action steps, at least as extensive as those standards prescribed in paragraph 7 of these specifications, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If Subcontractor fails to comply with the requirements of the Executive Order, the implementing regulations, or these specifications, the Director shall proceed in accordance with 41 CFR 60-4.8.

14. Subcontractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO policy is being carried out, to submit reports relating to the provisions hereof as may be required by the Government and to keep records. Records shall at least include for each employee the name, address, telephone numbers, construction trade, union affiliation if any, employee identification number when assigned, social security number, race, sex, status (e.g., mechanic, apprentice trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records shall be maintained in an easily

understandable and retrievable form; however, to the degree that existing records satisfy this requirement, subcontractors shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish different standards of compliance or upon the application of requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program).

**Texas Electrical Contractors, LLC**
Company

_____
Printed Name and Title

_____ 1/5/2015
Signature                          Date

# Exhibit 2

## IN THE COUNTY COURT AT LAW NUMBER THREE
## EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| 6330 MONTANA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Cause No: 2017DCV3746 |
| v. | § | |
| JORDAN FOSTER CONSTRUCTION, | § | |
| LLC, and GOREE ARCHITECTS, INC. | § | |
| | § | |
| Defendants. | § | |
| | § | |
| JORDAN FOSTER CONSTRUCTION, | § | |
| LLC | § | |
| | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CONTRACTORS FILES PLUS, INC.; | § | |
| THE GARICK GROUP INC.; TEXAS | § | |
| ELECTRICAL CONTRACTORS, LLC; | § | |
| COMMERCIAL ROOFING SYSTEMS, | § | |
| INC.; and CAMBRO CONSTRUCTION, | § | |
| INC. | § | |

## <u>PLAINTIFF'S THIRD AMENDED PETITION</u>

TO THE HONORABLE COURT:

COMES NOW Plaintiff 6330 Montana, LLC and files Plaintiff's Third Amended Petition over and against Defendants Jordan Foster Construction, LLC, and Goree Architects, Inc. This is a level three lawsuit. Plaintiff seeks monetary compensation exceeding one million dollars including damages of any kind, including penalties, costs, expenses, pre-judgment interest, and attorney's fees. The damages sought are within the jurisdictional limits of the court.

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 1**
527428.000002 23565840.5

Copy from re:SearchTX

# I.
## PARTIES

1.        Plaintiff 6330 Montana, LLC ("Plaintiff") is a Texas limited liability company with its principal place of business in El Paso, El Paso County, Texas.

2.        Defendant Jordan Foster Construction, LLC ("Jordan") is a Texas limited liability company with its principal place of business in El Paso, El Paso County, Texas.  Jordan was previously served with process and has appeared in this suit.

3.        Defendant Goree Architects, Inc. ("Goree") is a Texas corporation with its principal place of business in Bellaire, Harris County, Texas.  Goree was previously served with process and has appeared in this suit.

# II.
## STATEMENT OF FACTS

4.        On or about March 25, 2013, Goree entered into that certain Standard Form of Agreement between Owner and Architect (the "Architecture Contract") with Poe Investments, Ltd. ("Poe").  The Architecture Contract called for the design and oversight of construction of a two-story auto sales and service facility for the Dick Poe Toyota Dealership Facility at 6330 Montana Avenue, El Paso, Texas 79925 (the "Facility").

5.        On or about November 10, 2014, Jordan entered into that certain Standard Form of Agreement between Owner and Contractor (the "Construction Contract") with Poe.  The Construction Contract called for the construction of the Facility and other incidental work related thereto.  Jordan agreed to finish its work in under one year. Moreover, both Jordan and Goree have acknowledged Plaintiff's ownership of the Facility as well of the contractual rights of Plaintiff, or are estopped from asserting otherwise. In addition, no damage has occurred from said assignment. Further, both Jordan and Goree were aware by Court order that the principal of Plaintiff, Richard

Copy from re:SearchTX

C. Poe, II, was designated by Court order as the Owner's representative with respect to the Facility, the Architecture Contract, and the Construction Contract.

6.      Poe has sold the Facility designed by Goree and constructed by Jordan to Plaintiff. Poe has further assigned all right, title and interest to any claims, suits, damages, and causes of action it has or had against Jordan and Goree to Plaintiff.  Thus Plaintiff is the proper party and has standing to assert all causes of action set forth herein.

7.      Pursuant to the Architecture Contract, Goree had obligations to perform architectural services (directly or through consultants retained and paid by Goree)  "in compliance with all applicable Owner's Standards and Procedures for Construction and Exterior Design Standards…." Goree was "responsible for the performance of its consultants," and was to "ensure that its consultants abide by all of the terms and conditions" of the Architecture Contract. Goree further had an obligation to perform its services with "a standard of care consistent with the professional skill and care ordinarily provided by architects with experience in projects similar to this project."  Goree agreed that during each design phase, Goree would "evaluate the Owner's Design Standards and recommend any variances that should be made thereto that the Architect believes will provide a higher quality Project without exceeding the Project budget, or otherwise benefit the Owner."  Goree additionally was obligated to "recommend any changes to the Owner's program or preliminary design for the Project that the architect reasonably expects will reconcile the program…provide a higher quality Project without exceeding the Project budget, or otherwise benefit the Owner."  Ultimately, Goree was to "provide Construction Documents that conform to the accepted Design Development Documents, the Owner's Design Standards, all schedules accepted by Owner, and the Cost of Work."

Copy from re:SearchTX

8.      Goree additionally had obligations to timely implement requested changes during the construction process.  Specifically, Goree had a duty to "promptly review requests by the Owner…for changes in the Work," and if necessary incorporate estimates related to such changes "into a Change Order or other appropriate documentation for Owner's execution…."

9.      Goree (or consultants hired and paid for by Goree and for whose performance Goree is contractually responsible) failed to comply with its obligations under the Architecture Contract in a number of respects.  These failures include, without limitation and by way of example only, the failure to comply with the following: (a) failure to follow instructions and design standards communicated to Goree from the inception of its work on the Facility (b) a failure to design and provide Construction Documents for the Facility that allow 18-wheeler tractor trailers to maneuver around the Facility; (c) a failure to design and provide Construction Documents that place bollard posts around portions of the perimeter of the Facility structure that effectively prevent the passage of vehicles; (d) failure to design and provide Construction Documents for the Facility's service drive at a grade to allow for the installation of requested tile flooring; (e) failure to adequately space concrete joints; (f) failure to properly design the roof drainage; and (g) failure to design the drainage system for the dealership resulting in multiple flooding events.  Multiple expert reports have been produced in this case providing extensive details of these examples and other design (and/or civil engineering defects), all of which are the responsibility of Goree.  Such reports are incorporated herein for the purpose of notice and are on file herein as part of the expert designations.  Each of these acts were committed by Goree and/or consultants hired by Goree and for whom Goree is contractually obligated.

10.     In addition to the obligations above, Goree had obligations to provide evaluation and oversight functions during construction of the Facility.  Specifically:

Copy from re:SearchTX

> The Architect shall visit the site <u>not less often than once every 14 days and otherwise</u> at intervals appropriate to the state of construction…to become generally familiar with the progress and quality of the portion of the Work completed, and to determine, in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents.

Goree further had the obligation to "keep the Owner reasonably informed about the progress and quality of the Work," including furnishing written reports concerning "defects and deficiencies observed in the Work." Additionally, Goree had the obligation to "reject Work that does not conform to the Contract Documents."

11.     Goree has gone to great lengths to both mislead, hide, and fraudulently conceal its bad acts from Plaintiff (and/or its predecessors).  By way of example only, the main contact initially for the project and the president of Goree, Steve Craney, never indicated he was not an architect.  Regarding the drainage issue, the architect was advised to "create a detention pond on site" to minimize flooding.  Not only did Goree conceal this issue from the owner but Goree (in concert it appears with Jordan Foster) hoodwinked the City to approve the inadequate drainage design.  Contrary to their actions, both Goree (and presumably Jordan Foster) anticipated the exact problem now found by Plaintiff and as described above would likely happen:

> I am afraid with a good rain it will hold water and not shed it quick enough.  This is a concern with only one catch to basin serving roughly 60% of the site!…I can see that the catch basin is not handling the capacity of the runoff causing severe flooding in its vicinity which would damage the vehicles and other property.

12.     Indeed, the architect knew and stated that "[i]n El Paso's infamous flash floods, I don't think this will be sufficient and if it is, then the parked cars at that location will be flooded." Equally, Jordan had the contractual obligation to notify Plaintiff (and/or its predecessors) of "errors, inconsistencies, or omissions."

Copy from re:SearchTX

13.     No one gave this warning to Plaintiff (and/or its predecessor in contract).  Rather, while the owner may have expressed a desire to preserve parking, there were multiple alternatives that would have been much less costly that the current anticipated fixes.  More troubling is when it knew that the predicted flooding had occurred, both Goree and Jordan Foster did not reveal the truth, but rather blamed it on Plaintiff saying that "debris" had blocked the drain.

14.     The above actions not only are a breach of contract, but constitute fraudulent concealments, a breach of trust, and a total disregard of Plaintiff.

15.     Jordan made multiple warranties to Poe through the Construction Contract, including:

> …that materials and equipment furnished under the Contract will be of good quality and new unless the Contract Documents require or permit otherwise.  The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects except for those inherent in the quality of the Work the Contract Documents require or permit.  Work, materials, or equipment not conforming to these requirements may be considered defective.

Jordan further warranted that it "shall perform the work in a good and workmanlike manner in strict compliance with the Contract Documents." Jordan additionally warranted and was obligated to "promptly correct any of the work found to be not in accordance with the requirements of the Contract Documents."

16.     The work provided by Jordan is replete with defects and was not performed in a workmanlike manner.  The disclosure of Experts by Plaintiff describing many of the defects (including some for which Goree is responsible in concert or independent of Jordan), is on file in this action and incorporated herein.  Despite being notified of the defects, Jordan has failed and/or refused to correct them.

17.     Jordan was also supposed to provide electrochromic glass (glass that can transition from clear to opaque) in certain parts of the dealership.  However, Jordan's subcontractor's carrier

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 6**
527428.000002 23565840.5

Copy from re:SearchTX

broke such glass during shipment. Jordan has installed temporary glass, but refuses to re-order and install the glass specified in the Construction Contract.

18.     Jordan further did not complete the Facility by the time specified in the Construction Contract. As a result, Poe was charged by Jordan for 124 days during the delay—and lost use of the Facility for the same period.

19.     Throughout the construction process, Goree failed to oversee and ensure the quality of the work provided by Jordan. Goree, and its employees and representatives, repeatedly re-scheduled, cut-short, or failed to attend various Facility site inspections and meetings. Goree failed to inform Poe of and/or reject a number of readily visible and conspicuous defects and deficiencies resulting from Jordan's incomplete or noncompliant work. Jordan hid from and/or misled Plaintiff (or its predecessors) as to its own deficiencies and those of its contractors. Goree further failed to timely execute on requested Owner changes during or prior to the construction of the Facility.

20.     Plaintiff (and/or its predecessors) have fully performed its obligations under the Construction Contract and Architecture Contract, and given all necessary notices thereunder. All conditions precedent to Plaintiff's recovery have been satisfied.

21.     As described above, many of the bad acts were intentionally withheld from Plaintiff. Plaintiff therefore invokes for purposes of the statute of limitations defense and /or others as were asserted by Defendants, the discovery rule, fraudulent concealment, statutory tolling doctrine, and judicial tolling per the Texas Supreme Court.

### III.
### CAUSES OF ACTION

22.     All prior paragraphs are incorporated herein by reference.

Copy from re:SearchTX

**Breach of Contract - Goree**

23.    The Architecture Contract is a valid and binding contract between Goree and Plaintiff's predecessor in interest.   Plaintiff and its predecessor in interest have performed all obligations under the Architecture Contract.   Goree has breached its obligations under the Architecture Contract as set forth above and as referenced expert reports incorporated herein. Goree is responsible for the breaches outlined herein and those of its consultants, including specifically the civil engineer.

24.    Goree further breached its obligations to provide oversight and evaluation services and failed to adequately supervise its own consultants.   Goree mislead and hid important information from its contractual partner.   Goree failed to identify defects and deficiencies in the work and materials provided by Jordan during the construction of the Facility (as it hid its own deficiencies even when the predicted event occurred).   Goree failed to "perform its services with a standard of care as outlined in the contract".   Goree further failed to reject work during the construction of the Facility that was clearly noncompliant with the Contract Documents.   Finally, Goree failed to timely review and execute on requested changes to the Facility plans and construction.   Goree's breaches of the Architecture Contract has caused damages to Plaintiff within the jurisdictional limits of this Court.   Attached hereto as Exhibit "B" is a Certificate of Merit and Affidavit of Kenneth S.C. Wong, AIA, NCARB, RAS in support of the Plaintiffs' causes of action against Goree which is incorporated by reference as if fully set forth herein and as well the expert reports as alleged above.   In addition, the expert reports support same and are incorporated by reference.   Goree is vicariously liable for the acts of its consultants.

Copy from re:SearchTX

**Breach of Express Warranties - Jordan**

25.     The Construction Contract is a valid and binding contract between Jordan and Plaintiff's predecessor in interest.  Plaintiff and its predecessor in interest have performed all obligations under the Construction Contract.  Jordan has breached its express warranties as found in the Construction Contract.  Jordan's breaches of the Construction Contract have caused damages to Plaintiff within the jurisdictional limits of this Court.

**Breach of Contract - Jordan**

26.     The Construction Contract is a valid and binding contract between Jordan and Plaintiff's predecessor in interest.  Plaintiff and its predecessor in interest have performed all obligations under the Construction Contract.  Jordan has breached a number of its obligations as found in the Construction Contract.  Jordan's breaches include, without limitation, the following acts or omissions and as described in the experts reports incorporated herein:

- Jordan did not complete the Facility on time;

- Jordan neither reordered and installed electrochromic glass, nor did not provide a refund for the same;

- Jordan charged more than the contract specified;

- Jordan breached the Construction Contract by providing the following defective, nonconforming and/or incomplete Work;

- The drainage system provided by Jordan is defective and results in major flooding when rain falls;

- Jordan installed terrazzo flooring that is not uniform, is discolored, and/or was not properly installed;

- The entire foundation provided by Jordan is defective; it has extensive cracks throughout it and has caused the tiles above it to crack;

- Jordan installed the bollard posts on Montana Avenue incorrectly and out of place;

- Jordan poured the concrete around the service drive too high causing unevenness;

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 9**
527428.000002 23565840.5

Copy from re:SearchTX

- Tile throughout the dealership was improperly installed causing it to become discolored;

- Jordan installed the electrical system inappropriately causing lights and fans to go out of service prematurely;

- Jordan inappropriately installed the bollard posts in the service drive;

- The air conditioning unit in the principal's office was improperly installed causing it to drain water into the walls;

- The flooring in the principal's patio floods when rain falls and is peeling off;

- All water faucets and appliances near the principal's office area, including the principal's bathroom, emit water that comes out black and smells foul;

- Jordan installed broken tiles in the restroom of the second floor;

- Jordan provided a substandard data room that is unappealing and is not according to the Drawings;

- Jordan installed defective, subpar and unattractive staircases;

- The hot water heater that was installed leaked water shortly after installation;

- Many doors that Jordan installed were the wrong size;

- Jordan installed tiles using incorrect grout;

- The countertops that were installed in the bathrooms were cut the wrong size and not installed according to the Drawings;

- Jordan improperly installed lights which randomly dropped from the ceiling and broke;

- Jordan did not paint the ceiling and/or conduit as required by the Drawings;

- Jordan installed defective carbon-fiber carpet;

- Jordan did not install support for maglocks to be installed;

- Jordan did not paint the parking lot stripes;

- Jordan inappropriately installed the alarm room cables;

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 10**
527428.000002 23565840.5

Copy from re:SearchTX

- Jordan installed the exterior lights in a manner that does not allow for the lights to be turned off during the day;

27.    There are many other defective or unfinished items throughout the entire auto dealership.  Exhibit "A," attached hereto, lists some of the defective and unfinished items. Additional breaches are outlined in the expert reports on file herein.

**Negligence – Jordan**

28.    Jordan owed a duty to Plaintiff's predecessor in interest to design, supervise, and construct the Facility in a reasonable and non-negligent manner including, but not limited to, designing, supervising, and constructing the Facility in accordance with all plans, specifications, design professionals' recommendations, building codes, industry standards, and government agency requirements applicable to the construction of the Facility.

29.    Jordan's duty of care included the duty to ensure that all construction was designed and performed in a good and workmanlike manner by qualified contractors and subcontractors and the Facility was suited for its reasonably anticipated use.  Jordan also owed a duty of care to hire competent contractors and subcontractors and to supervise the contractors and subcontractors on the site in their work.

30.    Jordan is vicariously liable for the defective work performed by the various contractors and subcontractors, as they are Jordan's agents for purposes of the construction.

31.    As a result of Jordan's negligent and improper work, there are substantial defects at the Facility as referenced in Exhibit "A" attached hereto and as set forth in the expert reports in this matter.

Copy from re:SearchTX

32.     Plaintiff suffers from among other things, Jordan's failure to follow the plans and specifications, negligent construction, negligent supervision, failure to perform the work in a good and workmanlike manner, and failure to meet applicable building codes.

33.     Plaintiff alleges that the negligence of Jordan and its contractors and subcontractors was a proximate cause of the occurrences in question and Plaintiff's resulting damages. Specifically, Plaintiff alleges that the Jordan and its contractors and subcontractors were negligent in one or more of the following respects:

- Failing to use ordinary care in the construction of the Facility;

- Failure to use ordinary care in the selection and use of proper components for the Facility;

- Failure to use ordinary care in the selection of contractors and subcontractors for construction of the Facility;

- Failure to use ordinary care to inspect the products and construction work for the Facility;

- Failure to use ordinary care to supervise the contractors and subcontractors involved in construction of the Facility;

- Failure to use ordinary care to test the products and construction work for the Facility;

- Failure to repair or replace defective products and work;

- Failure to hire and contract competent contractors and subcontractors who were qualified and competent to perform the construction work on the Facility;

- Failure to have appropriate quality control policies and procedures in place;

- Failure to use due care under the circumstances;

- Failure to remedy the damages caused by Jordan's and its contractor's and subcontractor's negligence; and

- Failure to remedy the defects to protect Plaintiff from future damages.

Copy from re:SearchTX

34.     Despite being notified of the various defects and negligent work, Jordan has failed or refused to correct those defects.

35.     Jordan breached its duties to Plaintiff or its predecessor in interest by failing to properly supervise the contractors and subcontractors and to construct the Facility in a good and workmanlike manner.

36.     Plaintiff would show that each of the acts, errors, and omissions of Jordan and its contractors and subcontractors as alleged herein, constitute negligent construction, negligent supervision, negligent installation, negligent repairs or replacement, negligent failure to follow the plans and specifications, negligent failure to use acceptable and manufacture-recommended installation methods and procedures, and negligent failure to test work on the Facility. Jordan and its contractors and subcontracts owed a duty to Plaintiff or its predecessor in interest to perform their work and supply materials which, when competently and properly installed, would produce a Facility which was fit for its intended purpose, constructed in accordance with approved plans and specifications, constructed with reasonable quality, and free of the Construction Defects identified in Exhibit "A" and in the export reports.

37.     Jordan is liable for the acts and omissions of its contractors and subcontractors who were employed by or in an agency or contractual relationship with Jordan at all times material hereto. The defective construction work is tied to, related to, and a direct result of certain work performed by Jordan's contractors and subcontractors including, but not limited to:

- Cambro Construction Inc.'s defective and negligent construction work related to providing and installing site concrete, building concrete, and tilt wall panels at the Facility;

- APCO Building Specialties Inc.'s defective and negligent construction work related to the provision and installation of doors, door framing and hardware at the Facility;

Copy from re:SearchTX

- Commercial Roofing Systems Inc.'s defective and negligent construction work related to the provision and installation of roofing, wood blocking at the roof, roof accessories, sheet metal flashing, and trim at the Facility;

- Contractors Tile Plus Inc.'s defective and negligent construction work related to the provision and installation of ceramic tile, resilient floor tile, resilient wall base, carpet, epoxy terrazzo, and epoxy flooring at the Facility;

- Diversified Interiors Inc.'s defective and negligent construction work related to the provision and installation of metal studs, sheetrock, wood blocking, insulation, EIFS, stucco, ceiling systems, painting, wall coverings, access doors, and spray fire systems at the Facility;

- EFI Panels, LLC's defective and negligent construction work related to the provision and installation of ACM panels and Tyvek at the Facility;

- Miner El Paso LTD's defective and negligent construction work related to the provision and installation of doors, security grills, and fire shutters at the Facility;

- Steel Specialties Inc.'s defective and negligent construction work related to the provision and installation of structural steel, joists, deck, miscellaneous steel, metal stairs, pipe and tube rails and embed plates at the Facility;

- Texas Electrical Contractors, LLC's defective and negligent construction work related to the provision and installation of electrical and fire alarm systems at the Facility;

- The Garick Group Inc.'s defective and negligent construction work related to the provision and installation of mechanical, plumbing, and site utilities at the Facility;

- The Glass House Inc.'s defective and negligent construction work related to the provision and installation of glass, glazing, aluminum storefront, curtain walls, and hardware at the Facility;

- ThyssenKrupp Elevator Corp.'s defective and negligent construction work related to the provision and installation of hydraulic elevators at the Facility; and

- Alliance Riggers & Constructors Ltd.'s defective and negligent construction work related to the provision and/or installation of structural steel, joists, metal deck, miscellaneous steel, metal stairs, and tiltwall panels at the Facility.

38.     The work of the various contractors and subcontractors listed herein caused damage not only to their own work or products but each also caused physical injury to tangible property unrelated to their own work or products.

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 14**
527428.000002 23565840.5

Copy from re:SearchTX

39.     Jordan's negligence arises out of, or was caused in whole or in part, by the negligence of the contractors and subcontractors listed herein.

40.     Jordan is also vicariously liable for the negligence of the contractors and subcontractors listed herein.

41.     It is and was foreseeable that Jordan's negligence did and could in the future cause damage to the Plaintiff.

42.     Jordan's breach of these duties proximately caused damages to Plaintiff within the jurisdictional limits of this Court.

## IV.
## ATTORNEY'S FEES

43.     Defendants' breaches have necessitated the engagement of the undersigned counsel, and Plaintiff is entitled to an award of reasonable and necessary attorney's fees pursuant to Texas Civil Practice & Remedies Code §38.001 *et seq.*

## V.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff 6330 Montana, LLC respectfully prays that Defendants Jordan Foster Construction, LLC and Goree Architects, Inc. appear and answer herein, and that upon the trial of this matter Plaintiff recover from Defendants:

a.     All damages allowed by law;

b.     Actual damages;

c.     Special and consequential damages for lost profits and costs incurred resulting from the delayed completion of the Facility and/or as otherwise allowed;

**PLAINTIFF'S THIRD AMENDED PETITION – PAGE 15**
527428.000002 23565840.5

Copy from re:SearchTX

d.    Special and consequential damages for lost profits and costs incurred resulting from any loss of use or business interruption due to any closure or partial closure of the Facility necessitated by repair or re-work due to Defendants' breaches;

e.    Attorney's fees;

f.    Applicable pre and post-judgment interest as allowed by law;

g.    All costs of court; and

h.    Such other and further relief to which Plaintiff may show itself entitled.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: /s/ Greg W. Curry
Greg W. Curry
State Bar No. 05270300
Greg.curry@hklaw.com
Michael B. Tristan
State Bar No. 24046995
Michael.tristan@hklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

**MOSS LEGAL GROUP, PLLC**

By: /s/M. Mitchell Moss
M. Mitchell Moss
State Bar. No. 00784647
Mitch@MossLegalSolutions.com
Priscilla M. Castillo
State Bar No. 24076531
Priscilla@MossLegalSolutions.com
5845 Cromo Dr., Suite 2
El Paso, Texas 79912
Telephone: (915) 703-7307
Facsimile: (915) 703-7618

**COUNSEL FOR PLAINTIFF**

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record through the Court's electronic filing system on this 24th day of September, 2021, in accordance with the Texas Rules of Civil Procedure.

*/s/* Greg W. Curry
Greg W. Curry

Copy from re:SearchTX

# EXHIBIT A

1.  Holes in the wall, opening by junction box, exposed wiring and painted sprinkler head.    [Closet next to elevator, first floor.]

2.  Mismatched and missing screws in railing.    Some screws are loose.    Railing is not secured and stable.    [Stairwell, near elevator.]

3.  Elevator jumps and bounces.    Operates erratically.

4.  Significant noise in recessed area next to stairwell.

5.  Terrazzo flooring poorly cut at doorway, closet floor rough and unfinished, sheet rock chipped, primer showing on walls, and water leaking possibly due to improper installation of electric diode in water heater.    [Water heater closet near elevator on second floor.]

6.  No base plates on round poles.    [Hallway, second floor.]

7.  Area above door of conference room is not finished out.    [Hallway, second floor.]

8.  Unfinished edge outside of owner office window into showroom.    [Hallway, second floor.]

9.  Partially painted fixtures, tape on pipes, handwriting on steel beam, temporary light still in place, white paint drops on beams, primer showing in places, and cracks in sheet rock.    [Owner office.]

10. Holes in walls, exposed wiring, and carpet lifted near drains.    [Balcony adjoining owner office.]

11. Milky water and Sulphur smell from faucet.    Water sometimes comes out black.    Water gushes erratically and lands outside of basin.    [Owner restroom.]

12. Two screws are visible and protruding in tile above toilet.    [Owner restroom.]

13. Defects [chipped wood] in bathroom door. [Owner restroom.]

14. Scrapes and other defects on fixtures and tiled walls.    Poor calking work at junction of wall and floor.    [Hallway within owner office area.]

15. Milky water with gushing and erratic flow from faucet.    Sulphur smell.    Water sometimes comes out black.    [Wet bar within owner office.]

16. White splotches that cannot be buffed out in terrazzo floor.    [Hallway, second floor.]

17. Poor caulk work around doorway to file room.    [Comptroller's office.]

18. Hole above baseboard in file room.    [Comptroller's office.]

19. Poorly done air conditioner installation in file room.    [Comptroller's office.]

20. Counters, wood work, tile and calk work in need of repair.    [All public restrooms]

Copy from re:SearchTX

21. Poor calk work at union of toilet and floor.    [All public restrooms.]

22. Holes in sheet metal next to roof hatch.    [Roof access closet.]

23. Baseboard molding does not extend for full length of wall and has fallen off the wall.    [Roof access closet.]

24. Roof hatch does not latch to allow locking.    [Roof access closet.]

25. Many electrical outlets on second floor do not work.

26. Builder promised that all glass would be cleaned but never came back to do so.

27. Baseboard molding has been nicked by a buffer operated by builder.    [Employee breakroom.]

28. Baseboard molding has fallen off wall below kitchen cabinets.    [Employee breakroom.]

29. Floor is discolored near walls.    [Employee breakroom and everywhere there is terrazzo flooring.]

30. Poor caulk work at junction of floor and walls.    [Employee breakroom.]

31. Caulk work and metal work needs to be redone around doorway.    [Employee breakroom.]

32. Terrazzo floor is discolored and blotchy.    Buffing does not resolve the problem and floor needs to be redone.    [Employee breakroom, second floor hallway and sales/training room.]

33. Holes in floor and walls.    [Equipment room accessed from within sales/training room.]

34. Missing ceiling panels.    [Equipment room accessed from within sales/training room.]

35. Poor installation of floor to ceiling marker board at front of sales/training room.    Seams, uneven surface, nicks and scratches, and marker board surface protrudes at junction of walls and ceiling in corner of room.    [Sales/training room.]

36. Scratches and missing paint on railing.    [Stairway from showroom to second floor.]

37. Railing is not anchored flush to wall at bottom of stairway.    [Stairway from showroom to second floor.]

38. Garage doors do not function properly.    Some require one quick press of button to raise or lower door completely; others require button be held down until door is completely up or down.    [Delivery area next to showroom.    No photos.]

39. Numerous round inserts in ceiling are falling out [Delivery area and elsewhere.]

40. Cracks in the floor evidence foundation issues. [Delivery area and elsewhere.]

41. Water damage in several spots on ceiling.    [Delivery area.]

42. Severe and growing cracks in concrete on floor of management carport.    [Management Parking Portico.]

43. Lights on outside of main building remain on during daylight hours and cannot be turned off.

Copy from re:SearchTX

44. Poor caulking work on exterior walls.    [Main building.]

45. Cracks and poor workmanship in parking lot through window of showroom.    [New Car Showroom.]

46. Caulking in tile floor of showroom is incorrect.    Should be a sand grout but epoxy grout has been used, which gives a dirty appearance.    [New Car Showroom.]

47. Severe water damage on ceiling tile in showroom.    During times of inclement weather, a bucket must be placed under this ceiling tile.

48. Double door has issues.    Panel has fallen down from above door and hit a customer.    Door does not close flush with door frame.    [New Car Showroom.]

49. Large cracks in floor tiles.    [New Car Showroom.]

50. Poor caulk work at junction of floor and wall in service desk area.    [Main Building.]

51. Many showroom ceiling lights need replacement.    [New Car Showroom.]

52. Door does not fully open due to unlevel slab.    [Service Desk Area, Main Building.]

53. Cracks in floor evidence foundation issues.    Missing and discolored caulking.    [Main Building.]

54. Visible electrical wires on countertop in public restroom. [First floor, near Showroom.]

55. Wood paneling frequently falls.    [First floor, near Showroom.]

56. Damage to wood paneled wall.    [First floor, near Showroom.]

57. Damage to wood cubical.    [Service Desk Area, Main Building.]

58. Wood veneer is separating.    [Service Desk Area, Main Building.]

59. Poor caulking work including missing caulking between pavestones.    [Drive through area leading to service department.]

60. Pavestones are not level.    [Drive through area leading to service department.]

61. Many lights were not secured to posts.    As a result, they have fallen and broken.    [Driveway leading to service department.]

62. Poor caulk work at junction of floor and wall.    [Service Department driveway.]

63. Door to service waiting area has metal plate patchwork rather than being properly repaired or aligned.    Does not open fully due to unlevel pavestones.    [Service Waiting Area.]

64. Double doors are installed improperly.    They are very close at bottom and have a gap at top.    [Service Department.]

65. Light has fallen and had to be replaced.    [Service Department.]

66. Many lights are out in service garage.    [Service Department.]

67. Open junction box.    [Express Maintenance Desk.]

Copy from re:SearchTX

68. Sheet rock shows long seam or crack.    [Express Maintenance Desk.]

69. Gas leak was caused by equipment swinging back and forth.    Repaired with a brace at top and new flex tube.    [Detail bay.]

70. Tracks in concrete.    [Service Parking Lot.]

71. Tracks in concrete and poor caulking work.    [Service Parking Lot.]

72. Open junction box.    [Wash Bay.]

73. Poor concrete installation.    [Service Parking Lot.]

74. Loose floor tiles with no grout.    [Just inside garage door in Service Garage.]

75. Two ceiling fans do not work.    [Service Garage.]

76. Many lights are out prematurely.    [Service Garage.]

77. Broken pavestones.    [Service Garage.]

78. Tile missing in front of door. [Service Garage.]

79. Poor installation of electrical conduit.    [Parts Department.]

80. Paint on sprinkler head in parts department. [Parts Department.]

81. Equipment room is not finished out and air conditioning unit does not work properly.    Does not keep room cool.    [Parts Department.]

82. Door knob does not work.    [Parts Department.]

83. Cracks throughout floor.    [Parts Department.]

84. Walls and floor are not finished out.    [Photography room.]

85. Poor concrete work.    [Parking Lot.]

86. Floor lights on elevated display areas do not work. [Front Parking Lot.]

87. Exposed pipe is safety hazard in customer walking areas.    [Front Parking Lot.]

88. Broken lighting fixtures. [Front Parking Lot.]

89. Bollard posts are too far apart to prevent a vehicle traveling through them. [Front Parking Lot.]

90. Holes in concrete.    [Front Parking Lot.]

91. No liner (weed barrier) installed with landscaping and weeds are a large problem.    Not enough plants along front of property.    [Landscaping Along Montana Ave.]

92. No lights installed on two of the raised display areas.

93. Paint peeling off on ceiling of carport area.    [Front parking lot.]

94. Numerous lights not working.    [Used Car Lot.]

95. Incomplete lighting fixtures.    Some installed incorrectly.    One fell and almost hit a customer. [Used Car Showroom.]

96. Door closer detached.    [Used Car Showroom.]

97. Public restrooms in used car showroom have poorly installed tile, countertops and wooden panels underneath sink.    Power switch is poorly installed.    [Used Car Showroom.]

98. Cracking in sidewalk.    [Used Car Lot.]

99. Parking lot should be fully striped and is not.    [Front Parking Lot.]

Copy from re:SearchTX