IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| HANOVER LLOYDS INSURANCE COMPANY, AND UNITED FIRE & CASUALTY COMPANY, | § § § | |
| | § | |
| **Plaintiffs,** | § § | |
| v. | § § | EP-22-CV-00162-FM |
| DONEGAL MUTUAL INSURANCE COMPANY D/B/A MOUNTAIN STATES INSURANCE GROUP, | § § § § | |
| **Defendant.** | § § | |

## REPORT AND RECOMMENDATION

Before the Court are Defendant Donegal Mutual Insurance Company d/b/a Mountain States Insurance Group's ("Mountain") "Motion for Summary Judgment" (ECF No. 23) and Plaintiffs Hanover Lloyds Insurance Company ("Hanover") and United Fire & Casualty Company's ("United Fire") (collectively, "Plaintiffs") "Joint Motion for Partial Summary Judgment" (ECF No. 24).

On September 14, 2023, Senior United States District Judge Frank Montalvo referred the motions to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 32.) For the reasons set forth below, the Court recommends that Mountain's Motion for Summary Judgment be **DENIED** and Plaintiffs' Joint Motion for Partial Summary Judgment be **GRANTED in part and DENIED in part**.

### I.     BACKGROUND[1]

---

[1] The Court herein recounts only the factual and procedural backgrounds that are relevant to the instant motions.

On or about November 10, 2014, Poe Investments, Ltd. ("Poe") entered into an agreement with Jordan Foster Construction, LLC ("Jordan") for construction of an auto sales and service facility ("Facility").  (ECF No. 24-4:5.)  Jordan hired multiple subcontractors, including Texas Electrical Contractors, LLC ("TEC").  (*Id.*)  Subsequently, Poe sold the Facility to 6330 Montana, LLC (Montana").  (ECF No. 1-1:43.)

Montana filed suit against Jordan on October 26, 2017, in El Paso County Court at Law Number Three, Texas, in Cause No. 2017DCV3746 (the "Underlying Lawsuit").  (ECF No. 24-4:6, 17.)  Montana filed its first amended petition on August 19, 2019.  (ECF No. 23:2.)  It filed its second amended petition on August 18, 2020, alleging breach of express warranties, breach of contract, and negligence against Jordan.  (ECF No. 24-4:17–31.)  It filed its third amended petition on September 24, 2021.  (ECF No. 1-1:105.)

On December 1, 2020, Jordan filed a third-party petition in the same case against its subcontractors, including TEC, stating causes of action of breach of contract, contribution, indemnity, negligence, and breach of express and implied warranties.  (ECF No. 27-1:1–14.)  Jordan alleged that TEC provided "defective and negligent construction work" while carrying out "the provision and installation of electrical and fire alarm systems at the Facility."  (*Id.* at 5.)

TEC notified its three commercial general liability ("CGL") insurance carriers.  (ECF No. 24:8.)  Hanover insured TEC under policy number ZLD D358441 00 from September 8, 2017, to September 8, 2018, with a subsequent renewal until September 8, 2019.  (ECF No. 24-1:23–559.)  United Fire insured TEC under policy number 85317669 from September 8, 2014, to September 8, 2015, with subsequent renewals until September 8, 2017.  (*Id.* at 562–816.)  Mountain insured TEC from September 8, 2019, to September 8, 2020, under policy number CPT9241885, with a subsequent renewal until September 8, 2021, under policy number CXL9241885.  (ECF Nos. 23-

1; 23-2.)  Hanover and United Fire provided a defense to TEC, pursuant to a reservation of rights. (ECF No. 15:14.)  Mountain declined to defend TEC.  (ECF No. 24-1:5–9.)

On March 22, 2022, Hanover and United Fire brought the instant action against Mountain in the 205th Judicial District Court of El Paso County, Texas, in Cause No. 2022-DCV-0871, seeking: (1) a declaratory judgment that Mountain was required to defend TEC; (2) contribution from Mountain for TEC's defense costs; and (3) equitable subrogation from Mountain for TEC's defense costs.  (ECF No.1-1:5–22.)   On May 5, 2022, Mountain removed the case to federal court. (ECF No. 1.)  On November 14, 2022, Plaintiffs filed their first amended complaint, now asserting claims for: (1) declaratory judgment; (2) contribution for defense costs; and (3) breach of contract and equitable subrogation on behalf of TEC for TEC's defense and indemnity costs.  (ECF No. 15.)

On April 28, 2022, mediation took place in the Underlying Lawsuit, which resulted in Hanover and United Fire paying $100,000 to resolve the claims against TEC.  (ECF No. 24:8.) Mountain was invited to attend the mediation but declined.  (*Id.*)

On April 14, 2023, Mountain filed its motion for summary judgment as to all of Plaintiffs' claims.  (ECF No. 23.)  Plaintiffs filed their "Response to Defendant Donegal Mutual Insurance Company d/b/a Mountain States Insurance Group's Motion for Summary Judgment" (ECF No. 26) on April 28, 2023, and Mountain followed by filing its "Reply in Support of its Motion for Summary Judgment" (ECF No. 27) on May 5, 2023.

Also on April 14, 2023, Plaintiffs filed a joint motion for partial summary judgment, seeking: (1) a declaration that Mountain had a duty to defend TEC; (2) a declaration that Mountain had a duty to indemnify TEC; (3) a declaration that Mountain breached its own policy by failing to defend or indemnify TEC; (4) an award of $39,946.26 for Mountain's share of the cost of

defending TEC; (5) an award of $33,333.33 for Mountain's share of the cost of settling the Underlying Lawsuit; (6) reasonable and necessary attorneys' fees at the trial level; (7) reasonable and necessary conditional appellate attorneys' fees; (8) an award for taxable court costs; and (9) all other relief to which Plaintiffs may be entitled.  (ECF No. 24.)  On April 28, 2023, Mountain filed its "Response to Plaintiffs' Motion for Summary Judgment" (ECF No. 25), and on May 5, 2023, Plaintiffs filed their "Reply to Defendant's Response to Plaintiffs' Joint Motion for Partial Summary Judgment" (ECF No. 28).

## II.      LEGAL STANDARD

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material "if proof of its existence might affect the outcome of the case."  *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020).  "There exists a 'genuine dispute' about a material fact . . . when the evidence would allow a reasonable jury to return a verdict for the nonmovant."  *Id.*

A party seeking summary judgment bears the initial burden of proving the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant carries that burden, the burden shifts to the nonmovant to show that a genuine issue exists.  *Id.* at 323–25.  The ultimate inquiry is whether the evidence is "so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In ruling on a motion for summary judgment, "[c]ourts must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).  Courts, however, "refrain from making

credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). On cross-motions for summary judgment, the courts consider each motion "independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *BITCO Gen. Ins. v. Acadia Ins.*, 427 F. Supp. 3d 838, 847 (E.D. Tex. 2019) (quoting *Aldous v. Darwin Nat'l Assurance Co.*, 851 F.3d 473, 477 (5th Cir. 2017)).

**B. Law Governing Insurance Contracts**

A federal court sitting in diversity in Texas will apply Texas law to interpret insurance contracts. *BITCO*, 427 F. Supp. 3d at 847. The duty to defend and the duty to indemnify are the two separate duties assumed by insurers "[u]nder a typical CGL policy." *Trinity Universal Ins. v. Emps. Mut. Cas. Co.*, 592 F.3d 687, 691 (5th Cir. 2010). "[P]revailing on one does not guarantee prevailing on the other." *Word of Life Church of El Paso v. State Farm Lloyds*, 766 F. App'x 49, 55 (5th Cir. 2019).

In Texas, courts use the "eight-corners rule" to determine whether an insurer has a duty to defend. *Siplast, Inc. v. Emps. Mut. Cas. Co.*, 23 F.4th 486, 492 (5th Cir. 2022). This rule requires a liability insurer to determine whether it has a duty to defend based solely on "the terms of the policy and the pleadings of the third-party claimant." *Id.* (quoting *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006)). This means that the duty to defend can be determined by a court "as a matter of law based solely on these documents." *Discover Prop. & Cas. Co. v. Blue Bell Creameries USA, Inc.*, 622 F. Supp. 3d 349, 354 (W.D. Tex. 2022). No regard is given to whether the allegations in the plaintiff's pleading are true or false. *Windermere Oaks Water Supply Corp. v. Allied World Specialty Ins.*, 67 F.4th 672, 675 (5th Cir. 2023).

The duty to defend arises if any of the claims asserted in the third-party pleading could fall under the insurance policy. *Siplast, Inc.*, 23 F.4th at 493 (citation omitted). "Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within coverage of the policy." *Markel Ins. v. S.T.C.G., Inc.*, 737 F. Supp. 2d 626, 631 (N.D. Tex. 2010) (quoting *Heyden Newport Chem. Corp. v. S. Gen. Ins.*, 387 S.W.2d 22, 26 (Tex. 1965)). Further, as long as at least one cause of action potentially falls under the insurer's policy, the insurer is required to defend the insured against all claims. *Northfield Ins. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004).

Extrinsic evidence is generally not allowed under the "eight corners" analysis. *Siplast, Inc.*, 23 F.4th at 492. However, the Texas Supreme Court has recognized an exception in cases where "the extrinsic evidence (1) goes solely to the issue of coverage and does not overlap with the merits of liability, (2) does not contradict facts alleged in the pleading, and (3) conclusively establishes the coverage fact to be proved." *Monroe Guar. Ins. v. BITCO Gen. Ins.*, 640 S.W.3d 195, 197 (Tex. 2022).

### III.    DISCUSSION

#### A. Plaintiffs' Objections to Defendant's Summary Judgment Evidence

Before addressing the substance of either motion, the Court considers Plaintiffs' objections to Mountain's proffered summary judgment evidence. (ECF Nos. 26:2–4; 28:2–3.) "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). For summary judgment purposes, "materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th

Cir. 2016) (citation omitted).   "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."   Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

### 1.   Exhibit 3 attached to Mountain's Motion for Summary Judgment

Exhibit 3 is a copy of Jordan's third-party petition.  (ECF No. 23-3.)  Plaintiffs object to the exhibit on the grounds that it is not a certified copy and so has not been properly authenticated. (ECF No. 26:2.)  Thus, they argue, the exhibit does not comply with Fed. R. Evid. 902(4).[2]  (*Id.*) Additionally, Plaintiffs assert that the copy of the third-party petition is not complete.  (*Id.*)  Exhibit 3 contains the third-party petition and attached Exhibit A but is missing the rest of the attached exhibits.  (*Id.*)  Instead, Plaintiffs refer the Court to Exhibit 4 of the Plaintiffs' motion for partial summary judgment, which contains a certified copy of the third-party petition, as well as all of the exhibits attached to the petition.  (*Id.* at 2–3); (*see* ECF No. 24-4).

Mountain responded to this objection and provided a certified copy of the third-party petition and all attached exhibits.  (ECF No. 27:1–2); (*see* ECF No. 27–1.)  As such, the Court will not refer to Exhibit 3 and will instead rely on the certified and authenticated copies provided by the parties instead.

### 2.   Montana's First Amended Petition

Plaintiffs also object to Mountain's reference in its motion to Montana's First Amended Petition in the Underlying Lawsuit.  (ECF No. 26:3) (citing ECF No. 23:2–3).  Plaintiffs state that the document is not relevant for the purpose of determining whether Mountain had the responsibility to defend TEC.  (*Id.*)  Further, Plaintiffs argue, since Montana's First Amended

---

[2] It appears that Plaintiffs have mistakenly cited to Fed. R. Civ. P. instead of Fed. R. Evid.

Petition is not attached to Mountain's Motion and is not elsewhere in the summary judgment record, then Mountain's reference to it constitutes hearsay.  (*Id.*)

The duty to defend is determined by looking at the most recent pleading in the underlying case and the insurance policy.  *BITCO*, 427 F. Supp. 3d at 848.  When Jordan filed its third-party petition against TEC, it attached as an exhibit Montana's Second Amended Petition against Jordan. (*See* ECF No. 24-4:16–49.)  Thus, Montana's First Amended Petition was already superseded at the time that Jordan filed its petition, and, further, Montana's First Amended Petition is not referenced or included in Jordan's pleading.  Therefore, the Court will not take any references to Montana's First Amended Petition into consideration for purposes of determining the duty to defend.

### 3.  Proposed "Undisputed Facts"

Plaintiffs object to Mountain's reference to "Undisputed Facts" in its motion for summary judgment.  (ECF No. 26:3); (citing ECF No. 23:1–3).  Plaintiffs argue that some of the facts provided are not part of the summary judgment record.  (*Id.*)  Further, Plaintiffs argue that the "facts" listed do not "acknowledge or recognize *all* of the factual allegations implicating the scope of work of the parties' common insured, TEC."  (*Id.*)

All of the facts provided in this section of Mountain's Motion appropriately cite to parts of the summary judgment record, with the exception of the references to Montana's First Amended Petition. As discussed above, the Court will not take any references to Montana's First Amended Petition into consideration for the purposes of evaluating Mountain's duty to defend TEC.

### 4.  References to Extrinsic Evidence

Plaintiffs object to Mountain's reference to "extrinsic facts" in its motion for summary judgment.  (*Id.* at 3–4) (citing ECF No. 23:9).  Mountain asserts that, in some cases, courts can go

beyond the "eight corners rule" in considering whether the duty to defend is triggered. (ECF No. 23:9.) In cases where it is impossible to decide whether an insurer's duty to defend is triggered, court will allow extrinsic evidence that "goes solely to a fundamental issue of coverage." (*Id.*) (quoting *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 500 (Tex. 2020)).

In this case, the Court will follow the "eight corners rule" established by Texas jurisprudence in cases of insurance policies, unless the Court determines that this case is within the narrow subset of cases where extrinsic evidence may be introduced. *See infra* Section III.B.

### 5. Exhibit 1 attached to Mountain's Response to Plaintiffs' Motion for Summary Judgment

Exhibit 1 is a copy of Montana's Original Petition. (ECF No. 25-1.) As discussed above, for purposes of the duty to defend, the most recent pleading by the third-party plaintiff is the one that the Court will look to. In this case, Montana's Second Amended Petition is attached to Jordan's third-party pleading. (ECF No. 24-4:17–31.) Therefore, the Court will only look to Montana's Second Amended Petition and will not take Montana's Original Petition into consideration.

### B. Mountain's Duty to Defend TEC

In its motion for summary judgment, Mountain argues that the allegations in the Underlying Lawsuit against TEC are not claims that would be covered under its insurance policy with Mountain because they "only allege defects and inadequacy of [TEC]'s work and failure to perform as contracted." (ECF No. 23:5.) Mountain relies on the exclusion in Section 2(m) of its insurance contract:

**2. Exclusions**
This insurance does not apply to:
. . .

> **m. Damage To Impaired Property Or Property Not Physically Injured**
> "Property damage" to "impaired property" or property that has not been physically injured,
> arising out of:
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(*Id.*) (quoting ECF No. 23-1:87–90.)  Further, Mountain states that there was no "occurrence" under the policy during the policy period because all of the damage had already occurred by the time of the initiation of Mountain's policy.  (*Id.* at 7.)

In their response, Plaintiffs argue that the 2(m) exclusion does not apply.  (ECF No. 26:5.) "Impaired property" requires that the property become "functional upon repairing or replacing the insured's product or work."  (*Id.* at 6.)  The exclusion also covers property that was not physically injured if "the damages or loss of use arose out of the insured's defective product or work."  (*Id.*) Plaintiffs allege that property has been physically injured and that the damage involved is not only to impaired property; thus, the 2(m) exception does not apply.  (*Id.*)  Further, Plaintiffs argue that Mountain's policy does not require there to be an "occurrence" during the policy period but rather just property damage during the policy period.  (*Id.* at 7–8.)[3]  There is enough evidence of ongoing property damage to trigger Mountain's duty to defend.  (*Id.* at 8.)

In its reply to Plaintiffs' Response, Mountain asserts again that all of the damage that has been alleged by Jordan and Montana with respect to TEC's work has been damage to TEC's faulty

---

[3] Plaintiffs cite to language in Mountain's policies requiring that "'property damage' *occurs* during the policy period."  (*Id.*) (emphasis added).  Texas courts interpret this language to mean that there must be an occurrence during the policy period.  *See Don's Bldg. Supply, Inc. v. OneBeacon Ins.*, 267 S.W.3d 20, 24 (Tex. 2008) (interpreting the same language to mean that "[t]he policy's requirement [is] that property damage be caused by an 'occurrence.'").

work itself.  (ECF No. 27:3.)  The pleadings in the Underlying Lawsuit do not contain allegations that TEC's work caused property damage to the rest of the property.  (*Id.*)

      In their cross-motion for partial summary judgment, Plaintiffs allege that Mountain improperly denied TEC a defense in the underlying case.  (ECF No. 24:8.)  Plaintiffs claim that the "[a]llegations of physical damage to building elements as a result of defective construction are 'property damage' as defined by [Mountain's] policies."  (*Id.* at 13.)  Montana's second amended petition was filed in August 2020 and alleged present and ongoing property damage, "such as 'cracks in the floor evidence foundation issues,' 'cracking in sidewalk,' 'severe and growing cracks in concrete on floor of management carport,' 'large cracks in floor tiles,' and 'cracks throughout floor.'"  (*Id.* at 14) (citing ECF No. 24-4:33–35).  Since these allegations of property damage "could be construed to allege damage potentially occurring during the policy period of at least one of the [Mountain] policies," Mountain's duty to defend was triggered.  (*Id.* at 15.)

      In its response, Mountain argues that "its policy [with TEC] incepted long after the defect allegations were made."  (ECF No. 25:1.)  Mountain states that "the factual allegations against [TEC] assert only damages to [TEC]'s products or work, which are expressly excluded from coverage."  (*Id.* at 3.)  Mountain also argues that extrinsic evidence should be permitted in this case, since it is impossible to determine from the latest pleading in the Underlying Lawsuit whether Mountain had a duty to defend TEC.  (*Id.* at 7–8.)  Looking to Montana's Original Petition, which was filed in 2017, before TEC's policy with Mountain began, Mountain asserts that all of the property damage had already occurred.  (*Id.* at 8–9.)

      In their reply to Mountain's response, Plaintiffs assert that "allegations . . . that improperly installed lights . . . randomly dropped from the ceiling" and the claims of "broken lighting features" are enough to establish that there was physical injury to tangible property.  (ECF No. 28:4.)

Plaintiffs argue that "allegations as to concrete defects" that have created "severe and growing cracks" partially stem from the work of TEC, which establishes that there was ongoing property damage into TEC's policy period with Mountain. (*Id.* at 5.) Plaintiffs also point out that Mountain cannot rely on the time frame laid out in Montana's original petition, as that is not proper under Texas's "eight corners rule." (*Id.* at 6.)

Pursuant to the eight-corners rule, the Court will consider the relevant policy provisions and Jordan's third-party petition to determine whether Mountain had a duty to defend TEC.[4]

### 1. Property Damage

The Court first addresses the question of whether TEC allegedly caused property damage to the Facility. Property damage is defined in a CGL policy as physical injury to tangible property. *Lamar Homes v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007). Before taking any policy exclusions into consideration, this definition can cover defective workmanship that causes physical injury to the insured's own work. *Id.* However, a mere allegation that work is defective and must be replaced, without an allegation of physical injury or loss of use, is not enough to allege property damage. *Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins.*, 712 F. Supp. 2d 628, 645 (S.D. Tex. 2010). Additionally, if economic losses alone are alleged, that does not constitute property damage. *PPI Tech. Servs., L.P. v. Liberty Mut. Ins.*, 515 F. App'x 310, 314 (5th Cir. 2013).

---

[4] Texas state courts and federal district courts are split on whether the petition of the plaintiff (here, Montana) in the Underlying Lawsuit can be considered as part of the eight-corners analysis. *Compare, e.g., Huffhines v. State Farm Lloyds*, 167 S.W.3d 493, 497 (Tex. App. 2005) (solely focusing on third-party petition and insurance policies), *and Gibson & Assocs. v. Home Ins*, 966 F. Supp. 468, 473 (N.D. Tex. 1997) (even though the third-party complaint incorporated the complaint by reference, the court would not look to the complaint when determining the duty to defend), *with BITCO*, 427 F. Supp. 3d at 852–55 (citing the allegations in the original petition and the third-party petition in the eight-corners analysis), *and Evanston Ins. v. Kinsale Ins.*, No. 7:17-CV-327, 2018 WL 4103031, at *11 (S.D. Tex. July 12, 2018) ("[T]he Court may refer, if necessary, to the claims in the underlying suit in order to determine if the facts asserted trigger coverage."). In this case, the Court will refer to Montana's Second Amended Petition because it was attached to Jordan's Third-Party Petition. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also* Tex. R. Civ. P. 59 ("Notes, accounts, bonds, mortgages, records, and all other written instruments, constituting, in whole or in part, the claim sued on, . . . may be made a part of the pleadings by copies thereof, or the originals, being attached or filed.").

Mountain's policy states:

**SECTION I - COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1. Insuring Agreement**
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . .
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
(2) The "bodily injury" or "property damage" occurs during the policy period.

(ECF No. 23-1:87.)

**17.** "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. . . .

(*Id.* at 99.)

Jordan states in its third-party petition that TEC was "to perform electrical and fire alarm system work throughout the [Facility.]" (ECF No. 24-4:5.) Jordan lists Montana's complaints about the electrical work undertaken by TEC:

[Montana] complains of numerous deficiencies in the Electrical installation. [Montana] alleges that the Electrical installations are incomplete and defective because conduits and wiring were left exposed, there were loose ground connections and/or missing grounds, bushings were not properly installed, and other installations were either missing, deficient and/or not in accordance with plans and specifications. [Montana] complains that the Electrical deficiencies cause operational issues with electrical devices including, but not limited to, recessed light fixtures in the main showroom, exterior lighting, and circulating fans in the service bays. [Montana] asserts that [Jordan] is liable for the acts and omissions of TEC. [Montana] further alleges that TEC's negligence caused or contributed to cause these damages at the [Facility].

(*Id.* at 8.)  Jordan attached its contract with TEC, which states that TEC was to provide certain materials like "conductors and cables," "raceways and boxes," "switchboards," "panelboards," and "surge protective devices," as well as a "fire alarm system." (*Id.* at 207.)

In Montana's second amended petition, Montana complains of the electrical work, stating, "Jordan installed the electrical system inappropriately causing lights and fans to go out of service prematurely."  (*Id.* at 23.)  Exhibit A attached to the second amended petition, both of which are attached as Exhibit 1 to Jordan's third-party petition, lists some of the electrical issues in the facility as: (1) "exposed wiring," (2) "[m]any electrical outlets on second floor do not work," (3) "[l]ights on outside of main building remain on during daylight hours and cannot be turned off," (4) "[m]any showroom ceiling lights need replacement," (5) "[v]isible electrical wires on countertop in public restroom," (6) "[m]any lights were not secured to posts.  As a result, they have fallen and broken," (7) "[l]ight has fallen and had to be replaced," (8) "[m]any lights are out in service garage," (9) "[m]any lights are out prematurely," (10) "[p]oor installation of electrical conduit," (11) "[f]loor lights on elevated display areas do not work," (12) "[b]roken lighting fixtures," (13) "[n]o lights installed on two of the raised display areas," (14) "[n]umerous lights not working," and (15) "[i]ncomplete lighting fixtures. Some installed incorrectly.  One fell and almost hit a customer." (*Id.* at 32–36.)

The damages alleged in the pleadings demonstrate that TEC's work caused property damage.  Jordan states that TEC's work led to "operational issues with electrical devices," meaning that TEC's work caused physical injury to those electrical devices.  (*Id.* at 8.)  Montana's claim that the electrical work at the Facility caused fans and lights to go out of service prematurely requires that the alleged faulty electrical work damaged the lights and fans.  Claims of broken lighting fixtures and lights falling mean that lights were damaged by TEC's work.  Additionally,

falling lights would have caused damage to other tangible property at the Facility.  Further, Montana's second amended petition alleges, "The work of the various contractors and subcontractors listed herein caused damage not only to their own work or products but each also caused physical injury to tangible property unrelated to their own work or products." (*Id.* at 28.) TEC is one of the subcontractors listed in the second amended petition. (*Id.* at 27.)  Resolving any ambiguities in favor of the insured, the Court concludes that property damage occurred due to TEC's faulty work.

### 2.  "Occurrence" During the Policy Period

The Texas Supreme Court has held "that 'claims for damage caused by an insured's defective performance or faulty workmanship' may constitute an 'occurrence' when 'property damage' results from the 'unexpected, unforeseen or undesigned happening or consequence' of the insured's negligent behavior." *Lamar Homes*, 242 S.W.3d at 16 (quoting *Federated Mut. Ins. v. Grapevine Excavation Inc.*, 197 F.3d 720, 725 (5th Cir. 1999)).  An "occurrence" does not include allegations "that the insured intended the injury (which is presumed in cases of intentional tort)" or where "the resulting damage was the natural and expected result of the insured's actions." *Id.* at 9.

Under Texas law, property damage under an occurrence based CGL insurance policy occurs "when actual physical damage to the property occur[s]." *Don's Bldg. Supply, Inc. v. OneBeacon Ins.*, 267 S.W.3d 20, 24 (Tex. 2008).  "The date that the physical damage is or could have been discovered is irrelevant under the policy." *Id.*

Mountain's policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF No. 23-1:98.)  The property damage in this case is alleged to be the result of TEC's negligent behavior. (ECF No. 27-

1:10.)  There is no suggestion that TEC foresaw or expected this damage to occur.  Therefore, there is an occurrence under Mountain's policy.

Mountain asserts that the Court should use extrinsic evidence to resolve any ambiguities about when the property damage occurred.  (ECF Nos. 23:8–9; 25:7–9.)  Specifically, Mountain points to Montana's Original Petition, filed in October of 2017, to show that the alleged occurrences of property damage all happened before Mountain's policy period.  (ECF No. 23:10–11.)  Mountain also points to the inspection report, dated August 22, 2017, attached to the Original Petition, to show that all of the damage to the Facility's electrical system occurred by 2017.  (ECF No. 25:8–9.)

Despite the Texas Supreme Court's recent decision in *Monroe* that extrinsic evidence can be permitted in certain circumstances to determine an insurer's duty to defend, extrinsic evidence is still routinely excluded from consideration in these types of cases.  *See, e.g., Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 477–78 (Tex. 2022) (holding that there was no "gap" in the pleadings that made extrinsic evidence necessary); *Am. Reliable Ins. v. Weisinger*, No. 4:22-CV-03289, 2023 WL 5185147, at *3 (S.D. Tex. Aug. 11, 2023) (deposition testimony could not be used because it did "not conclusively establish the coverage fact to be proved"); *Century Sur. Co. v. Club Adventure Learning Ctr. LLC*, No. EP-22-CV-213-KC, 2023 WL 3575647, at *10 (W.D. Tex. May 22, 2023) (there was no gap in the pleading that would require extrinsic evidence).  Even in *Monroe*, the Texas Supreme Court ultimately concluded that the extrinsic evidence in question could not be used because it would go to the matter of the liability of the insured.  *BITCO Gen. Ins. v. Monroe Guar. Ins.*, 31 F.4th 325, 331 (5th Cir. 2022).

The third-party petition does not explicitly state when the subcontractors carried out their work on the Facility, but this does not mean that there is a gap in the pleading.  *See Tejas Specialty Grp. Inc. v. United Specialty Ins.*, No. 02-20-00085-CV, 2021 WL 2252742, at \*9 (Tex. App. June 3, 2021) (inferring that the work of the subcontractors was done between the date of their hiring and the date of the third-party petition, and thus some of the work could have been done within the coverage period).[5]  Further, although Montana's original petition and the inspection report allege that some damage occurred before October 2017, that does not mean that all of the damage to the Facility occurred before that date. Indeed, Montana's subsequent amendments of its petition and the later inclusion of Exhibit A, a list of the damage and faulty workmanship at the Facility, suggest that some damage might have occurred later.  This means that the extrinsic evidence does not conclusively establish the coverage fact to be proved.

Because of this, the Court cannot conclude that no property damage to the facility occurred due to TEC's negligent work during the time period of Mountain's policy with TEC.  As the Court must interpret the operative pleading and insurance policy together strictly in favor of the insured, the Court concludes that there was an occurrence of property damage during the relevant time period.

### 3.  2(m) Exclusion

Section 2(m), the "impaired property" exclusion, excerpted above, is the only policy exclusion asserted by Mountain.  "The initial burden of proof is on the insured to show that a given claim is covered by the insurance policy."  *Siplast, Inc.*, 23 F.4th at 494.  If the insurer wishes to

---

[5] The Eleventh Circuit has concluded the same.  *Trizec Props. v. Biltmore Constr. Co., Inc.*, 767 F.2d 810, 813 (11th Cir. 1985) ("At this stage in the proceedings, we have no way of conclusively ascertaining exactly when the damage occurred. . . . We hold only that the complaint is broad enough to trigger [the insurer's] duty of defense.").

rely on a policy exclusion, "it bears the burden of proving that one or more of those exclusions apply." *Id.* (quoting *Trinity Universal*, 592 F.3d at 692).

This provision "excludes coverage for 'damage to third-party property that incorporates the insured's product when the third-party property is functional upon repairing or replacing the insured's product.'" *Mt. Hawley Ins. v. J2 Res. LLC*, No. 4:20-CV-2540, 2022 WL 1785483, at *9 (S.D. Tex. June 1, 2022) (citation omitted).  It "also excludes coverage for 'damages to property, or for the loss of its use, if the property was not physically injured' and the damages or loss of use arose out of the insured's defective product." *Id.* (citation omitted).

A product or type of property that can be repaired or "placed back into service" simply by repair or replacement of the defective workmanship would constitute "impaired property." *See Nat'l Union Fire Ins. of Pittsburgh, PA v. Puget Plastics Corp.*, 450 F. Supp. 2d 682, 702 (S.D. Tex. 2006) (stating that water heaters that could be made serviceable again by repairing or replacing defective water chambers would be "impaired property").  On the other hand, if the property has been damaged and cannot be fixed simply by repair or replacement of the defective property, then it is not "impaired property." *See id.* ("[A] water heater that has been damaged . . . to the point where it will not properly function by repair or replacement of the water chambers does not fall within the definition of 'impaired property.'").  When addressing this exclusion, courts generally look for some evidence that the damage done to the property can be remedied by the "repair, replacement, or adjustment" of the defective work product.  *Federated Mut. Ins.*, 197 F.3d at 728 (holding that there was no evidence that the damage to the parking lot could be fixed by replacing or repairing the insured's excavation work) (citing *Action Auto Stores, Inc. v. United Capitol Ins.*, 845 F. Supp. 417, 426 (W.D. Mich. 1993) (holding that there was no evidence that

the damage done to the property surrounding a gasoline containment system could be fixed by replacing or repairing the containment system)).

Mountain's policy defines "impaired property" as:

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

(ECF No. 23-1:97.)  "Your work" is defined as:

(1) Work or operations performed by you or on your behalf; and
(2) Materials, parts or equipment furnished in connection with such work or operations.
b. Includes:
(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
(2) The providing of or failure to provide warnings or instructions.

(*Id.* at 99.)

In the instant case, the burden is on Mountain to demonstrate that the exclusion covers the alleged faulty workmanship.  Mountain has asserted that the claims in the Underlying Lawsuit stem from defects, deficiencies, and inadequacies of TEC's work.  (ECF No. 23:5–7.)  However, Mountain has not asserted that the property in question is impaired property because it has not asserted that repairing or replacing TEC's work will restore the rest of the property to use. Mountain does assert that TEC's alleged defective workmanship did not cause any physical damage to the Facility, but, as discussed above, Jordan and Montana have sufficiently alleged property damage in the underlying pleadings.  As a result, the Facility cannot be considered either impaired property or property that has not been physically injured.  Since the exclusion that

19

Mountain refers to does not apply, and the pleading alleges that there was property damage that occurred within the policy period, Mountain's duty to defend was triggered, and Mountain improperly refused to defend TEC.

### 4.  Defense Costs

Mountain relies on *Mid-Continent Ins. v. Liberty Mut. Ins.*, 236 S.W.3d 765 (Tex. 2007) for the proposition that, because TEC has been "fully defended and indemnified," then TEC cannot obtain any additional payments from Mountain.  (ECF No. 23:14.)  However, the Fifth Circuit has restricted *Mid-Continent* to its facts, which is that the insurers "(1) were co-primary insurers, (2) did not dispute that both covered the loss, and (3) were subject to pro rata clauses."  *Amerisure Ins. v. Navigators Ins.*, 611 F.3d 299, 306 (5th Cir. 2010).

The Fifth Circuit addressed the question of contribution by insurers for defense costs in *Trinity Universal.*  "To prevail on a claim for contribution, a party must show that '(1) the several insurers share a common obligation or burden and that (2) the insurer seeking contribution has made a compulsory payment or other discharge of more than its fair share of the common obligation or burden.'"  592 F.3d at 695 (quoting *Mid-Continent*, 236 S.W.3d at 772).  If an insurer has the obligation to provide a complete defense to an insured, then this "duty to defend creates 'a debt which is equally and concurrently due by' all of its insurers."  *Id.* (same).

If an insurer admits "that it did not participate in or contribute to [the insured]'s defense," then "the second requirement for a contribution claim, 'that the insurer seeking contribution has made a compulsory payment or other discharge of more than its fair share of the common obligation or burden'" is met.  *Id.* (same).  The Fifth Circuit determined that an insurer who did not comply with its duty to defend must pay "a proportionate share of defense costs."  *Id.* at 696.

In *Trinity Universal*, the insurer was liable for one-fifth of the costs of defending the insured, since five insurers provided coverage to the insured during the relevant period. *Id.* at 695.

In this case, the Court has found that Mountain improperly failed to provide a defense to TEC. Mountain had the duty to provide a complete defense to TEC, which was an obligation or burden it shared with Plaintiffs. As Mountain did not contribute in TEC's defense, Plaintiffs were required to pay more than their fair share of the common obligation or burden. Thus, Mountain is liable for contribution to Plaintiffs for one-third of the costs of TEC's defense.

Plaintiffs claim that they have paid $119,838.79 to defend TEC. (ECF No. 24:3.) Hanover has provided invoices to show that it has paid a total of $52,629.97 in defense costs, as well as $4,696.12 in expert fees. (ECF No. 24-2:7–151.) United Fire has provided invoices to show that it has paid a total of $57,816.58 in defense costs, as well as $4,696.12 in expert fees. (ECF No. 24-3:6–146.) This equals a total of $119,838.79. One-third of this total is $39,946.26, which is the amount that Plaintiffs seek to recoup in defense costs from Mountain. Therefore, the Court holds that Mountain owes $39,946.26 to Plaintiffs for the cost of defending TEC.

## C. Mountain's Duty to Indemnify

Mountain argues that it owes TEC no duty to indemnify for the same reasons that its duty to defend was not triggered. (ECF No. 25:9.) Further, Mountain argues that, since TEC "was fully defended and indemnified from one or more of its insurers," TEC is precluded from recovering from Mountain as well. (ECF No. 23:13.) It asserts that, because TEC has no remaining right to recover costs from Mountain, then Plaintiffs, who have an assignment of rights from TEC, have no remaining right to recover, either. (ECF No. 25:11–12.)

Plaintiffs argue that property damage occurred during Mountain's policy period, and, as a result, Mountain also had a duty to indemnify TEC. (ECF No. 24:16.)   Plaintiffs assert that they

21

can recover settlement costs from Mountain via equitable subrogation. (ECF No. 26:10–12.) They argue that Mountain breached its contract with TEC by failing to defend it, and thus, due to the assignment of rights, Plaintiffs can stand in for TEC to "assert its rights under the [Mountain] policies." (ECF No. 28:10.) Additionally, Plaintiffs claim that because Mountain was given the opportunity to participate in the settlement conference and chose not to, Mountain "is barred from collaterally attacking" the settlement agreement. (ECF No. 24:17.)

The duty to indemnify is the duty to "pay all covered claims and judgments against an insured." *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins.*, 300 S.W.3d 740, 743 (Tex. 2009) (citation omitted). "No duty to indemnify arises unless the underlying litigation establishes liability for damages covered by the insuring agreement of the policy." *Bain Enters. LLC v. Mountain States Mut. Cas. Co.*, 267 F. Supp. 3d 796, 815 (W.D. Tex. 2016) (citation omitted). It is "generally evaluate[d] . . . after the parties have developed the actual facts that establish liability in the underlying lawsuit." *LCS Corrs. Servs., Inc. v. Lexington Ins.*, 800 F.3d 664, 668 (5th Cir. 2015). As a result, courts usually decide this issue "at the conclusion of litigation." *Id.* at 672.

Here, Plaintiffs argue that there is evidence that TEC's work created property damage to the Facility. Plaintiffs cite to Montana's statements about "[c]racks in the floor evidenc[ing] foundation issues," "[s]evere and growing cracks in concrete on floor of management carport," "[l]arge cracks in floor tiles," and "[c]racks throughout floor." (ECF No. 24:14) (citing ECF No. 24-4:33–35.) Plaintiffs also point to the expert report conducted by Rimkus Consulting, which "addresses the evaluation of the electrical system. (ECF No. 24-8:4.) The report noted "[e]xcessive floor concrete cracking" at various areas of the Facility, "[a]ccelerated and excess surface wear on tile in showroom," and "AC supply condensation and ceiling water damage at the executive conference room," among other issues. (*Id.* at 39, 62, 75.) Plaintiffs assert that TEC is

responsible for at least some of this work because TEC was "responsible for excavating and backfilling the underground lines." (ECF No. 24-4:209.) Plaintiffs point out that Jordan's contract with TEC also assigns TEC the responsibility to "assist the concrete subcontractor in laying out all Electrical imbeds and penetrations," "furnish and install fire-stopping at all Electrical penetrations through fire-rated floor and wall partitions," and "furnish and install all aerial, underground, and above ground electrical routing to connect service entrance equipment to point of connection at the building and to the EPEC transformer including but not limited to conduit risers, layout verification, excavation, backfill and compaction." (*Id.*) Plaintiffs claim that the fact that TEC was responsible for this work suggests that TEC might have been responsible for some of the property damage at the Facility.

Mountain, on the other hand, asserts that the only damage at the Facility that can be tied to TEC is TEC's faulty work itself: "electrical outlets [that] . . . do not work," "[l]ights on outside of main building remain[ing] on during daylight hours," "showroom ceiling lights [that] need to be replaced," "[v]isible electrical wires," "lights [that] . . .have fallen and broken," "lights . . . out in service garage," "[o]pen junction boxes," "ceiling fans [that] do not work," "[p]oor installation of electrical conduit," "[f]loor lights [that] do not work," "[b]roken lighting fixtures," "[n]umerous lights not working, "[i]ncomplete lighting fixtures," and a "[p]ower switch [that] . . . is poorly installed." (ECF No. 24-4:33–36.) All of these complaints are specific to the electrical system, which TEC installed, and none of them allege any property damage to other parts of the Facility. Mountain claims that any assertions of ongoing property damage stem from the work of other subcontractors, like the concrete subcontractor. (ECF No. 27:3.) Mountain also points to the inspection report attached to Montana's original petition, which "reflects that the alleged injuries had already occurred" at the time the original petition was filed in 2017. (ECF No. 25:8.) The

inspection, carried out by Jim Daw, was conducted in August of 2017 and noted issues in the electrical system such as "lights that are loose," "open junction box and exposed wires," "there is a parking lot light . . . that has a missing cover," "a loose open junction box," "missing lights," and "wires exposed."  (ECF No. 25-1:7, 25–29.)

The Court finds that there are genuine issues of material fact regarding whether Mountain was required to indemnify TEC in the underlying lawsuit.  Since there are genuine issues of fact as to what work TEC was responsible for, what property damage it may have caused, and when such damage, if any, occurred, the issue of whether Mountain had a duty to indemnify TEC cannot be determined via summary judgment.  Consequently, Plaintiffs' potential claims against Mountain for settlement costs cannot be decided, as they rely on whether Mountain had a duty to indemnify.

## IV.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that:

- Defendant Donegal Mutual Insurance Company d/b/a Mountain States Insurance Group's Motion for Summary Judgment (ECF No. 23) be **DENIED**; and

- Plaintiffs Hanover Lloyds Insurance Company's and United Fire & Casualty Company's Joint Motion for Partial Summary Judgment (ECF No. 24) be **GRANTED** in part and **DENIED** in part.

Specifically, the Court **RECOMMENDS**:

- Plaintiffs' request for a declaration that Mountain owed a defense obligation to TEC in the underlying lawsuit be **GRANTED**;

- Plaintiffs' request for a declaration that Mountain owed an indemnity obligation to TEC in the underlying lawsuit be **DENIED**;

- Plaintiffs' declaration that Mountain breached the terms of the Mountain policies by failing to defend and indemnify TEC in the underlying lawsuit be **DENIED**;

- Plaintiffs' request for judgment for damages equaling Mountain's unpaid share of defense costs be **GRANTED**; and

- Plaintiffs' request for judgment for damages equaling Mountain's unpaid share of indemnity costs be **DENIED**.

**SIGNED** this 5th day of October, 2023.

**ROBERT F. CASTAÑEDA**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE</u>**

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THE FOREGOING REPORT, WITHIN FOURTEEN DAYS OF SERVICE OF SAME, MAY BAR DE NOVO DETERMINATION BY THE DISTRICT JUDGE OF AN ISSUE COVERED HEREIN AND SHALL BAR APPELLATE REVIEW, EXCEPT UPON GROUNDS OF PLAIN ERROR, OF ANY UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS AS MAY BE ACCEPTED OR ADOPTED BY THE DISTRICT COURT.**